**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

JAMES K. BENEFIELD, et al.       )
                                      )
            Plaintiffs,       )
                                      )
versus                        )       CIVIL ACTION NO.:
                                      )
INTERNATIONAL PAPER COMPANY,  )       2:09-cv-232-WHA-TFM
                                      )
            Defendant.      )

<u>**INTERNATIONAL PAPER COMPANY'S MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**</u>

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

LEGAL STANDARD .............................................................................................5

ARGUMENT ..........................................................................................................6

I.     Plaintiffs' Class Definition Is Not Sufficiently Definite And Would Require A
       Series Of Mini Trials. ..................................................................................6

II.    The Named Plaintiffs Cannot Satisfy Rule 23(a). ............................................12

       A.     Plaintiff Benefield Is Not Typical Of Putative Class Members Because
              He Did Not Own Property Within The Class Area And Lacks
              Standing. .........................................................................................12

       B.     Plaintiff Johnson Is Not Typical Of The Putative Class And Cannot
              Adequately Represent The Putative Class. .........................................14

       C.     Plaintiffs Do Not Meet The Numerosity Requirement Because Joinder
              Is Not Impracticable.........................................................................17

III.   Certification Is Not Appropriate Under Rule 23(b)(3) Because Individual
       Issues Of Fact And Law Overwhelm Common Questions. ...............................18

       A.     Plaintiffs' Claims Would Require Property-Specific Proof Of Any
              Injury................................................................................................22

              1.     Plaintiffs' Experts Cannot Establish Class-Wide
                     "Contamination"—To The Contrary, Their Own Work
                     Reveals Significant Variability Among Class
                     Properties. ..............................................................................24

                     a)     Plaintiffs' Corrosion Sampling Reveals Several
                            Properties Without Any "Contamination" And
                            Significant Variability Across Properties. ........................25

                     b)     Plaintiffs' Dioxin Sampling Similarly Shows
                            Properties Lacking Injury And Significant
                            Variability. ......................................................................28

                     c)     Plaintiffs' Air Emissions Modeling Does Not
                            Identify Actual "Contamination" And Cannot
                            Support A Claim Of Uniform "Contamination."..............31

B.    Plaintiffs' Claims Present Critical Individual Issues Of Causation. .....................33

        1.    Dioxin .......................................................................................34

        2.    Corrosion...................................................................................38

        3.    Acid Rain ..................................................................................40

        4.    Odor ..........................................................................................41

C.    Individualized Assessments Of Damages Would Dominate Class Proceedings. ............................................................................................43

D.    IP Has Compelling Statute of Limitations Arguments That Necessitate Individual Examination Of Each Plaintiff's Claims And Underlying Circumstances. .........................................................................................50

        1.    Determining When The Statute Of Limitations Began To Run Will Require Plaintiff-by-Plaintiff Scrutiny. ...................50

        2.    Plaintiffs' Allegations Of Continuous Torts Do Not Overcome The Problems For Class Certification Created By The Statute of Limitations. .......................................54

IV.    The Class Definition And The Nearly Simultaneous Filing of the *Brantley, et al. v. IP* Litigation Raise Significant Manageability Issues And Demonstrate That A Class Action Is Not Superior.....................................................................55

    A.    The Existence Of The *Brantley* Litigation And The Exclusion Contained In The Class Definition Pertaining To It Render The Putative Class Action Unmanageable And Not Superior To Other Methods Of Litigation...............................................................................55

    B.    Plaintiffs Provide No Explanation For How Three Causes Of Action Identified In The Complaint Will Be Dealt With During Class Proceedings. ............................................................................................58

V.    Plaintiffs Also Do Not Qualify for Class Certification Under Rule 23(b)(2), Because Injunctive Relief Does Not Predominate Over Damages In This Case. .............61

CONCLUSION...............................................................................................................62

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Action Marine, Inc., et al. v. Continental Carbon Co.*,
01-F-994-E (M.D. Ala. Nov. 17, 2003) .................................................................... passim

*Adair v. Johnston*,
221 F.R.D. 573 (M.D. Ala. 2004) ..................................................................................... 6

*Alabama v. Blue Bird Body Co.*,
573 F.2d 309 (5th Cir. 1978) ........................................................................................... 6

*Allison v. Citgo Petroleum Corp.*,
151 F.3d 402 (5th Cir. 1998) ......................................................................................... 61

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997) ................................................................................................ 10, 19

*Anglado v. Leaf River Forest Prods., Inc.*,
716 So.2d 543 (Miss. 1998) .......................................................................................... 33

*Arizonans for Official English v. Ariz.*,
520 U.S. 43 (1997) .................................................................................................. 12, 14

*Ash v. Tyson Foods, Inc.*,
546 U.S. 454 (2006) ....................................................................................................... 15

*Barnes v. Am. Tobacco Co.*,
161 F.3d 127 (3d Cir. 1998) .......................................................................................... 51

*Bates v. Tenco Servs. Inc.*,
132 F.R.D. 160 (D.S.C. 1990) ....................................................................................... 21

*Bentley v. Honeywell Int'l, Inc.*,
223 F.R.D. 471, 474-75 (S.D. Ohio 2004) .................................................................... 21

*Birmingham News Company v. Horn*,
901 So.2d 27 (Ala. 2004) ............................................................................................... 57

*Boughton v. Cotter Corp.*,
65 F.3d 823 (10th Cir. 1995) ......................................................................................... 20

*Bradford v. Union Pac. R.R. Co.*,
No. 05-CV-4075, 2007 WL 2893650 (W.D. Ark. Sept. 28, 2007).............................. 49

*Brockman v. Barton Brands, Ltd.*,
2007 U.S. Dist. LEXIS 86732 (W.D. Ky. Nov. 25, 2009) ........................................... 37

*Brockman v. Burton Brands*,
2007 US LEXIS 86732 (W.D. Ky. Nov. 20, 2007)....................................................... 20

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ......................................................................................... 51

*Brown v. Southeastern Pennsylvania Transp. Authority*,
1987 WL 9273 (E.D. Pa. 1987) ............................................................................... 24, 25

*Burkhead v. Louisville Gas & Elec. Co.*,
2008 US Dist. LEXIS 22651 (W.D. Ky. Apr. 18, 2008) .............................................. 20

*Carr v. Int'l Ref. & Mfg. Co.*,
13 So. 3d 947, 953 (Ala. 2009) ...................................................................................... 50

*Castono v. American Tobacco Co.*,
84 F.3d 734 (5th Cir. 1996) ..................................................................................... 60, 61

## Table of Authorities
## (Continued)

Page(s)

*Church v. General Elec. Co.*,
  138 F.Supp.2d 169 (D. Mass. 2001) ........................................................ 20
*Comer v. Nationwide*,
  2006 U.S. Dist. LEXIS 33123 (S.D. Miss. Feb. 23, 2006) ........................ 49
*Cook v. Rockwell Int'l Corp.*,
  151 F.R.D. 378 (D. Colo. 1993) ............................................................... 21
*Cooper v. Southern Co.*,
  390 F.3d 695 (11th Cir. 2004) .................................................. 14, 16, 18
*Corley v. Entergy Corp.*,
  220 F.R.D. 478 (E.D. Tex. 2004) ............................................................. 51
*Daigle v. Shell Oil Co.*,
  133 F.R.D. 600 (D. Colo. 1990) ............................................................... 11
*Day v. NLO, Inc.*,
  144 F.R.D. 330 (S.D. Ohio 1992) ............................................................ 21
*Dobyne v. State*,
  4 So.3d 506 (Ala. Ct. Civ. App. 2008) .................................................... 13
*Duffin v. Exelon Corp.*,
  2007 WL 845336 (N.D. Ill. March 19, 2007) .......................................... 11
*Dunn v. Midwest Buslines, Inc.*,
  94 F.R.D. 170 (E.D. Ark. 1982) ................................................................. 8
*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) ................................................................................. 55
*Evans v. Walter Indus., Inc.*,
  579 F. Supp. 2d 1349 (N.D. Ala. 2008) ................................................... 51
*Fisher v. Ciba Specialty Chem. Corp.*,
  238 F.R.D. 273 (S.D. Ala. 2006) ...................................................... passim
*Fisher v. Ciba Specialty Chems. Corp.*,
  No. 03-0566, 2007 WL 2995525 (S.D. Ala. Oct. 11, 2007) ..................... 52
*Flournoy v. Honeywell, Int'l, Inc.*,
  239 F.R.D. 696 (S.D. Ga. 2006) .............................................................. 21
*Focus on the Family v. Pinellas Suncoast Transit Authority*,
  344 F.3d 1263 (11th Cir. 2003) ............................................................... 14
*Forman v. Data Transfer, Inc.*,
  164 F.R.D. 400 (E.D. Pa. 1995) ................................................................. 8
*Funliner of Ala., L.L.C. v. Pickard*,
  873 So. 2d 198 (Ala. 2003) ...................................................................... 59
*Garcia v. Gloor*,
  618 F.2d 264 (5th Cir.1980) .................................................................... 17
*Gates v. Rohm & Haas Co.*,
  265 F.R.D. 208 (E.D. Pa. 2010) .............................................................. 20
*Gates v. Rohm & Haas Co.*,
  248 F.R.D. 434, 436 (E.D. Pa. 2008) ...................................................... 21

**Table of Authorities**
**(Continued)**

Page(s)

*Gen. Tel. Co. of the Southwest v. Falcon*,
  457 U.S. 147 (1982) ............................................................................ 12
*Georgine v. Amchem Prods., Inc.*,
  83 F.3d 610 (3d Cir. 1996) ............................................................. 12, 18, 33
*Grimes v. Rave Motion Pictures Birmingham, L.L.C.*,
  264 F.R.D. 659 (N.D. Ala. 2010) ....................................................... 8
*Hagen v. Winnemucca*,
  108 F.R.D. 61 (D.Nev.1985) ............................................................. 8
*Harper v. Regency Dev. Co.*,
  399 So.2d 248 (Ala. 1981) ............................................................... 24
*Henry v. St. Croix Alumina, LLC*,
  2008 WL 2329223 ................................................................ 30, 33, 44
*Hilliard v. Huntsville Elec. Util.*,
  599 So.2d 1108 (Ala. 1992) .............................................................. 24
*Hines v. Widnall*,
  334 F.3d 1253 (11th Cir. 2003) ......................................................... 12
*In re Katrina Canal Breaches Consol. Litig.*,
  238 F.R.D. 128 (E.D. La. 2009) ........................................... 43, 44, 45, 48
*In re MTBE Prods. Liab. Litig.*,
  241 F.R.D. 185 (S.D.N.Y. 2007) ................................................... 20, 21
*In re N.D. Cal. Dalkon Shield IUD Prods. Liab. Littig.*,
  693 F.2d 847 (9th Cir. 1982) ............................................................ 51
*In re Shell Oil Refinery*,
  136 F.R.D. 588 (E.D. La. 1991) ........................................................ 21
*Janes v. Ciba-Geigy Corp.*,
  2007 WL 1362469 (N.J. Super. Ct. App. Div. May 10, 2007) ................. 21
*Johns v. Johns*,
  9 So. 419 (Ala. 1891) ..................................................................... 14
*Johnson v. Orleans Parish Sch. Ed.*,
  790 So. 2d 734 (La. App. 2001) ......................................................... 21
*Jones v. Allercare*,
  203 F.R.D. 290 (N.D. OH. 2001) ....................................................... 16
*Jones v. Roy*,
  202 F.R.D. 658, 662-63 (M.D. Ala. 2001) ........................................... 16
*Klay v. Humana, Inc.*,
  382 F.3d 1241 (11th Cir. 2004) ................................................... passim
*LaBauve v. Olin Corp.*,
  231 F.R.D. 632 (S.D. Ala. 2005) .................................................. passim
*Leclercq v. Lockformer Co.*,
  No. 00-C-C-7164, 2001 WL 199840 (N.D. Ill. Feb. 28, 2001) ................. 21
*Love v. Turlington*,
  733 F.2d 1562 (11th Cir.1984) .......................................................... 16

**Table of Authorities**
**(Continued)**

Page(s)

*Lowe v. Sun Ref. Co.*,
    597 N.E. 2d 1189 (Ohio Ct. App. 1992) ................................................................. 21
*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................. 12
*Lukenas v. Bryce's Mtn. Resort, Inc.*,
    538 F.2d 594 (4th Cir. 1976) ................................................................................... 51
*Marr v. WMX Techs., Inc.*,
    711 A.2d 700 (Conn. 1998) ..................................................................................... 21
*Martin v. Foster Wheeler Energy Corp.*,
    No. 3:06-CV-0878, 2007 WL 4437221, at *1 (M.D. Pa. Dec. 14, 2007) .............. 21
*Matter of Rhone-Poulenc Rorer, Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ............................................................................ 10, 60
*McGuire v. Int'l Paper Co.*,
    1994 WL 261360 (S.D. Miss. 1994) ................................................... 16, 20, 32, 55
*McKenzie v. Killian*,
    887 So. 2d 861 (Ala. 2004) ..................................................................................... 50
*Mejdreck v. Lockformer Co.*,
    No. 01-C-6107, 2002 WL 1838141 (N.D. Ill. Aug. 12, 2002) ............................... 21
*Murray v. Auslander*,
    244 F.3d 807 (11th Cir. 2001) .......................................................................... 61, 62
*O'Connor v. Boeing North America, Inc.*,
    197 F.R.D. 404 (C.D. Cal. 2000) ...................................................................... 51, 54
*Pickett v. IBP, Inc.*,
    182 F.R.D. 647 (M.D. Ala. 1998) ........................................................................... 49
*Piazza v. Ebsco Indus. Inc.*,
    273 F.3d 1341 (11th Cir. 2001) ............................................................................... 50
*Porter v. Porter*,
    472 So.2d 630 (Ala. 1985) ....................................................................................... 57
*Ragsdale v. Rubbermaid, Inc.*,
    193 F.3d 1235 (11th Cir. 1999) ............................................................................... 54
*Reilly v. Gould, Inc.*,
    965 F.Supp. 588 (M.D. Pa. 1997) .................................................................. 16, 36, 58
*Reynolds Metals Co. v. Hill*,
    825 So.2d 100 (Ala. 2002) ....................................................................................... 59
*Ridgeway v. CSX Transp., Inc.*,
    723 So.2d 600, 608 (Ala. 1998) .............................................................................. 24
*Robichaux v. State ex rel. Dep't. of Health & Hosps.*,
    952 So. 2d 27 (La. Ct. App. 2006) .......................................................................... 21
*Russell Corp. v. Sullivan*,
    790 So.2d 940 (Ala. 2001) ................................................................................... 8, 24
*Rutstein v. Avis Rent-A-Car Sys., Inc.*,
    211 F.3d 1228 (11th Cir. 2000) ................................................................................. 5

**Table of Authorities**
**(Continued)**

Page(s)

*Sher v. Raytheon Co.*,
   261 F.R.D. 651 (M.D. Fl. 2009) ............................................................ 20
*Stocks v. CFW Constr. Co.*,
   472 So. 2d 1044 ....................................................................................... 50
*Tipler v. McKenzie Tank Lines*,
   547 So.2d 438 (Ala. 1989) ..................................................................... 59
*Turner v. Murphy Oil USA, Inc.*,
   234 F.R.D. 597 (E.D. La. 2006) ........................................................ 20, 21
*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .......................................................... 15, 60
*Wehner v. Syntex Corp.*,
   117 F.R.D. 641 (N.D. Cal. 1987) ........................................................... 21
*Wright v. Circuit City Stores, Inc.*,
   201 F.R.D. 526 (N.D. Ala. 2001) ........................................................ 12, 15

**Statutes**
42 U.S.C. § 9658(a)(1) ................................................................................. 51
42 U.S.C. § 9658(b)(4)(A) ...................................................................... 51, 52
Ala. Code § 6-5-123 (1975) ........................................................................ 59
Ala. Code. § 6-5-100-104 ............................................................................ 59
Ala. Code. § 6-5-102 ................................................................................... 59

**Other Authorities**
15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 15 *Federal Practice &*
   *Procedure* § 3868 (2009) ....................................................................... 33
Jeanelle Mims Marsh and Charles W. Gamble, *Alabama Law of Damages* § 1–8 (4th ed. 1999) 57
Reference Manual on Scientific Evidence, Fed. Jud. Ctr., at 419 (2d ed. 2000) ............................. 9
U.S. Environmental Protection Agency, The Plain English Guide to the Clean Air Act: Reducing
   Acid Rain, http://www.epa.gov/air/peg/acidrain.html ............................ 41

**Rules**
Fed. R. Civ. P. 23(a) ..................................................................................... 5
Fed. R. Civ. P. 23(a)(1) .............................................................................. 17
Fed. R. Civ. P. 23(b)(2) 1966 Amend. Advisory Committee's Note .......................................... 61
Fed. R. Civ. P. 23(b)(3)(D) ........................................................................ 55

# TABLE OF EXHIBITS

<u>Exhibit No.</u>

Excerpts of Deposition of Carolyn Sue Scott, dated May 11, 2010 ............................................... 1

Excerpts of Deposition of Dr. Paul Rosenfeld, dated July 14-15, 2010 ........................................ 2

Excerpts of Deposition of Dr. Nicholas P. Cheremisinoff, dated July 7-8, 2010 .......................... 3

Excerpts of Deposition of Dr. John A. Kilpatrick, dated June 29, 2010 ........................................ 4

Affidavit of Dr. Douglas Daugherty, dated August 12, 2010 ........................................................ 5

Affidavit of Dr. Walter Shields, dated August 12, 2010 ............................................................... 6

Affidavit of Dr. Thomas Jackson, dated August 6, 2010 ............................................................... 7

*Action Marine, Inc. v. Continental Carbon Co.*, 01-F-994-E (M.D. Ala. Nov. 17, 2003) ............. 8

Excerpts of Deposition of James K. Benefield, dated May 12, 2010 ............................................. 9

Excerpts of Questionnaire Response of James K. Benefield, dated January 12, 2010 ................ 10

Certified Copy of Statutory Warranty Deed to Madge Benefield, dated January 22, 1988 ........ 11

Excerpts of Questionnaire Response of Madge Benefield, dated January 12, 2010 .................... 12

Last Will and Testament of Madge Benefield, dated April 28, 2000 ........................................... 13

Excerpts of Deposition of Donald Ray Johnson, dated May 7, 2010 .......................................... 14

Affidavit of John E. Hall, III, dated August 11, 2010, attaching Appraisals of Real Property,
   dated June 15 & 16, 2010 ...................................................................................................... 15

Letter from Patrick W. Dennis to J. Edward Bell, III, Ryan J. Heiskell, Gregory A. Cade, Hoyt
   Gregory Harp, Kevin B. McKie, Mark Rowe, and Christina E. Wall, dated July 9, 2010 ....... 16

Emails (six) from Kevin McKie to Patrick W. Dennis, copying Greg Cade, dated July 13, 2010
   with attachments ................................................................................................................... 17

Exhibit 7 to Deposition of Dr. Paul Rosenfeld, dated July 14, 2010 ........................................... 18

Excerpts of Questionnaire Response of Shadel Johnson, dated January 20, 2010 ...................... 19

Warranty Deed, Joint Tenants With Right of Survivorship, dated March 15, 1996 ................... 20

Excerpts of Questionnaire Response of Donald Ray Johnson, dated January 20, 2010 .............. 21

## <u>INTRODUCTION</u>

Plaintiffs ask this Court to certify a class of all owners of real property that has been allegedly "contaminated" by unspecified "Hazardous Substances, Particulate Matter, and/or Noxious Odors" released over an undefined period of time by the International Paper Company ("IP") paper mill located in Prattville, Alabama (the "Prattville Mill").  Notwithstanding substantial changes to their proposed class claims—Plaintiffs eliminated two putative classes entirely and dropped four of their six putative class representatives—Plaintiffs remain unable to satisfy the requirements for class certification under Rule 23(a) and Rule 23(b)(3) for their diminution in property value claims.[1]  There are four core shortcomings that doom Plaintiffs' request for certification:  (1) three experts whose work demonstrates the unsuitability of this case for class certification, (2) an utterly unworkable class definition, (3) class representatives who do not meet the requirements of Rule 23(a), and (4) the more than 300 plaintiff *Brantley* case based on nearly identical factual allegations, which confirms that a class action is neither a necessary nor a superior mechanism to address Plaintiffs' claims.

First, despite the passage of more than a year since filing this putative class action, Plaintiffs offer no evidence in support of their effort to demonstrate that class certification is appropriate other than the insufficient opinions of three experts.  Far from carrying Plaintiffs' burden, the opinions and testimony of these experts affirmatively show why Plaintiffs' motion should be denied:

---

[1]  Carolyn Sue Scott, one of the original property class representatives, conceded that her claims were unsuitable for class treatment.  (*See* Deposition of Carolyn Sue Scott ("Scott Dep.") 10:5-10:9, May 11, 2010, excerpts attached hereto as Ex. 1 ("Q: Okay, you understand that whatever property damage claims you have, they're not suitable for you to be the class representative?  A:  Yes."); *see also id*. at 6:1 – 8:16.)

- None of Plaintiffs' experts offered an opinion on whether properties in the Prattville community actually experienced any diminution in value.  Dr. Kilpatrick, Plaintiffs' expert on real estate appraisal, expressly disavowed any consideration of this critical issue.[2]  In fact, Dr. Kilpatrick candidly observed that local real estate professionals in the Prattville area who his firm surveyed ***"were consistent in their lack of awareness of contamination in the Prattville area.***"  (Affidavit of Dr. John Kilpatrick ("Kilpatrick Aff.") 17, Doc. 89-7 (emphasis added).)  Similarly, Plaintiffs' two physical science experts, Dr. Nicholas Cheremisinoff and Dr. Paul Rosenfeld, both disavowed any consideration of whether property values in the Prattville area have been diminished.[3]

- The small number of hand-picked samples identified by Drs. Cheremisinoff and Rosenfeld demonstrate that there is no uniformity or discernible pattern in the environmental "contamination" claimed by the Plaintiffs, let alone any basis to determine the source of any such contamination on a class-wide basis.  Dr. Cheremisinoff collected thirteen samples to test for "pitting corrosion," which he opined can be caused by sulfide and chloride emissions from an industrial source such as the Prattville Mill.  His laboratory analysis of these samples, however, determined that ***nearly 40%*** (five of the thirteen) had experienced pitting corrosion due to moisture rather than any industrial source.  This led him to concede during his deposition "[t]hat's why you have to do the screening evaluation to determine … the cause of that corrosion," (Cheremisinoff Dep. 121:17-19)—"***you can't just look at something and say I know the mechanism that's causing it.  That's why you do the [ ] analytical sampling.***"  (*Id.* at 122:16-18 (emphasis added).)

  Dr. Rosenfeld's sampling of attic dust for dioxin at eleven properties also demonstrated wide variability across the Prattville community.  The concentrations of dioxin ranged from a low of 16.8 parts per trillion (ppt) to a high of 1,237 ppt—an extremely broad span of nearly two orders of magnitude.  When asked if he could indicate whether "a home within two miles of the plant" would contain attic dust with dioxin concentration of "16 [ppt] or over a thousand [ppt]," Dr. Rosenfeld opined that "***you [would] have to test it in order to know***."  (Rosenfeld Dep. 95:6-10 (emphasis added).)  Dr. Rosenfeld also put forward an air dispersion model purporting to depict the airborne concentration of six substances allegedly released by the Prattville Mill.  Even accepting this model at face value, none of the concentrations depicted exceed regulatory health standards, including the EPA's National Ambient Air Quality Standards, which are expressly designed to protect the public health and welfare.  (*See* Affidavit of Douglas Daugherty, Ph.D. ("Daugherty Aff.") ¶ 17(a), dated Aug. 12, 2010, attached hereto as Ex. 5.)

---

[2]   (Deposition of Dr. John Kilpatrick ("Kilpatrick Dep.") 12:22-14:10, June 29, 2010, excerpts attached hereto as Ex. 4.)

[3]   (Deposition of Dr. Paul Rosenfeld ("Rosenfeld Dep.") 73:22-74:10, July 14-15, 2010, excerpts attached hereto as Ex. 2; Deposition of Dr. Nicholas Cheremisinoff ("Cheremisinoff Dep.") 436:18-437:2, July 7-8, 2010, excerpts attached hereto as Ex. 3.)

- Both Dr. Rosenfeld and Dr. Cheremisinoff readily admit that they gave no consideration to alternative sources of the substances they examined, which abound in the Prattville area. Defendant's expert Dr. Walter Shields identifies the numerous alternative sources of dioxin in the community, including fireplaces and trash burning that takes place on or near the named representatives' own properties. (*See* Affidavit of Dr. Walter Shields ("Shields Aff.") ¶¶ 30-36, dated Aug. 12, 2010, attached hereto as Ex. 6; *see also* Affidavit of John E. Hall, III, dated Aug. 10, 2010, attached hereto as Ex. 15 (attaching photographs of a fireplace in James Benefield's home and trash burning occurring near Donald Johnson's home).) Similarly, Defendant's expert Dr. Douglas Daugherty identifies numerous alternative sources of chlorine and sulfur throughout the Prattville area that could cause metal corrosion, including wastewater treatment plants and swimming pools. (*See* Daugherty Aff. ¶¶ 22-23; *see also* Ex. 15 (attaching a photograph of a swimming pool on James Benefield's property).)

- Plaintiffs' expert Dr. Kilpatrick fails to present any methodology that could be used to calculate damages on a classwide basis. This failure is particularly significant given the lack of evidence of any diminution in value and the substantial variability of properties located within the proposed class area. The attached affidavit of Defendant's expert Dr. Thomas Jackson, an experienced real estate professor and advisor who has studied the wide range of properties located within the proposed class area, demonstrates that there is not an appropriate classwide method to calculate any damages in this case. (Affidavit of Dr. Thomas Jackson ("Jackson Aff."), dated Aug. 6, 2010, attached hereto as Ex. 7.)

Presented with similar evidence, several federal courts within Alabama have recently denied certification of classes claiming property damages allegedly due to airborne contamination. *See Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006) (denying certification of class claiming property damage allegedly caused by airborne and other releases of chemicals from defendant's pesticide and herbicide manufacturing plant); *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 662 (S.D. Ala. 2005) (denying certification of class claiming property damage allegedly caused by airborne releases of mercury from a manufacturing plant); *Action Marine, Inc v. Cont'l Carbon Co.*, 01-F-994-E, slip op. at 34-35 (M.D. Ala. Nov. 17, 2003) (Fuller, J.) (denying class certification where plaintiffs claimed air emissions of carbon black from defendant's facility damaged their properties), attached hereto as Ex. 8.

Second, Plaintiffs' class definition does not provide a readily ascertainable class due to its requirements for inclusion **and** exclusion. Class membership extends only to those persons

whose real property was both "contaminated" by substances allegedly released from the Prattville Mill and who suffered "damages" in the form of diminution in their property's value. Excluded from the class are persons suffering from personal injuries as a "proximate result" of alleged emissions from the Prattville Mill. Well before class proceedings can get underway, these requirements would require mini-trials on injury, causation, and damages in order to determine membership in the class. Plaintiffs' exclusion of the *Brantley* plaintiffs and personal injury claimants will further complicate class membership because many putative class members jointly own their property with excluded *Brantley* plaintiffs and/or persons who may claim personal injuries. In fact, Donald Johnson and his wife (who is a named plaintiff in *Brantley* and claims personal injuries) both seek property damages for the same property that they jointly own.

Third, neither Mr. Benefield nor Mr. Johnson is an appropriate class representative. Mr. Benefield does not own the real property he claims was allegedly damaged and, thus, has no injury-in-fact and cannot serve as a representative of real property owners. Mr. Johnson, who now seeks to serve as a property class representative, is an inadequate representative because his claims for residential property damage do not represent the myriad other properties within the Prattville community (e.g., industrial and agricultural).[4]

Finally, Plaintiffs' motion and brief wholly ignore the existence of *Brantley, et al. v. IP*, 09-cv-230, and the dispositive effect that this more than 300 plaintiff mass action has on the propriety of class certification here. Plaintiffs state in their brief that, "as a practical matter, class

---

[4]  Mr. Johnson previously served as the named representative for the odor class. (*See, e.g.,* Compl., Doc. 1.) On June 1, well after the close of discovery and Mr. Johnson's deposition, Plaintiffs identified Mr. Johnson as a representative of the property class. This result was particularly unexpected because during Ms. Scott's deposition Plaintiffs' counsel stated on the record that "Mr. Benefield [will] be the sole class representative on property." (Scott Dep. 7:1-8:3.)

action treatment is the only viable option for litigating this controversy for most proposed Class Members because, in light of the complexity of the environmental issues and the significant costs associated with presenting them, the cost of bringing individual cases to trial would not be economically feasible."  (Pls.' Br. 46.)  That claim is flatly undercut by the fact that more than 300 individuals have joined the *Brantley* case and are currently pursuing individual claims of personal injury and property damages against IP based on nearly identical factual allegations. Simply put, not only are individual claims practicable, they have already been prosecuted for more than a year and there is a mechanism available for interested individuals to join that lawsuit.  (*See, e.g., Brantley*, Doc. 92 at 3-4 (providing for the "Joinder of New Plaintiffs").)

For the foregoing reasons, IP respectfully requests that the Court deny Plaintiffs' motion for class certification.

## **LEGAL STANDARD**

"The initial burden of proof to establish the propriety of class certification rests with the advocate of the class."  *Rutstein v. Avis Rent-A-Car Sys., Inc*., 211 F.3d 1228, 1233 (11th Cir. 2000).  Plaintiffs must demonstrate that the proposed class action satisfies the requirements of both Rule 23(a) and Rule 23(b).  *See Klay v. Humana, Inc.*, 382 F.3d 1241, 1250 (11th Cir. 2004).  Under Rule 23(a), a party seeking class certification must show (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *See* Fed. R. Civ. P. 23(a).

Rule 23(b)(3) provides for certification of a class only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fairly and efficient adjudicating of the controversy."  Fed. R. Civ. P. 23(b)(3).  As the Eleventh Circuit has explained, "[t]he predominance inquiry focuses on the legal or factual questions that

qualify each class member's case as a genuine controversy." *Rutstein*, 211 F.3d at 1233

(quotation omitted).  The "legal and factual questions," *id.* at 1235, of liability here include "the

question of fact of injury, or impact" and questions of causation.  *See Alabama v. Blue Bird Body

Co.,* 573 F.2d 309, 320 (5th Cir. 1978).  Resolution of Plaintiffs' motion for class certification

turns on whether these critical legal and factual questions are "subject to generalized proof, or

whether [they are] instead … issue[s] unique to each class member."  *Id.*; *see also Rutstein*, 211

F.3d at 1235, 1240 (declining to certify a class because "most, if not all, of the plaintiffs' claims

will stand or fall … on the resolution of … highly case-specific factual issues" and "liability for

damages is a necessarily individualized inquiry").

## ARGUMENT

## I.   Plaintiffs' Class Definition Is Not Sufficiently Definite And Would Require A Series Of Mini Trials.

Class certification should be denied because there is not an adequately defined class.  *See*

*Adair v. Johnston,* 221 F.R.D. 573, 577 (M.D. Ala. 2004).  Courts "begin[] with the proposed

definition of the class because absent a cognizable class, the Rule 23 requirements are

irrelevant."  *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 662 (S.D. Ala. 2005) (citation omitted).

The class definition must be sufficiently definite to permit identification of those putative

members who are entitled to notice of a Rule 23(b)(3) class action under Rule 23(c)(2)(B) and

who would be fairly bound by a final judgment.  In determining whether a class is adequately

defined, courts consider whether the definition allows them to "utilize ***objective indicia*** to

determine who is and is not part of the class."  *Fisher v. Ciba Specialty Chems. Corp.*, 238

F.R.D. 273, 301 (S.D. Ala. 2006) (emphasis added).

Plaintiffs define the class sought for certification as follows:

All persons who on the date of the filing of the Complaint or Second Amended Complaint:

> (a) **owned real property** located in whole, or in part, within two miles of the outer boundary of the Facility;
>
> (b) **which was contaminated** by the Hazardous Substances, Particulate Matter, and/or Noxious Odors released into the environment from the Facility; and
>
> (c) **who suffered damages** as a result in the form of a diminution in value of the real property.

Excluded from this class are:

> (a) **all persons owning contaminated real property** within the Class Area **who have suffered any personal injury as a proximate result** of the Hazardous Substances, Particulate Matter, and/or Noxious Odors;
>
> (b) all employees, officers, directors, legal representative, heirs, successors, and assigns of International Paper.
>
> (c) All Plaintiffs in *Brantley et al., v. International Paper*, 2:09-cv-230-WHA-TFM (U.S.D.C. Ala).

(Pls.' Mot. 2-3 (emphases added).)[5]

Although the class definition and Plaintiffs' Motion purport to identify a "class area" of real property within two miles of the facility, the class definition contains two features, each of which requires prolonged individualized fact-finding and merits determinations to ascertain class membership.  First, the definition requires a merits adjudication as a preliminary matter because class members are defined as persons who owned real property within two miles of the Prattville

---

[5]   Subsequent to filing this Motion, Plaintiffs filed a Third Amended Complaint ("TAC") that modifies the class definition in two respects.  First, the TAC defines the class to include persons who owned real property as of the date of filing of the TAC, June 16, rather than June 1, the date the Second Amended Complaint was filed.  Second, both the Second and Third Amended Complaints exclude from the class "all persons who acquired their interest in the real property by inheritance within 10 years of the date of filing of the [Second or Third] Amended Complaint."  (*See* Second Am. Compl. ¶ 20; TAC, ¶ 20.)

Mill "*which was contaminated* by the Hazardous Substances, Particulate Matter, and/or Noxious Odors" allegedly released by IP and "*who suffered damages as a result* in the form of a diminution in value of the real property."  (Pls.' Mot. 2 (emphases added).)

Courts faced with similar class definitions have denied certification on the grounds that "[d]etermining a membership in the class would essentially require a mini-hearing on the merits of each case."  *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (holding that the class definition is "untenable" because it required that a putative class member had received "unsolicited facsimile advertisements" from the defendant, mimicking the liability standard at issue).  Similarly, in a case alleging infringement of constitutional rights, the court rejected a class definition that hinged membership on "whether a person's constitutional rights had actually been violated," *Hagen v. Winnemucca*, 108 F.R.D. 61, 63 (D. Nev. 1985), and in a Title VII case the court rejected a class definition that would first require "a finding of discrimination in order to define the class," *Dunn v. Midwest Buslines, Inc.*, 94 F.R.D. 170, 171-72 (E.D. Ark. 1982).[6]

In addition, determining whether property is "contaminated" due to alleged emissions from the Prattville Mill and whether a putative member has "suffered damages as a result" requires individualized factual findings as to each putative class member.  *See Grimes v. Rave Motion Pictures Birmingham, L.L.C.*, 264 F.R.D. 659, 665 (N.D. Ala. 2010); *see also Russell Corp. v. Sullivan*, 790 So.2d 940, 948 (Ala. 2001) (considering evidence of contamination of plaintiffs' real properties, including competing expert testimony, and granting judgment in favor of defendants because "[n]either expert for the plaintiffs tested the soil on the plaintiffs'

---

[6]   Any effort by Plaintiffs to redefine class membership on solely geographic terms should be rejected as futile for the reasons provided in the remaining sections of this brief.  In particular, common issues do not predominate over individual issues even if the class were defined in geographic terms only.  *See infra*, Section III.

property"); Jackson Aff. ¶ (G)(4).  Dr. Jackson explains that the authoritative guidance put forward by the Uniform Standards of Professional Appraisal Practice ("USPAP") determines "environmental contamination" by reference to whether concentrations of hazardous substances "exceed regulatory limits" and this determination "necessitates the individual testing of each property to determine whether or not it is 'contaminated' from an appraisal standpoint and therefore included in the proposed class."  (Jackson Aff. ¶ (G)(4), at 7.)

Second, the class definition excludes owners of real property within the relevant area "who have suffered any personal injury as a proximate result of the Hazardous Substances, Particulate Matter, and/or Noxious Odors."  (Pls.' Mot. 3.)  In order to effect this exclusion, and thereby ascertain who is a member of the putative class and who is not, the Court will be required to conduct a merits determination for claims no longer sought for class certification— personal injury claims.[7]

The determination of whether any personal injuries are the "proximate result" of releases from the Prattville Mill will require extensive fact development and expert opinions.  For example, collection of putative members' medical histories, medical treatment records, depositions of treating physicians, and extensive information about alleged exposure locations will need to be identified and assessed.  Expert testimony, including complex opinions on causation, will be required.  *See* Reference Manual on Scientific Evidence, Fed. Jud. Ctr., at 419 (2d ed. 2000) (describing the three "preliminary assessments" that an opinion on causation

---

[7]  The original complaint filed in this case contained six named representatives seeking certification of three classes, including a personal injury class.  Four of these named representatives withdrew from this case and joined the *Brantley* case within days of Plaintiffs' filing their motion for class certification.  Mr. Johnson and Mr. Benefield withdrew their claims for personal injuries during their depositions in May 2010.

should contain: whether there is a "biologically plausible theory" connecting the disease to the alleged exposure, whether the exposure occurred "in a manner that can lead to absorption into the body," and "whether the dose to which the plaintiff was exposed is sufficient to cause the disease"). The parties spent months engaging in this very process with regard to the 6 original plaintiffs in this case who claimed personal injuries. Conducting that process on the putative class "of over 1,500 of [sic] property owners" would take years. (Pls.' Mot. 2.)

Plaintiffs' counsel cannot remedy this defect by asserting that putative class members can self-select whether they claim "personal injuries" due to alleged emissions from IP. First, self-selection is inconsistent with the definition's requirement of "proximate[] cause[]," which is a legal determination. Second, self-selection would render the class definition inherently subjective, which is prohibited. *See Fisher*, 238 F.R.D. at 301-02 (denying class certification, in part, because "[t]he class definition submitted by plaintiffs does not allow for objective determinations of class membership status for particular property owners" and rejecting plaintiffs' self-selection proposal).[8]

The personal injury claimant exclusion also adds another burden not addressed by the Plaintiffs. It is not clear how the exclusion will apply to a piece of property jointly owned by a

---

[8] To the extent Plaintiffs may seek to strike the exclusion altogether, class treatment would remain inappropriate. Personal injury claims cannot be included in a class action because of the numerous individualized injury and causation issues attendant in toxic tort personal injury claims. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623-24 (1997) (finding that common exposure to asbestos did not satisfy the commonality requirement and that individual-specific questions, such as amount and length of exposure, type of injury, and history of cigarette smoking undermined class cohesion). To the extent the putative class members claiming personal injuries would seek to bring those claims outside of the class proceedings but have their property claims adjudicated in a class action, significant claim-splitting concerns would arise under the Seventh Amendment. *See infra*, Section IV(B) (discussing *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995)).

person who claims personal injuries (and is thereby excluded from the proposed class) and

another who does not (and is thereby included in the proposed class).  Because the "end result"

of Plaintiffs' class definition "would be a series of mini-trials just to evaluate the threshold issue

of which property owners are class members," certification should be denied.  *Fisher,* 238 F.R.D.

at 302.[9]

---

[9]     Finally, class certification can be denied where plaintiffs fail to "identify any logical
reason … for drawing the boundaries where they did."  *Daigle v. Shell Oil Co.*, 133
F.R.D. 600, 603 (D. Colo. 1990); *see also Duffin v. Exelon Corp.*, No. CIV A 06 C 1382,
2007 WL 845336, at *3-4 (N.D. Ill. Mar. 19, 2007) (denying certification of a class
alleging property damages from release of a radioactive material where the class was
defined in "geographic terms unrelated to evidence of  actual … contamination … [and]
there [was] no probative evidence of class-wide contamination").

Plaintiffs' experts' reports and deposition testimony undercut the assertion in Plaintiffs'
brief that the proposed class area was "indicated as the contaminated area" by Plaintiffs'
experts.  (Pls.' Br. 34; *see also id*. at 35-36.)  Dr. Kilpatrick did not have any knowledge
concerning contamination in the Prattville area.  (Kilpatrick Dep. 202:2-203:10.)  Dr.
Cheremisinoff and Dr. Rosenfeld both testified that they did not define the two-mile
radius or identify any specific area of property contamination allegedly resulting from
emissions from the Prattville Mill.  (Cheremisinoff Dep. 168:17-19 ("Look, I didn't
determine the aerial extent of the class action . . . I mean somebody else did that.");
Rosenfeld Dep. 101:25-102:2 (describing the identification of the geographic boundary
of the class area and noting "[a] lot of that was legal").)  Dr. Rosenfeld further testified
that he "iteratively tried to find the concentration that would result in impacting the two-
mile radius around the facility, and then figured out what concentration was the lowest
that would cover the entire area."  (*See* Rosenfeld Dep. 172:11-15.)

## II.   The Named Plaintiffs Cannot Satisfy Rule 23(a).

Plaintiffs do not meet the adequacy, typicality, and numerosity requirements of Rule 23(a).  Failure to establish any one requirement of Rule 23 will "completely defeat a motion for class certification."  *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 536 (N.D. Ala. 2001).[10]

### A.   Plaintiff Benefield Is Not Typical Of Putative Class Members Because He Did Not Own Property Within The Class Area And Lacks Standing.

The typicality requirement demands that a "sufficient nexus exists between the claims of the named representative[s] and those of the class at large."  *Hines v. Widnall*, 334 F.3d 1253, 1256 (11th Cir. 2003) (quotation omitted).  A named representative "does not have the requisite typicality to raise the same claim on behalf of a class" if he or she does not possess "individual standing to raise a legal claim."  *Id.* (quotation omitted); *see also Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 156 (1982).  It is well settled that at the commencement of the litigation a plaintiff must have "suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"—to demonstrate standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation omitted); *see also Arizonans for Official English v. Ariz.*, 520 U.S. 43, 68 n.22 (1997).

Mr. Benefield's claims concern the real property located at 227 County Road 29, including the contiguous residence identified as 227A County Road 29, Prattville, Alabama.  (*See* Deposition of James K. Benefield ("Benefield Dep.") 61:22-63:2, May 12, 2010, excerpts

---

[10] Rule 23(a)'s "commonality" requirement is not discussed here because, regardless of whether there are some common issues, they do not "predominate" over individual issues as demonstrated below under the Rule 23(b)(3) analysis.  *See also Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 626 (3d Cir. 1996) ("23(b)(3)'s predominance requirement incorporates the commonality requirement," enabling the Court to consider them simultaneously), *aff'd sub nom Amchen Prods., Inc. v. Windsor*, 519 U.S. 591 (1997).

attached hereto as Ex. 9; *see also* Excerpts of Questionnaire Response of James K. Benefield, dated Jan. 12, 2010, attached hereto as Ex. 10[11].)  The deed to 227 County Road 29, a certified copy of which was obtained from Autauga County, identifies that Mr. Benefield's recently deceased wife, Madge Benefield, was the sole holder of title to the property beginning in 1988 (and that she acquired it from her parents).  (*See* Ex. 11; *see also* Benefield Dep. 66:18-68:15 (describing the 227 County Road 29 property); Ex. 15 (attaching to an appraisal of 227 County Road 29 the Autauga County Tax Assessor records that identify Madge Benefield as the sole owner).)  Mr. Benefield has not produced, nor is he aware of, any document suggesting that he possesses any ownership interest in 227 County Road 29.  (*See* Benefield Dep. 93:6-94:2.)

As a result, Mr. Benefield lacked standing to bring claims for the diminution in value to real property owned by Madge Benefield on March 20, 2009, the date the Complaint was filed. Madge Benefield asserted nearly identical claims of property damage to the 227 County Road 29 property in her own name in *Brantley, et al. v. IP*, 09-cv-230, before this suit was filed.  (*See Brantley*, Doc. 1 (identifying Madge Benefield as a plaintiff); *see also* Excerpts of Questionnaire Response of Madge Benefield, dated Jan. 12, 2010, attached hereto as Ex. 12 (claiming real property damages to 227 County Road 29).)  Madge Benefield's ownership and assertion of claims concerning 227 County Road 29 evince that she, and not Mr. Benefield, had the ownership interest necessary to bring claims for damage to that property when the cases were filed in March 2009.  *See Dobyne v. State*, 4 So.3d 506, 510 (Ala. Ct. Civ. App. 2008) (holding that plaintiff-inmate lacked standing to challenge state's seizure of real property he inhabited with his father, the title-owner, because plaintiff did "not have an ownership interest … [and the

---

[11]     As part of their discovery responses in this litigation, each of the named Plaintiffs completed the questionnaire form used in the *Brantley* and *Brooks* cases.

forfeiture of [real property] cannot have caused [him] an injury in fact to a legally protected right").[12]

Moreover, because Mr. Benefield did not own the property when the Complaint was filed, he did not "possess the same interest and suffer the same injury as the class members" as of that date and is therefore an inappropriate class representative. *Falcon*, 457 U.S. at 156; *see also Fisher*, 238 F.R.D. at 297 (holding that the three named plaintiffs who "do not own property within the borders of the Proposed Class Area … are not part of the class, cannot satisfy Rule 23(a) considerations of typicality and adequacy, and are ineligible to serve as class representatives"); *Johns v. Johns*, 9 So. 419, 420 (Ala. 1891) (holding that title to property represents *prima facie* evidence of ownership).

### B.     Plaintiff Johnson Is Not Typical Of The Putative Class And Cannot Adequately Represent The Putative Class.

The other proposed representative, Mr. Johnson, does not meet the Rule 23(a) requirements of typicality and adequacy. Typicality is lacking if the factual position of the representative differs meaningfully from that of other members of the class. *Cooper v. S. Co.*, 390 F.3d 695, 714 (11th Cir. 2004) (affirming district court's denial of certification and holding that the "named plaintiffs did not present claims typical of the ***full range*** of employees in their

---

[12]   Plaintiffs produced Madge Benefield's will, which does not provide Mr. Benefield with an ownership interest in the property at issue.  (*See* Ex. 13.)  Even if Mr. Benefield obtained any share in Madge Benefield's estate upon her death, such an interest would be irrelevant as standing must "exist at the commencement of the litigation."  *Arizonans for Official English*, 520 U.S. at 68 n.22; *see also Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003) ("Article III standing must be determined as of the time at which the plaintiff's complaint is filed.").  Moreover, Mr. Benefield would presumably be outside the class in any event due to exclusion (d) in the class definition contained in the Complaint for inheritance within ten years of filing.  (*See* Second Am. Compl. ¶ 20; Third Am. Compl. ¶ 20.)

putative class" (emphasis added)), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457-58 (2006); *Wright*, 201 F.R.D. at 544 ("typicality may be defeated if factual differences dominate").  The adequacy requirement further probes whether the representative will adequately prosecute the action on behalf of *all* class members.  *See Valley Drug Co. v. Geneva Pharm., Inc.*  350 F.3d 1181, 1189 (11th Cir. 2003).

While Mr. Johnson's claims could be "typical of some conceivable subgroup of the overall class," he does not have claims that are "typical of the entire class," for several reasons. *Id.*  First, Mr. Johnson owns a single-family residential property.  The proposed class area, however, contains over 30 different property types—including industrial, agricultural, and commercial properties, among others.  (*See* Jackson Aff. ¶ (G)(3); *see also id.* Ex. 2-1 & Ex. 3-2.)  There are nearly 800 parcels of property in the proposed class area that are not the "single family" property type.  (*See id.* at Ex. 3-1.)  In addition, Mr. Johnson's property was built in the 1990s and sits west of the Prattville Mill.  (Deposition of Donald Ray Johnson ("Johnson Dep.") 60:14-61:6, 108:4-110:5, May 7, 2010, excerpts attached hereto as Ex. 14).  Mr. Johnson's interests, therefore, would concern the "contamination" of residential property beginning at the time his home was built in the 1990s.  The Complaint, however, appears to allege that emissions from the Prattville Mill from 1967 to the present have damaged the putative class members' real property.  (*See* Third Am. Compl. ¶¶ 35-37 (claiming that substances "released into the environment from the Facility" with no limitation on the relevant time period have "contaminated" Plaintiffs' property); *see also* Doc. 41, Opp'n to Mot. to Dismiss at 10 ("this action does not concern a single, discrete action taken on a single, discrete date [] the Defendant discharged … substances … over many, many years") (emphasis omitted).)

Mr. Johnson, therefore, is not typical of the divergent class members who owned different types of real properties that were allegedly subject to different periods of "contamination."  *See Cooper*, 390 F.3d at 714 (affirming district court's rejection of plaintiffs' argument that a named representative's claims were typical because they were "were based on the same legal theories" as those presented by the class where certain class claims turned in part on facts not shared by the class representatives); *Love v. Turlington*, 733 F.2d 1562, 1564 (11th Cir.1984) (same); *see also Reilly v. Gould, Inc.*, 965 F. Supp. 588, 600 (M.D. Pa. 1997) (holding that the typicality requirement is not met for property damage class because of the "factual disparity among the plaintiffs' claims" due to widely ranging concentrations of lead in the soil of class representatives); *Action Marine*, Ex. 8 at 25-27 (holding that the named plaintiffs' claims are not representative of the proposed class members).[13]

Second, Mr. Johnson cannot adequately represent the class because he totally lacks familiarity with the class action allegations and the purported class members.  Mr. Johnson testified that he had not seen the Complaint until defense counsel marked it as an exhibit during his deposition.  (Johnson Dep. 39:3-13.)  Mr. Johnson further testified that he personally spent "very little" time working on the lawsuit; he has done nothing to advance or investigate the claims of the putative class members; and that he works 80 to 90 hours a week.  "[B]lind reliance, even on competent counsel, is insufficient" to meet the requirement that Mr. Johnson adequately represent the interests of the class.  *See McGuire v. Int'l Paper Co.*, Civ.A.No. 1:92-CV-593BRR, 1994 WL 261360, at *5 (S.D. Miss. Feb. 18, 1994) (holding that the adequacy

---

[13]   *See also Jones v. Roy*, 202 F.R.D. 658, 662-63 (M.D. Ala. 2001); *Jones v. Allercare*, 203 F.R.D. 290, 301 (N.D. OH. 2001).

requirement has not been met where the named representatives "seem to lack familiarity with their suit, and are not able to articulate the class they seek to represent").[14]

**C.**      **Plaintiffs Do Not Meet The Numerosity Requirement Because Joinder Is Not Impracticable.**

The numerosity requirement requires Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  As explained by the pre-split Fifth Circuit in *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980), the court recognized that the core of the numerosity requirement is "practicability of joinder, not number of interested persons per se." *Id.* at 267.

Plaintiffs fail the numerosity requirement for two reasons.  First, the existence of the *Brantley* litigation and the approximately 170 plaintiffs seeking claims of property damage against IP in that litigation shows that joinder is not "impracticable" in this case.  Second, Plaintiffs cannot demonstrate that the requirement is met here by reference to a purported listing of property owners within a two-mile radius of the Prattville Mill because the class is not defined by reference to this geographic area alone.  *See supra*, Section I; *see also Action Marine*, Ex. 8 at 22 (holding that the numerosity requirement was not met, in part, because "there would be

---

[14]    To the extent Mr. Benefield somehow overcomes his lack of property ownership, he would lack typicality and would not adequately represent the class for similar reasons. The 227 County Road 29 property claimed by Mr. Benefield is a residential property. Mr. Benefield did not begin residing at 227 County Road 29 until 1988.  (Benefield Dep. 62:20-63:2.)  Like Mr. Johnson, Mr. Benefield had not seen the complaint filed in this action until defense counsel showed it to him during his deposition, had not been given any discovery requests served by IP, and has not otherwise done any work as a class representative.  (*See id.* at 25:2-26:9; *id.* at 34:12-21, 143:18-144:11.)

significant problems identifying the members of the class" and observing that "[t]he numerosity requirement is more than a game of numbers").[15]

## III.   Certification Is Not Appropriate Under Rule 23(b)(3) Because Individual Issues Of Fact And Law Overwhelm Common Questions.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3). This predominance requirement is "far more demanding" than the Rule 23(a) commonality requirement.  *Cooper*, 390 F.3d at 722.  In *Klay*, the Eleventh Circuit explained that where "after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification."  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004).  The predominance requirement is not satisfied where, as here, plaintiffs' claims will "stand or fall depending on individual-specific factual issues."  *LaBauve*, 231 F.R.D. at 671.

Plaintiffs assert that common issues predominate because "the class consists only of owners of real property that is contaminated above the EPA Regional Screening Level by International Paper's toxic pollution.  Causation, therefore, will not necessitate an individualized inquiry for each and every Plaintiff."  (Pls.' Br. 46.)  This tautological argument is undermined by Plaintiffs' own experts and the weight of the case law.  *See, e.g., Georgine v. Amchem Prods.,*

---

[15]  Plaintiffs attach as Exhibit C to their brief a "[l]ist of property owners in the class area, excluding Plaintiffs in the individual related cases."  Exhibit C is an uncertified document containing a table with four columns purporting to identify names and apparently corresponding addresses.  There are many fields with a value of "0" and there is no indication of the source of the information presented.

*Inc.*, 83 F.3d 610, 628 (3d Cir. 1996), *aff'd sub nom., Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ("[I]ndividualized issues can become overwhelming in actions involving long-term mass torts (i.e. those which do not arise out of a single accident.)"); *Fisher*, 273 F.R.D. at 306-07 ("Any theory of liability predicated on intrusion of . . . contaminants on a plaintiff's property (*e.g.*, nuisance, trespass, negligence) finds common issues being overwhelmed by individual issues.").

Courts have consistently held that claims of diminution in property value due to airborne emissions are inappropriate for class resolution, particularly where the alleged contamination occurred over a period of years. As succinctly explained in *LaBauve*, "plaintiff-by-plaintiff scrutiny" is required on core merits issues, such as "[w]hether a plaintiff's property is contaminated, the source(s) of such contamination, the extent of such contamination, the cause and timing of harm, and the resulting damage (measured in diminution of property value)." 231 F.R.D. at 673 (holding that while there may be certain common factual issues relating to defendants' conduct, class certification of property owners claiming airborne mercury contamination should be denied because "numerous other fundamental issues will demand individual-specific resolution").

These "factual differences translate into significant legal differences, including causation, limitations, and damages." *Id.* at 679. Two other cases from the Alabama federal courts are similarly instructive. *See Action Marine,* Ex. 8 at 34 (denying class certification where plaintiffs claimed air emissions of carbon black damaged their properties and holding that "[a]djudication of common issues in this case on a class basis would not necessarily achieve any efficiency because the case would essential[ly] require numerous mini-trials on causation and damages"); *Fisher*, 38 F.R.D. at 305 (denying certification of class claiming diminution in real property

value due to alleged airborne and other emissions from defendant's pesticide and herbicide manufacturing facility because "[i]rrespective of how … common questions are resolved, the existence and degree of [defendant's] liability will turn on … individual-specific questions"). Courts in numerous other jurisdictions have reached similar conclusions.[16]

Plaintiffs' primary authorities, *Sher, MTBE*, and *Turner*, are distinguishable. *See Sher v. Raytheon Co.*, 261 F.R.D. 651 (M.D. Fl. 2009); *In re MTBE Prods. Liab. Litig.*, 241 F.R.D. 185 (S.D.N.Y. 2007); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006). First, none of these cases involved claims of airborne contamination; rather, they involved groundwater contamination resulting from either a single spill or releases over a defined period of time (less

---

[16]   *See, e.g., Boughton v. Cotter Corp.*, 65 F.3d 823, 828 (10th Cir. 1995) (upholding trial court's denial of certification on the grounds that individual issues predominated as to whether particular individuals' properties were allegedly exposed to defendant's emissions); *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208 (E.D. Pa. 2010) (denying class certification where there was no evidence that all class members claiming property damage were exposed to vinyl chloride at a minimum level above background, or that such a determination could be made with common proof); *Burkhead v. Louisville Gas & Elec. Co.*, No. 3:06CV-282-H, 2008 WL 1805487 (W.D. Ky. Apr. 18, 2008) (denying certification because plaintiffs did not provide adequate evidence regarding the causal link between the defendant's acts—emissions from its facility—and plaintiff's alleged harms—property damage caused by noxious odors, fallout, pollutants, and contaminants); *Brockman v. Burton Brands*, No. 3:06CV-332-H, 2007 WL 4162920  (W.D. Ky. Nov. 21, 2007) (plaintiffs failed to establish that intrusions and interference from odor/particles were comparable to one another within a two-mile radius); *Church v. Gen. Elec. Co.*, 138 F. Supp. 2d 169 (D. Mass. 2001) (finding that individual issues did not predominate and noting "[t]he individual characteristics of each plaintiff's property are crucial" to determine whether the invasion by alleged chemical emissions was harmful enough for liability to attach); *McGuire*, 1994 WL 261360, at *7 (denying class certification for a property damage class where "the claims concern an alleged course of conduct extending over a number of years, during which class members supposedly claim that they have been affected in different ways and at different times").

than ten years).[17]  Airborne contamination is significantly more variable than groundwater

contamination and, among other things, is dramatically affected by local meteorological

conditions on an ongoing basis.  Second, Plaintiffs' singular reliance on *Sher* is misplaced as the

_____

[17]   The string citation of cases by Plaintiffs in support of the claim that "[c]ourts have
repeatedly certified class actions involving claims that property was harmed by ***seepage
of contaminants such as oil or chemicals or waste***" are similarly distinguishable here
because nearly all involved claims of groundwater contamination, radioactive nuclear
materials, or oil spills, not claims of property damage caused by airborne contamination.
(Pls.' Br. 32 (emphasis added) (quotation omitted); *see id*. at n.34.); *see In re MTBE*, 241
F.R.D. at 189 (S.D.N.Y. 2007) (plaintiffs claimed underground tanks leaked gasoline into
soil and contaminated groundwater); *Turner*, 234 F.R.D. at 601-02 (claimed aboveground
tanks leaked oil onto their property and contaminated groundwater); *Bentley v. Honeywell
Int'l, Inc.*, 223 F.R.D. 471, 474-75 (S.D. Ohio 2004) (plaintiffs claimed defendants
contaminated groundwater); *Mejdreck v. Lockformer Co.*, No. 01-C-6107, 2002 WL
1838141, at *1 (N.D. Ill. Aug. 12, 2002) (plaintiffs claimed TCE "contaminated the soil,
groundwater and domestic water supply"); *Leclercq v. Lockformer Co.*, No. 00-C-7164,
2001 WL 199840, at *1 (N.D. Ill. Feb. 28, 2001) (plaintiffs claimed defendants allowed
harmful chemicals to contaminate groundwater); *In re Shell Oil Refinery*, 136 F.R.D.
588, 589 (E.D. La. 1991) (plaintiffs claimed "environmental damage," death, physical
and mental injury, and property damage after refinery explosion); *Bates v. Tenco Servs.,
Inc.*, 132 F.R.D. 160, 164 (D.S.C. 1990) ("The common questions in this suit will be the
cause of the ground water contamination, the defendants' liability, and the alleged effects
of jet fuel contamination on the neighborhood and the people who have lived there.");
*Wehner v. Syntex Corp.*, 117 F.R.D. 641, 643 (N.D. Cal. 1987) (plaintiffs claimed
defendants contaminated groundwater); *Janes v. Ciba-Geigy Corp.*, 2007 WL 1362469,
at *1 (N.J. Super. Ct. App. Div. May 10, 2007) (plaintiffs claimed defendants
contaminated groundwater); *Robichaux v. State ex rel. Dep't. of Health & Hosps.*, 952
So.2d 27, 31 (La. Ct. App. 2006) (same); *Johnson v. Orleans Parish Sch. Bd.*, 790 So.2d
734, 738 (La. App. 2001) (plaintiffs claimed defendant landfill owner contaminated soil);
*Lowe v. Sun Ref. & Mktg. Co.*, 597 N.E. 2d 1189, 1190 (Ohio Ct. App. 1992)
(defendant's underground pipeline ruptured and spilled hazardous material into water
supply); *Day v. NLO, Inc.*, 144 F.R.D. 330, 332 (S.D. Ohio 1992) (plaintiffs claimed
exposure to radioactive and hazardous materials); *Cook v. Rockwell Int'l Corp.*, 151
F.R.D. 378, 380 (D. Colo. 1993) (same); *Marr v. WMX Techs., Inc.*, 711 A.2d 700, 701
(Conn. 1998) (claim did not involve claims of exposure to environmental contaminants).

Additionally, in some cases cited by Plaintiffs, a class was certified for settlement
purposes only.  *See Gates v. Rohm & Haas Co.*, 248 F.R.D. 434, 436 (E.D. Pa. 2008);
*Martin v. Foster Wheeler Energy Corp.*, No. 3:06-CV-0878, 2007 WL 4437221, at *1
(M.D. Pa. Dec. 14, 2007); *Flournoy v. Honeywell Int'l, Inc.*, 239 F.R.D. 696, 697 (S.D.
Ga. 2006).

court found that "unique circumstances" supported class certification, including that **both** parties' experts acknowledged that there was a contaminated groundwater plume under the class area; the defendant admitted that contaminants migrated from its facility and that it was responsible for the cleanup of the facility and several surrounding properties; and the county appraiser had already performed an analysis of the class area and determined that the properties had suffered a diminution in value based on the presence of the groundwater contaminant plume.  *Sher*, 261 F.R.D. at 670-671.  No such "unique" factual circumstances exist here.  To the contrary, IP denies liability and even Plaintiffs' experts have been unable to demonstrate **any** diminution in real property values within the class area.

### A.   Plaintiffs' Claims Would Require Property-Specific Proof Of Any Injury.

Relying on the opinions of Dr. Cheremisinoff and Dr. Rosenfeld, Plaintiffs assert that they can demonstrate "uniform contamination" of their properties by emissions from the Prattville Mill.[18]  Plaintiffs attempt to prove such "contamination" through the limited sampling conducted by Dr. Cheremisinoff and Dr. Rosenfeld for corrosion and dioxin, respectively, and the air modeling performed by Dr. Rosenfeld for six compounds—total Volatile Organic Compounds ("VOCs"), Nitrogen Oxides ("NOx"), Sulfur Dioxide ("SO$_2$"), Hydrochloric Acid ("HCl"), Particulate Matter ("PM-10"), and fine Particulate Matter ("PM-2.5").  Based on their experts' work, Plaintiffs assert that "the common question of whether defendant contaminated

---

[18]   Plaintiffs' third expert, Dr. Kilpatrick, admitted that he did not examine or opine on any "contamination" in the proposed class area. (*See* Kilpatrick Dep. 202:2-203:10.)

the proposed class area is not only shared by all proposed Class Members, but predominates over any differences between the individual properties."  (Pls.' Br. 45.)[19]

An examination of the opinions offered by Dr. Cheremisinoff and Dr. Rosenfeld, however, reveals that whether properties within the proposed class area have been "contaminated" at all—before even getting to the question of the source of any "contamination"—cannot be answered with reference to class-wide proofs.  As the court in *Fisher* observed, "both the existence of contamination and the risk of future contamination will have to be proven on a property-by-property basis."  238 F.R.D. at 307.  Indeed, both experts admit that individualized inquiry will be necessary to determine the presence and extent of "contamination" actually present on a given putative class member's property.  Thus, contrary to Plaintiffs' assertions, "most of plaintiff's claims will stand or fall depending on individual-specific factual issues" and class certification is therefore inappropriate.  *La Bauve*, 231 F.R.D. at 671.

---

[19]    Plaintiffs' focus on a limited number of substances in support of class certification is in sharp contrast to the vague and undefined claims contained in Plaintiffs' Complaint and in the class definition.  There, Plaintiffs allege that "Hazardous Substances"—defined to include hundreds of substances identified in ten different regulatory listings—allegedly harmed the Plaintiffs.  (*See, e.g.,* Third Am. Compl. ¶ 2; Pls.' Mot. at 2.)  Inclusion of additional compounds in any class action would create additional variability and individualized issues.

1.     **Plaintiffs' Experts Cannot Establish Class-Wide "Contamination"—To The Contrary, Their Own Work Reveals Significant Variability Among Class Properties.**

To succeed on their tort claims for diminution in real property value, Plaintiffs are required to demonstrate an injury to their property.[20]  The testimony and evidence put forward by Plaintiffs' experts demonstrate that the threshold question of whether the class members have suffered a legal injury cannot be proven by reference to common proof.  As an initial matter, all three of Plaintiffs' experts expressly disavowed any opinion on whether a diminution in property value has occurred anywhere in the class area.  (*See* Kilpatrick Dep. 12:22-14:10; Rosenfeld Dep. 73:22-74:10; Cheremisinoff Dep. 436:18-437:2.)  Further, Plaintiffs' own physical sampling within the proposed class area, which was specifically designed to identify purported injury due to corrosion or dioxin "contamination" revealed several properties within the proposed class area wholly lacking any such injury.

In addition, Plaintiffs' experts' corrosion sampling, dioxin sampling, and air modeling all demonstrate significant variability within the class area that renders the evidence unsuitable for use across the proposed class.  The substantial variability demonstrates that individual, property-specific factors must be considered to determine to what extent, if at all, a given plaintiff's property is "contaminated" and whether any such contamination was caused by the Prattville Mill.  *See Brown v. Se. Pennsylvania Transp. Auth.*, Civ. A. No. 86-2229, 1987 WL 9273, at *11

---

[20]     *See Russell Corp.*, 790 So.2d at 947 (proof of indirect trespass requires an "invasion affecting an interest in the exclusive possession" of property and "substantial damage[] to the res," among other things); *Hilliard v. Huntsville Elec. Util.*, 599 So.2d 1108, 1111 (Ala. 1992) (plaintiff must demonstrate injury to prove negligence); *Ridgeway v. CSX Transp., Inc.*, 723 So.2d 600, 608 (Ala. 1998) (same with regard to wantonness); *Harper v. Regency Dev. Co.*, 399 So.2d 248, 253 (Ala. 1981) (same with regard to abnormally dangerous activity).

(E.D. Pa. Apr. 9, 1987).  The "presence of [contaminants] on a property does not establish injury for all members of the class"—each plaintiff's property "will be damaged to a different degree, if at all, based on its proximity to the site, topography, and the off-site migration patterns of [the contaminant]."  *Id.* (holding that "individual litigants will have to establish injury and causation in order to succeed on the merits").

**a)**  **Plaintiffs' Corrosion Sampling Reveals Several
Properties Without Any "Contamination" And
Significant Variability Across Properties.**

Dr. Cheremisinoff offered opinions on a range of issues, most of which are not actually germane to the class determination.[21]  His only opinion relevant to the threshold question of whether real property within the class area is "contaminated" concerns corrosion.  Dr. Cheremisinoff asserts that "[t]he community is being constantly exposed to … corrosive pollutants which …result in property damage on an ongoing basis."  (Ex. D to Pls.' Br., at 58.)

Dr. Cheremisinoff hand-picked thirteen objects from seven properties within the class area that were visibly corroded to test for "pitting corrosion," a type of corrosion that he stated can be associated with *either* industrial emissions—specifically, emissions of sulfides and chlorides—*or* a variety of other potential causes, including naturally occurring atmospheric

---

[21]  Dr. Cheremisinoff offered two opinions pertaining to the merits of the case.  He asserted that IP has (1) routinely underreported its air emissions to the Toxics Release Inventory ("TRI") program, and (2) violated its Title V permit, releasing amounts of chemicals in excess of its allowable emissions limits under the permit.  Dr. Cheremisinoff admitted that these opinions do not demonstrate that property within the class area has been "contaminated."  (Cheremisinoff Dep. 436:18-437:2.)  Because of that admission, and the fact that whether Dr. Cheremisinoff is right or wrong does not bear on the determination of whether individual issues overwhelm any common issues, IP does not provide here an extended discussion of the significant flaws rendering these opinions unreliable and contrary to fact.  (*See* Daugherty Aff. ¶ 28-31 for a brief discussion of these flaws.)

25

moisture conditions.  (*See* Cheremisinoff Dep. 57:18-58:1; *id.* at 117:19-22.)[22]  Dr.

Cheremisinoff then tested these hand-picked samples for the presence of sulfides and chlorides,

which can be emitted by industrial sources.  The testing revealed that five of the thirteen samples

tested (obtained from three of the seven properties), or approximately 40% of the sampled

population, did ***not*** contain any sulfides or chlorides and, thus, cannot be connected to emissions

from any industrial source, including the Prattville Mill.  (*See* Ex. D to Pls.' Br., at 59; *id.* at Fig.

3 (identifying non-detects at two Prattville properties).)  Dr. Cheremisinoff concluded that the

visible corrosion on these five samples was caused by moisture conditions.  (Cheremisinoff Dep.

119:15-19.)

 Dr. Cheremisinoff, however, excluded two of these five moisture corrosion samples as

"outliers" and pronounced that sulfide and/or chloride present in eight of the remaining eleven

samples "statistically supports that corrosion of metal components in the community may be

attributed to environmental contaminants."  (Ex. D to Pls.' Br., at 60.)  But even accepting Dr.

Cheremisinoff's selective exclusion of two samples whose results he did not like, his results still

show that over 18% of his self-selected and edited sample set had no indication of

"environmental contamination" from any industrial source, let alone from the Prattville Mill.[23]

---

[22] The properties sampled for corrosion were not selected randomly by Dr. Cheremisinoff.
He only sampled property locations provided to him by Plaintiffs' counsel.
(Cheremisinoff Dep. 78:10-14.)  Dr. Cheremisinoff explained that he considered his
sample set unbiased because he was "assuming that [the plaintiffs' attorneys] are acting
in good faith."  (*Id*. at 71:6-18.)

[23] Dr. Cheremisinoff's exclusion of the two samples as "outliers" is so flawed it should be
rejected out of hand.  He admitted that he did not employ any valid statistical test to
designate the samples as outliers.  (Cheremisinoff Dep. 124:16-125:15.)  Instead, he
claimed that because the two samples were taken from a property across the street from
another property where a sample with sulfur was found and there was "nothing different

[Footnote continued on next page]

The unedited results of Dr. Cheremisinoff's own hand-picked sampling, thus, reveal a nearly 40% incidence of corrosion due to non-industrial sources generally (and even the edited version indicates an 18% incidence). These results underscore, rather than controvert, the fact that individualized testing of each and every property within the proposed class area is required in order to determine whether there is a potential impact from industrial or other sources, which may or may not include the Prattville Mill. Dr. Cheremisinoff himself ultimately conceded this implication of his work by observing "from a visual standpoint [] all [of the samples] showed the same type of corrosion"; therefore property-specific testing is the only way determine whether such corrosion was potentially caused by industrial emissions or was caused by simple moisture. (Cheremisinoff Dep. 65:14-20; *see also id.* at 121:13-19 (explaining that because pitting corrosion can be due either to moisture or an industrial source "***you have to do the screening evaluation to determine what is the cause of the corrosion.***" (emphasis added)); *id.* at 122:16-18 ("you can't just look at something and say I know the mechanism that's causing it. That's why you do the [ ] the analytical sampling"); *see generally id.* at 119:5-122:18.) Dr. Cheremisinoff also stated that the phenomenon of corrosion "is not uniform" and that "it's a ***localized attack*** on the metal surface . . . you're not going to find the same level of contamination even within the same article." (*Id*. at 127:2-130:13 (emphasis added).)

-----

[Footnote continued from previous page]
between the two properties" that could "explain the difference[]," the two non-detect samples were outliers and could be tossed out. (Cheremisinoff Dep. 124:16-125:15; *see also* Cheremisinoff Dep. 125:19-128:11; Ex. D to Pls.' Br., at 60.) This reasoning defies common sense—if any result should be thrown out, it should be the one out of four that contained sulfides, because it is inconsistent with the other three non-detect samples. In any event, whether these samples are "outliers" or not, the variable conditions at two locations in close proximity confirms why it is necessary to sample every property.

Dr. Cheremisinoff's work confirms *LaBauve*'s observation that "[w]hether a plaintiff's property is contaminated, the source(s) of such contamination, [and] the extent of such contamination … are all questions that will require plaintiff-by-plaintiff scrutiny."  231 F.R.D. at 673.

**b)**  **Plaintiffs' Dioxin Sampling Similarly Shows Properties Lacking Injury And Significant Variability.**

Plaintiffs assert that properties within the class area are "uniformly contaminated" based largely on Dr. Rosenfeld's opinion that the compound dioxin has been found in eleven samples of *attic dust* at levels that exceed the EPA RSL for dioxin *in soil*.[24]  Even assuming, *arguendo*, that an exceedance of the dioxin *soil RSL* in attic dust constitutes an injury, Dr. Rosenfeld's opinion fails to demonstrate that the properties within the class are "uniformly contaminated" or that such "contamination" can be proven by common evidence.

First, Plaintiffs' dioxin sampling reveals that *only one property* in the proposed class area meets or exceeds the only potentially relevant EPA threshold concerning dioxin in indoor dust. Dr. Rosenfeld analyzed dioxin from dust samples retrieved from the attics of eleven different properties allegedly within the proposed class area.  (Ex. E to Pls.' Br., at 13, Fig. 2.)  He then compared the concentrations of dioxin from these samples to RSLs developed by the EPA for use *in soil*, not indoor dust.  (*Id.* at 16; Rosenfeld Dep. 68:13-15.)  As explained in the affidavit of Dr. Shields, a dioxin expert with a Ph.D. in Soil Science, it is not appropriate to compare dioxin concentrations found in attic dust to RSLs prepared for dioxin in soil.  (Shields Aff. ¶¶ 18-20.)  Rather, the EPA has conducted risk assessments for dioxin in dust from interior surfaces

---

[24]   Although Dr. Rosenfeld's report identifies RSLs for other compounds generally, he does not argue that any RSL other than for dioxin has been exceeded.  (*See, e.g.,* Ex. E to Pls.' Br., at 15-17, Tables 4 & 5.)

and that would be the appropriate benchmark, or screening level, for purposes of analyzing dioxin found in attic spaces.  (*Id*. ¶ 21.)  A conservative calculation of the threshold concentration under this indoor dust screening level is 750 ppt.  (*Id.*)  Only one of the eleven properties sampled by Dr. Rosenfeld meets or exceeds this threshold and, as discussed below, there are confounding factors associated with that property.  (*Id*. ¶ 22; Ex. E to Pls.' Br., at Fig. 3.)  Moreover, as Dr. Shields observes, one would expect to find dioxin in attic dust in Prattville, and similar areas in America, at the levels found by Dr. Rosenfeld based on general background levels associated with the numerous emission sources throughout the country.  (Shields Aff. ¶¶ 24-25, 27.)

Second, Dr. Rosenfeld's results demonstrate significant variability:  the dioxin toxicity equivalents ("TEQs"), a measure of the total dioxin concentration, among his samples ranges from a low of 16.8 parts per trillion ("ppt") to a high of 1,237 ppt—an extremely broad span covering nearly two orders of magnitude. (Ex. E to Pls.' Br., at Fig. 3.)  As noted by Dr. Shields, "[b]ased on this sampling and the lack of any discernable spatial pattern, it is impossible to accurately predict what the dioxin and furan concentrations would be in any of the 99% of the proposed class properties that were not sampled."  (Shields Aff. ¶ 10.)  Dr. Rosenfeld himself conceded that given this considerable variability, dioxin levels could not be accurately predicted across the class area.   (Rosenfeld Dep. 95:6-10 (observing that in order to determine whether "a home within two miles of the plant" would contain attic dust with a dioxin concentration of "16 [ppt] or over a thousand [ppt]," "***you [would] have to test it in order to know***." (emphasis added)).)  Furthermore, while Plaintiffs repeatedly claim that the alleged contamination from the Prattville Mill is uniform because eleven attic dust samples revealed levels of dioxin above the

*soil* RSL, Dr. Rosenfeld also admitted, "it is possible" that there may be attic dust within two miles of the mill (i.e., in the class area) that is below the soil RSL.  (*Id*. at 98:21-99:2.)

This observed variability is attributable to a number of property-specific factors that Dr. Rosenfeld conceded could affect his results, but which he did not consider.  For example, meteorological conditions such as air temperature, wind direction and wind speed, and topographical features all affect the amount of any airborne substance deposited on property. *See Action Marine*, Ex. 8 at 18 ("given that weather conditions and wind patterns change over time and Plaintiffs contention that carbon black has been released on numerous occasions, it would be surprising to find a uniform pattern of carbon black deposits within [the proposed class area]"); *Henry v. St. Croix Alumina, LLC,* No. 1999-0036, 2008 WL 2329223, at *6 (D. V.I. June 3, 2008) (holding that individual issues predominated where "[t]he properties of individual class members are not all the same distance from the [alleged source], do not have the same topography, and it cannot be said that the [weather] affected them all in the same way").  Dr. Rosenfeld explicitly acknowledged that meteorological conditions such as differing wind conditions, rain, and fog would contribute to different levels of "contamination" within the class area.  (Rosenfeld Dep. 108:2-20 ("there [is] so much variability in the way that the ash – the fly ash or the particulate matter coming out of the stacks drops out of the sky.  There are so many different meteorological conditions . . . if it rains one day, it will cause the material to drop closer to the facility.  If there is fog, it can cause it to go further.  It depends on the wind direction.").)

Moreover, Dr. Rosenfeld testified that the location of the testing itself can influence results.  He stated that there could be up to a two order of magnitude difference in dioxin levels between samples taken within a single attic, depending on the exact location of the sampling and factors such as the vent location, circulation, and presence of insulation.  (Rosenfeld Dep. 96:20-

97:6, *see also* 123:20-23.)  Thus, far from establishing "uniform contamination," Dr. Rosenfeld's own dioxin sampling reveals considerable variability and further confirms the need for property-specific examination.

> **c)**       **Plaintiffs' Air Emissions Modeling Does Not Identify Actual "Contamination" And Cannot Support A Claim Of Uniform "Contamination."**

Dr. Rosenfeld's modeling of the Prattville Mill's air emissions of six different compounds—VOCs, NOx, $SO_2$, HCl, PM-10, and PM-2.5—also fails to support Plaintiffs' claims of class-wide "uniform contamination" of property.  First, the modeling concerns ambient air concentrations (i.e., air above the ground) and does not purport to demonstrate that any property is "contaminated" with any of the substances modeled.[25]  Further, Dr. Rosenfeld's modeling does not demonstrate concentration levels above any recognized health, property damage, or other published regulatory standard, such as the National Ambient Air Quality Standards ("NAAQS") established by the federal Clean Air Act. (Rosenfeld Dep. 169:16-20, 209:14-24.) [26]

Second, Dr. Rosenfeld's model intentionally does not depict accurate concentrations of the six substances modeled.  Dr. Rosenfeld candidly admitted that the goal of his model was not

---

[25]   Dr. Rosenfeld ran his model to predict "deposition" of particulate matter, purportedly coming from the Prattville Mill within the class area, but the model results did not generate what he believed was a sufficient amount of particulate matter deposited in the class area and he rejected the results and did not include them in his report.  (Rosenfeld Dep. 298:23-300:18.)

[26]   The NAAQS are standards set by the EPA Office of Air Quality Planning and Standards under the Clean Air Act.  They include primary standards, which are set at a level to protect public health, including the health of "sensitive" populations such as asthmatics, children, and the elderly, and secondary standards, which are set at a level to protect public welfare, including protection against decreased visibility, damage to animals, crops, vegetation, and buildings.  Clean Air Act, 42 U.S.C. § 7409.

to depict a representation of actual emissions, but rather to depict the purported highest common concentration of emissions that could be best "fit" by the computer program to match Plaintiffs' counsel's 2-mile proposed class area.  (Rosenfeld Dep. 172:11-15 (explaining that he "iteratively tried to find the concentration that would result in impacting the two-mile radius around the facility, and then figured out what concentration was the lowest that would cover the entire area").)  Thus, Dr. Rosenfeld's modeling work was intended to create an artificial impression of uniformity of concentration of these substances throughout the class area when, in fact, there is none.  Dr. Rosenfeld admitted that concentration will vary depending upon the distance from the alleged source and over time.  (*See* Rosenfeld Dep. 175:19-24 (agreeing that a person at the fence line of the Mill would experience a different concentration level than what he modeled); *id.* 235:18-236:20 ("from year to year, the one-hour maximum concentration will change").)  As Dr. Daugherty explains, this methodology is unconventional, flawed, and not scientifically acceptable.  (*See* Daugherty Aff. ¶¶ 15-17.)[27]  *See also McGuire*, 1994 WL 261360, at *7 (denying certification of a property damage class concerning an IP paper mill because "the claims concern an alleged course of conduct extending over a number of years, during which class members supposedly claim that they have been affected in different ways and at different times").

------------------------------------------------------------

[27]   In 2008, Dr. Rosenfeld did run his model to show this type of more conventional result – i.e., his 2008 results show that concentrations of modeled compounds varied dramatically within the proposed class area, and generally declined rapidly from the perimeter of the mill toward the outer boundary of the two mile radius.  (*See* Daugherty Aff. ¶ 13(g).) However, those graphics were not produced with his report in support of the class certification motion and when confronted with them he testified that he just "would like them to go away."  (Rosenfeld Dep. 152:2-4; *see also id.* at 152:8-20.)

### B.   Plaintiffs' Claims Present Critical Individual Issues Of Causation.

Plaintiffs appear to have simply assumed, *ipse dixit*, that any dioxin and corrosion found on the sampled properties are attributable to IP:  "the class consists only of owners of real property that is contaminated above the EPA Regional Screening Level by International Paper's toxic pollution.  Causation, therefore, will not necessitate an individualized inquiry for each and every Plaintiff."  (Pls.' Br. 46.)  But, of course, the "mere presence of [a contaminant of concern] at a location says nothing about causation, for purposes of holding [IP] liable."  *Fisher*, 238 F.R.D. at 307; *see also Anglado v. Leaf River Forest Prods., Inc.*, 716 So.2d 543, 549 (Miss. 1998) (granting summary judgment to defendant paper mill on grounds that "Plaintiffs have produced no evidence linking the dioxin on their properties with that discharged by the mill").

Mass tort cases, particularly those involving airborne contamination, "often present highly individualized issues with regard to causation and damages."  15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, 15 *Federal Practice & Procedure* § 3868 (2009); *see also Fisher*, 238 F.R.D. at 307 (denying class certification and holding that whether the defendant's plant was the source of the contamination of plaintiffs' properties "will unquestionably be an individual-specific enterprise").  The infrequent circumstances in which class certification have been granted in toxic tort cases are only "where proximate cause can be determined on a class-wide basis, 'such as an airplane crash or a cruise ship food poisoning.'"  *Henry*, 2008 WL 2329223, at *3  (quoting *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 628 (3d Cir. 1996)).

In this case, Plaintiffs' experts have utterly failed to explain how causation can be established on a common basis.  Plaintiffs' allegations of "contamination" allegedly caused by the Prattville Mill concern common substances released by many different sources in and around the Prattville community.  As identified in the affidavits of Dr. Shields and Dr. Daugherty, there

are multiple potential causes and factors that must be considered in order to establish causation

with regard to corrosion and dioxin, none of which were considered by Dr. Cheremisinoff or Dr.

Rosenfeld.  (*See generally* Shields Aff. ¶¶ 29-36; Daugherty Aff. ¶¶ 20-27.)  In addition, as

identified by Dr. Jackson, a search of public records reveals sites listed on national hazardous

waste registries and other sources of environmental contamination in the Prattville community.

(*See* Jackson Aff. ¶ (G)(5); *see also id.* Ex. 5.)  Moreover, these sources will have varying effects

on properties, thereby demanding an individualized, property-specific inquiry.

### 1.    Dioxin

In his report, Dr. Rosenfeld posits that the Prattville Mill emits, among other things,

dioxins and furans (collectively, "dioxins"), and that dioxins are "associated with various

processes at integrated pulp and paper mills."  (Ex. E to Pls.' Br., at 2, 9.)  Dr. Rosenfeld also

asserts that the Prattville Mill has a long history of emissions of dioxin and that attic dust

samples collected in 2008 "indicate that the community of Prattville has been historically

exposed to Dioxins."  (*Id.* at 16.)  From these premises and his "finding" that the dioxin

concentration in some attic dust samples was "150 times greater than the U.S. EPA Regional

Screening Level for dioxins in soil," Dr. Rosenfeld makes the leap that "dioxins/furans have

been historically emitted from the Prattville Mill facility and deposited in the Prattville

community at concentrations that greatly exceed a level which U.S. EPA considers safe."  (*Id.*)

Dr. Rosenfeld's causation assumption is fatally flawed in two core respects.

First, Dr. Rosenfeld's bald assertion that because allegedly "high" concentrations of

dioxin have been observed, the Prattville Mill must be the cause wholly ignores the numerous

alternative sources of dioxin in the Prattville community and the small amounts of dioxin

emissions that IP reports each year to the EPA.  The dioxin concentrations in Dr. Rosenfeld's

samples actually ***increased*** as distance from the Prattville Mill increased.  (Ex. E to Pls.' Br., at

Fig. 3.)  This is inconsistent with the Prattville Mill being the source of the dioxin.  As explained by Dr. Shields, "[i]f the Prattville Mill [were] the source of the dioxins and furans in the sampled attics, as Dr. Rosenfeld contends, then there would be a generally decreasing—and predictable— gradient with distance from the Mill."  (Shields Aff. ¶ 11.)  In addition, an analysis of the ratios of dioxins to furans in Dr. Rosenfeld's samples shows wide variability, ranging from 5.5 to 29.2.  (*Id*. ¶ 41).  As Dr. Shields explains, this variability is further confirmation that (a) the Prattville Mill was not "the predominant source" of dioxin found in Dr. Rosenfeld's attic dust samples, and (b) the dioxin in the samples likely came from multiple sources.  (*Id*. ¶ 46.)

There are many potential sources of dioxin in and around the Prattville community (indeed, the same is true for most developed areas in the United States) that can explain the results obtained by Dr. Rosenfeld's sampling, including residential, municipal, industrial, and commercial waste incineration sources, power/energy generation sources, minimally controlled or uncontrolled combustion sources, and certain commonly used chemicals.  (Shields Aff. ¶ 30.) Further, dioxin sources commonly found on or around residential properties, including the Plaintiffs' here, include:

- Trash or leaf burning at residences in the surrounding community can result in dioxin deposition.  (Shields Aff. ¶¶ 30, 32.)  Dr. Rosenfeld testified that he was aware of barrel burning in the community, but did not know whether it occurred at any of the homes sampled.  (*Id.* ¶ 32; Rosenfeld Dep. 57:17-58:2.) Photographs taken on and around Plaintiff Johnson's property during a Rule 34 inspection conducted by an appraiser, John E. Hall, III, confirm that barrel burning occurs in proximity to, or even on, class properties.  (*See* Ex. 15.)

- The burning of wood in a wood-burning stove or home fireplace can result in dioxin deposition.  (Shields Aff. ¶ 33.)  Dr. Rosenfeld was aware that burning wood is a source of dioxin and claimed that his staff should have recorded observations of a fireplace or wood burning stove, but no such notations appear on any of his sampling forms.  (*Id.*; *see* Ex. E to Pls.' Br., at App. D.)  In fact, the Benefield residence at 227A County Road 29, which is included in Mr. Benefield's claim for property damage, has a large fireplace, which is apparent from photographs of both the interior and exterior of the home taken during the Rule 34 inspection.  (Shields Aff. ¶ 35; *see also* Ex. 15.)  Despite the obvious presence of the fireplace, there was no documentation by Dr. Rosenfeld of this clear site-specific alternative source of dioxin.  Dr. Rosenfeld testified that "it may have been overlooked."  (Rosenfeld Dep. 59:19.)

- Home cooking or combustion sources such as meat smokers and barbecues can also contribute to dioxin deposition.  (Shields Aff. ¶36.)  The Benefield property contained a meat smoker, the presence of which was not documented in Dr. Rosenfeld's field notes.  (*Id.*; *see also* Ex. 15.)  Additionally, pentachlorophenol, a chemical commonly used in the past to treat wood to prevent termite infestation, is also a source of dioxin.  Pentachlorophenol is commonly found in house dust as a result of the historic use of treated wood in building materials.  (Shields Aff. ¶ 31.)  Dr. Rosenfeld, however, testified that he did not investigate this potential alternative source.  (Rosenfeld Dep. 60:9-10 ("We did not test the homes for pentachlorophenol."))

Significantly, the only property with dioxin levels above the indoor dust level "screening level" used by the EPA was Mr. Benefield's property, which, as noted above, contained multiple alternative sources of dioxin—a fireplace and meat smoker (Shields Aff. ¶ 36.)  In *Reilly*, the court observed that even though it was "well established" that the defendant released lead into the environment, individual issues predominated where "there are other prevalent sources of lead emission[s]" in the proposed class area, such as lead-based gasoline and lead-based paint.  *Reilly v. Gould, Inc.*, 965 F. Supp. 588, 603 (M.D. Pa. 1997).  *See also LaBauve*, 231 F.R.D. at 680 (holding that alternative causes necessitated "an individualized inquiry for each and every plaintiff" where the contaminant of concern was "mercury" and it "may be emitted by many sources, natural and manmade … [i]t could come from the local incinerator, from the nearby electric power plants, from various household products, or from the earth's crust"); *Fisher*, 238

F.R.D. at 307 (observing that "some level" of the contaminants of concern is "expected in Alabama without [defendant's] wrongdoing" because the contaminants were used for agricultural purposes and pest control); *Brockman v. Barton Brands, Ltd*., No. 3:06CV-332-H, 2007 WL 4162920 (W.D. Ky. Nov. 21, 2007) (denying class certification concerning allegations of particulate matter and noxious odor contamination where these substances were emitted by various sources).

Dr. Rosenfeld's failure to consider alternative sources at Mr. Benefield's property and the other properties in the class area is, therefore, fatal to his assertion that his sampling reveals "uniform contamination" attributable to the Prattville Mill. As explained by Dr. Shields, "Because he did not evaluate or document alternate sources of dioxins and furans, Dr. Rosenfeld is unable to determine how much, if any, of the dioxins and furans measured in the attic dust of the 11 locations is a result of emissions from the Prattville Mill." (Shields Aff. ¶ 38.)

Second, Dr. Rosenfeld admitted that his report does not contain any scientific analysis to attempt to connect the dioxin found in attic dust samples to any dioxin emissions from the Prattville Mill. (Rosenfeld Dep. 45:18-23.) The term "dioxin" is actually an umbrella term for a family of related chemical compounds. (Shields Aff. ¶¶ 7-8.) Dioxin emitted from different sources can have different molecular combinations of "congeners." (*Id*. at ¶ 39.) On the first day of Dr. Rosenfeld's deposition, he admitted that he had not even attempted to compare the distribution of congeners reported by the Prattville Mill with the attic dust sample data. (*See* Rosenfeld Dep. 45:11-23; *see also* Shields Aff. ¶ 41.) On the second day of his deposition, Dr. Rosenfeld attempted to offer *an entirely new opinion* that the distribution of dioxin congeners historically reported by the Prattville Mill is "similar" to that contained in the attic dust samples, having apparently conducted some analyses the evening between the deposition days. (*See*

Rosenfeld Dep. 321:4-9; *see also* Shields Aff. ¶ 42.)  Dr. Rosenfeld, however, later conceded

that he did not believe he had sufficiently accurate data to support such a conclusion, thus,

undercutting his own testimony that the reported congener profile is "similar" to the congener

profile found in the attic dust.  (*See* Rosenfeld Dep. 334:19-335:12; *see also* Shields Aff. ¶ 45.)

Putting aside Dr. Rosenfeld's own equivocation on the alleged "similarity" between the

Prattville Mill's reported congener profile and that found in his attic dust sampling, Dr.

Rosenfeld's assertion that the "fingerprints match" because the congener OCDD "is the majority

of the dioxins" is flawed.  (*See* Rosenfeld Dep. 322:4-9; Shields Aff. ¶ 44.)  OCDD is the

dominant congener in almost *every* dioxin source fingerprint, as well as in background soil,

sediment, water and house-dust samples; therefore, its presence in both the Prattville Mill

emissions and the attic dust samples is meaningless.  (Shields Aff. ¶ 44 ("The fact that this

congener may be dominant in both the Prattville Mill emissions and the attic dust does not mean

that the fingerprints match.  That would be like saying that because sugar was the dominant

ingredient in two different brands of candy that they came from the same manufacturer.").)

### 2.   Corrosion

Dr. Cheremisinoff concluded that because eight of the thirteen corrosion samples

collected contain "elevated levels" of sulfides and/or chlorides, and because the Prattville Mill

emits sulfides and chlorides, the "corrosion has been fingerprinted to the chemicals released from

IPC's recovery furnaces and kilns [i.e., the Prattville Mill]."  (Ex. D to Pls.' Br., at 58.)  Sulfides

and chlorides, however, are common in the environment, and there are many sources of sulfides

and chlorides in and around the Prattville community.  (*See* Daugherty Aff. ¶¶ 22-23.)

Dr. Cheremisinoff's own work highlights that a property-specific inquiry is required in

order to establish the cause of any corrosion observed.  There are several precipitators of

corrosion, including general environmental conditions, other industrial sources, or property-specific contamination sources such as swimming pools.  For example:

- General environmental conditions that vary from property-to-property could contribute to corrosion.  Indeed, Dr. Cheremisinoff stated that five of the thirteen objects sampled for corrosion were corroded due to moisture.  (Cheremisinoff Dep. 119:15-19, 120:3-6.)  The moisture on a given property is impacted by both natural occurrences (e.g., amount of rainfall) and conduct that varies by household (e.g., use of sprinklers, etc.).

- The two substances allegedly resulting in the corrosion at issue—sulfides and chlorides—are common substances that are released by other industrial and natural sources.  Dr. Cheremisinoff identified waste water treatment plants ("WWTPs"), combustion processes, and burning of diesel fuel as potentially significant source of sulfides.  (Cheremisinoff Dep. 107:1-109:1.)  There are at least two WWTPs in the Prattville area, one of which is within the two-mile class radius.  (Daugherty Aff. ¶ 22(b).)  According to Dr. Cheremisinoff's own testimony on prevailing winds around the Mill, (*see* Cheremisinoff Dep. 77:5-9,) the sulfides from these WWTPs could have impacted the class area.

- There are also other common sources of chlorides.  Dr. Cheremisinoff acknowledged that a swimming pool, for example, could contribute to chlorides being found on objects used in or around the pool.  Swimming pools are present within the class areas—in fact, the property occupied by Mr. Benefield has a pool.  (*See* Ex. 15 (attaching photographs of the swimming pool).)  Dr. Cheremisinoff, however, had no knowledge of whether there were any swimming pools either on the tested properties, such as Mr. Benefield's, or in the class generally.  (*See* Cheremisinoff Dep. 102:17-103:9.)

- An object's tendency to corrode will also depend on factors such as its age and its history of use.  Dr. Cheremisinoff admitted that his team did not document each sample's age, its original metal composition, nor its history of use.  (Cheremisinoff Dep. 137:1-9.)  For example, an RV handle was tested, but Dr. Cheremisinoff did not know how often the RV travelled on the highway (resulting in exposure to diesel fuel), or whether it spent time near the seashore (where greater amounts of sulfide and chloride are present in the air).  (*Id.* at 196:1-17.)  Dr. Cheremisinoff acknowledged that such factors could contribute to corrosion; however, his analysis did not account for these potential confounders.  (*See id.* at 108:9-11.)  Dr. Cheremisinoff used no controls in his analysis and did nothing to account for the obvious influence that an object's history and prior use can have on its tendency to corrode.  Thus, he cannot support his simplistic conclusion that any amount of sulfide or chloride present in a corroded piece of metal means that the corrosion was caused by emissions from the Prattville mill.

3.      **Acid Rain**

Dr. Cheremisinoff opined that the Prattville Mill contributes extensively to acid rain that allegedly damages homes in the community, but he presented no evidence to support this opinion.  (*See generally* Ex. D to Pls.' Br., at 58-74.)  He did not conduct any air modeling of acid rain precursor compounds, nor did he conduct any testing that could have indicated corrosion due to acid rain. (Cheremisinoff Dep. 145:21-146:11 (noting that he did not test objects for their associated pH levels, which would be relevant for determining whether there was acid rain).)  Dr. Cheremisinoff testified that he based his opinion on isopleths showing ranges of air concentrations for different compounds, such as hydrochloric acid, provided to him by Dr. Rosenfeld's firm, Soil Water Air Protection Enterprise ("SWAPE").  (*Id.* at 162:8-13 ("I'm relying on air dispersion studies that were conducted by SWAPE.").)  After Dr. Cheremisinoff's deposition, Plaintiffs' counsel produced the air dispersion studies or "isopleths" that Dr. Cheremisinoff relied upon.  (*See* Exs. 16 & 17 (attaching letter of Patrick W. Dennis, dated July 9, 2010 and emails of Kevin McKie in response, dated July 13, 2010, attaching the isopleths).) In his deposition, Dr. Rosenfeld admitted that these isopleths are inaccurate; thus, they cannot support Dr. Cheremisinoff's opinion on acid rain.  (Rosenfeld Dep. 147:6-19 ("I do not believe [the 2008 modeling] is accurate, and I would prefer not to talk about it anymore.").)[28]

---

[28]   This recently disavowed 2008 air dispersion modeling by SWAPE has been previously characterized as part of the "substantial evidence" compiled by Plaintiffs' experts to provide a basis for the lawsuits filed against IP in March 2009.  (*See, e.g.,* Doc. 41, Opp'n to Mot. to Dismiss 30 (describing the air "dispersion modeling" that allegedly "establish[ed] the causal effect of Defendant's emissions"); *see also* Hr'g Tr. 22-23, 25-27, Nov. 9, 2009 (Plaintiffs' counsel responding to the Court's question about the SWAPE report).)

Moreover, Dr. Cheremisinoff wholly overlooks the well-accepted phenomenon that acid rain is a regional, not a local, issue.  (*See* Daugherty Aff. ¶ 24.)  Indeed, this phenomenon of regional deposition of strongly acidic precipitation is the premise of the Clean Air Act's Acid Rain Program, which established national cap-and-trade controls of emissions of sulfur dioxide from utilities.  *See* David R. Wooley & Elizabeth M. Morss, *Clean Air Act Handbook* 341-43 (19th ed. 2009)*; see generally*, U.S. Environmental Protection Agency, The Plain English Guide to the Clean Air Act: Reducing Acid Rain, http://www.epa.gov/air/peg/acidrain.html (accessed August 4, 2010) (noting that "since the wind can carry pollutants across the country, the effects of acid rain can be seen far from the original source of the acid forming pollutant.").

The regional nature of acid rain deposition has a confounding effect on the alternative sources of pitting corrosion within the proposed class area.  The potential regional sources for acid rain that were not considered by Dr. Cheremisinoff are extensive, (*see* Daugherty Aff. ¶ 24), ranging from utilities and other power-generating sources to vehicles.  In addition, acid rain is produced by the combustion of fossil fuels such as coal, natural gas, and oil.  *See* Clean Air Act Handbook at 341.  Thus, even if were one to assume that any property could have been damaged by acid rain, a series of extensive inquiries into alternative causes would be necessary to determine if the Prattville Mill's contribution is even relevant, let alone significant.

### 4.   Odor

Given Plaintiffs' decision to abandon their proposed odor class and realignment of Mr. Johnson as a property damage class representative, it is unclear why Dr. Cheremisinoff and Dr. Rosenfeld both referred to odor in their reports.  To the extent they did so to buttress their opinions of "contamination" within the proposed class area, their efforts fall well short and, like their work involving corrosion and dioxin, further demonstrates individual variability across the proposed class.

41

Dr. Cheremisinoff opined that paper mills employing the Kraft manufacturing process, like the Prattville Mill, produce malodorous compounds, and he produced a table that describes the odor detection thresholds reported in the literature.  (*See* Ex. D to Pls.' Br., at 10-14.)  Dr. Cheremisinoff, however, did not opine that the class area contained concentrations of odorous compounds that exceeded any of these thresholds.  In addition, there is no evidence that Dr. Cheremisinoff conducted any sampling or monitoring for the presence of odorous compounds anywhere in the class area.  Although Dr. Cheremisinoff compiled a list of informal complaints received by the Prattville Mill over several years and from various locations, including Montgomery, he did not examine the complaints for consistency in terms of type of complaint, timing, or location.  (See Cheremisinoff Dep. 401:19-402:7, 402:12-22.)  Further, Dr. Cheremisinoff specifically noted that "odor is very . . . variable" and that he was not offering an opinion that any type of consistent odor was documented in the complaints.  (*See id*. at 403:1-404:12.)

Dr. Rosenfeld similarly offered an opinion in his report that "[o]ngoing release of air pollution from the IP Prattville Mill facility has resulted in odor emissions that travel up to five miles from the Site and beyond and reduce the ability of community members to use and enjoy their property."  (Ex. E to Pls.' Br., at 48.)  Dr. Rosenfeld, however, did not present modeling to support his opinion, despite the fact that he has done so in past cases and the fact that he had (from Dr. Cheremisinoff) purported emissions levels of individual compounds that could have been modeled.  (Daugherty Aff. ¶ 18(a)).[29]  Thus, there is no evidence concerning the dispersion

---

[29]  In 2008, Dr. Rosenfeld modeled the airborne concentrations of three of the compounds that appear in Dr. Cheremisinoff's Table 1 (listing the odor threshold concentrations for hydrochloric acid, formaldehyde and acetaldehyde).  (*See* Rosenfeld Dep. Ex. 7, attached

[Footnote continued on next page]

and potential impact of the alleged odorous compounds in the class area outside of the qualitative analysis of complaints conducted by Dr. Rosenfeld and Dr. Cheremisinoff.  Moreover, as Dr. Rosenfeld himself admitted, odor detection is highly variable, with the ability to detect certain odors and the level at which they become offensive varying from person to person.  (Rosenfeld Dep. 256:24-257:19, 259:1-13; *see* Daugherty Aff. ¶ 18(c).)

### C.    Individualized Assessments Of Damages Would Dominate Class Proceedings.

The assessment of damages in the proposed class proceedings would add yet an additional layer of individualized issues.  When, as here, there are no "easy or essentially mechanical methods" to calculate damages and there are "significant individualized questions going to liability," the need for "individualized assessments of damages is enough to preclude 23(b)(3) certification."  *See Klay*, 382 F.3d at 1260.

Plaintiffs assert in their brief that "damages in this case can be proven on a class wide basis."  (Pls.' Br. 25.)  In support, Plaintiffs put forward their expert, Dr. Kilpatrick, who opined that a "mass appraisal" model could be used to calculate the diminution in value to residential properties within the proposed class area on a class-wide basis.  (Ex. F to Pls.' Br., at 18-19.) Courts have repeatedly held that similar "mass appraisal" methods would result in prolonged, individualized evidentiary proceedings that would defeat any efficiencies otherwise gained from class certification.  *See In re Katrina Canal Breaches Consol. Litig.*, 258 F.R.D. 128, 134 (E.D. La. 2009) (holding that Dr. Kilpatrick's "mass appraisal plan" fails to establish that common issues predominate because it "fails to propose any workable formula by which any of these [real

---

[Footnote continued from previous page]

      hereto as Ex. 18.)  Dr. Rosenfeld's 2008 modeling results indicate levels of each of these three compounds that are ***below*** the odor thresholds stated in Dr. Cheremisinoff's report. (Daugherty Aff. ¶ 18(d).)

and personal property] damages can be assessed"); *Henry*, 2008 WL 2329223, at *6-7 (rejecting Dr. Kilpatrick's claims that a mass appraisal technique can be used to show class-wide diminution in value from alleged airborne contamination).  In fact, no court has accepted a mass appraisal proffered by Dr. Kilpatrick to actually calculate diminution in value to real property— the measure of damages sought here—on a class-wide basis.[30]

Dr. Kilpatrick, however, does not even purport to include all properties within the proposed class area in his analysis.  Dr. Kilpatrick admitted that he has not addressed ***any*** non-residential properties within the class area and that he analyzed only the feasibility of residential properties for assessment on a class-wide basis.  (*See* Kilpatrick Dep. 75:8-21.)  The class definition, of course, includes ***all*** properties within the proposed class area, including commercial, public, large-scale agricultural, farming and other property types.  (*See* Pls.' Mot. 2-3; Jackson Aff. ¶ (G)(1) (describing different property types within proposed class area); *see also* Exs. 2-1 & 3-1 (depicting the 31 different property types within the proposed class area in tabular form and graphically); *see also id.* at Exs. 2-2 & 3-2 (35 different property types within the alternative class boundary).)  The hundreds of diverse, non-residential properties in the class area will raise additional, significant individual valuation concerns that Dr. Kilpatrick has not attempted to include in any class-wide damage methodology.  *See In re Katrina*, 258 F.R.D. at 135 (observing that "[m]easuring business damages presents additional problems, including evaluating the loss of further intangible assets, such as customer goodwill").  As Dr. Jackson

---

[30]    Dr. Kilpatrick testified that he could not recall ***any*** court accepting a mass appraisal he performed to estimate the effects of environmental contamination on property values. (Kilpatrick Dep. at 184:10-16).  Nor has Dr. Kilpatrick published in a peer-reviewed journal the results of any mass appraisal used to estimate the effects of environmental contamination on property values. (*Id.* at 184:3-9.)

explains, "uses this diverse cannot be meaningfully analyzed together for purposes of determining the impact of environmental contamination on market value.  There is no single model, analytic method, or appraisal technique that would permit these uses to be analyzed together on a common, class-wide basis."  (Jackson Aff. ¶ (G)(1), at 4.)

Similarly, Dr. Kilpatrick admitted that his report does not address any impacts to personal property.  (Kilpatrick Dep. 164:2-6.)  Both Mr. Johnson and Mr. Benefield claim personal property damages.  (*See* Johnson Dep. 100:4-13 (claiming damages to air-conditioning units, parakeets, small dog, and washer and dryer); Benefield Dep. 101:18-102:15 (air conditioner), 108:13-20 (lawn mowers and riding tractor), 111:21-115:8 (two vehicles and a motor home), 139:7-16 (gun damage); *see also* Ex. 10 (identifying Mr. Benefield's allegedly damaged personal property); Ex. 21 (identifying Mr. Johnson's allegedly damaged personal property).)  No formula could capture the wide variety of claims for damages allegedly caused to various types of personal property, ranging from air conditioning units and washers and dryers to vehicles and parakeets—they would necessarily need to be evaluated individually.  *See In re Katrina*, 258 F.R.D. at 135 (noting that "individual assessments [are required] with regards to personal property").

Putting aside these core omissions—which implicate dispositive individual issues across the putative class—Dr. Kilpatrick's vague assertions that diminution in value to residential real property can be determined on a class-wide basis through mass appraisal fall well short of establishing the suitability and accuracy of such methods for this case.  As detailed in Dr. Jackson's affidavit, there are numerous individual characteristics that can impact the value of a property and even more individual variables that must be considered before reaching a conclusion that a residential property was damaged by environmental contamination and, if so,

by how much.  (*See* Jackson Aff. ¶ (G)(2), at 5 ("property characteristics" such as size, age, and condition "can and do influence property values").)

Dr. Kilpatrick repeatedly stated that an analysis of property-specific factors would be "premature" at this stage in the litigation and that factors that directly impact how any valuation model would actually work—what factors would or would not be considered as impacting value, what data the model would use, and how the model would factor in these considerations and data—are "merits related" issues that he has not yet addressed.  (*See, e.g.,* Kilpatrick Dep. 54:14-58:1, 129:4-8.)  For example, Dr. Kilpatrick admits that although "properties vary," he has not "analyzed or quantified the type or magnitude of variation within the proposed class area."  (*Id*. 96:13-97:8; *see also id.* at 78:12-79:11 (Dr. Kilpatrick testified that he has "not drilled down on any specific properties," including the named representatives' properties).)  Dr. Kilpatrick similarly admits that he has not considered numerous factors that may impact the valuation of real property, both before and after any alleged impairment.  (*See Id*. 113:11-114:3 (locational characteristics have not been examined), 129:4-8 (distance of property from the source of contamination has not been considered); *id.* at 162:15-163:9 (proportion of homes with and without trailers not considered).)  More fundamentally, Dr. Kilpatrick emphasized that "property values have a whole lot to do with people's attitudes about buying and selling homes, [and] that property values come to us from a marketplace of market participants" but admitted that he has not spoken with any buyers or sellers of real estate within the Prattville area to determine what factors individuals in that area deem to be specific drivers of valuation.  (*See id.* at 160:16-161:1, 208:4-15.)

Although Dr. Kilpatrick recognized (as he must) that the identity of an alleged contaminant present on property can be relevant to the determination of any impairment to value,

he has not yet considered whether there is variability in the identity or amount of any contamination present, and he was unable to identify any part of his affidavit that explained how his proposed mass appraisal model could account for variability in the identity or amount of any contamination in the proposed class area.  (Kilpatrick Dep. 30:19-39:16 (testifying that he would treat a home with 1000 pounds of arsenic contamination and a home with 1 ounce of arsenic contamination "uniformly, and – in a consistent manner.").)[31]  As Dr. Jackson describes in his affidavit, it is improper and inconsistent with USPAP to simply assume that such factors can be addressed on a uniform basis across properties without regard to the specific circumstances of the environmental impact.  (*See* Jackson Aff. ¶ (G)(4).)

The result is that Dr. Kilpatrick has neither provided nor tested the mass appraisal concept he claims can be used to determine diminution in residential real property values in the proposed class area.  This alone is grounds for denying certification.  *See LaBauve*, 231 F.R.D. at 676-78 (denying certification because, among other things, plaintiffs' damages expert had not tested his purported methodology).[32]

---

[31]  Dr. Kilpatrick was similarly unable to explain how his mass appraisal model could account for variability in any corrosion damage to properties within the class area (*see* Kilpatrick Dep. 47:19 – 61:18) or for differences among properties that had alleged damage repaired prior to the date of his mass appraisal and those that had not.  (*See id.* at 172:18 – 179:6.)

[32]  Dr. Kilpatrick's convenient characterization of numerous inherently individualized issues as "merits phase" determinations that he has not, and supposedly need not, consider prior to the class certification determination is not a product of any appraisal standard (*see* Jackson Aff. ¶ (G)(6), and n. 15 ("there is no appraisal standard that would limit consideration of such issues until the 'merits' phase of a litigation matter") or of any lack of available data.  (*See* Kilpatrick Dep. 235:3-8.)  Instead, it reflects a calculated litigation gambit to avoid individual issues that was based upon a discussion with Plaintiffs' counsel.  (*Id.* at 237:7-238:14.)

Dr. Kilpatrick's affidavit nevertheless anticipates (as it must) that even if a mass appraisal model were used, there would be a number of "unique" properties that cannot be valued using the mass appraisal model and instead "will be subjected to individualized appraisal methods." (Ex. F to Pls.' Br., at 5.)  Dr. Kilpatrick, however, has not yet identified the number of unique properties within the proposed class area.  (Kilpatrick Dep. 147:11-20 (stating that the number of unique properties is "something that would be appropriately determined at the merits phase")).) He has also not identified critical features of the proposed class area, such as the number of "submarkets" that exist, which could compel separate analyses. (*Id.* at 97:11-98:11.)  These deficiencies render Dr. Kilpatrick's proposal fatally deficient.  *See LaBauve*, 231 F.R.D. at 676-78; *see also In re Katrina*, 238 F.R.D. at 133 (observing these same deficiencies with the mass appraisal model put forth by Dr. Kilpatrick in that case).

Finally, Dr. Kilpatrick admits that although benchmark dates are needed to determine the "before" (or "unimpaired") and the "after" (or "impaired") property values necessary to calculate the diminution in property value, he has not yet identified what those dates will be. (*See* Kilpatrick Dep. 87:10-21, 89:8-90:18, 190:15-21.)  Dr. Kilpatrick also has not addressed the significant complication created by the class definition's de facto establishment of three classes of damaged property owners—those who owned property as of the filing of the First Complaint on March 20, 2009, those who owned property as of the filing of the Second or Third Amended Complaint on June 16, 2010, and those owned their property on both dates.  (*See* Pls.' Mot. 2-3; Third Am. Compl. ¶ 20.)  Dr. Kilpatrick would leave the resolution of how to split any diminution in value among different consecutive owners to the Court.  (Kilpatrick Dep. 193:13-194:4.)  This would be no easy task.  As Dr. Jackson explains, "[p]roperty values and prices change over time…. Potential class members who acquired their real property interests in the

distant past could have a different set of impacts and conditions than owners who acquired their interests more recently."  (*See* Jackson Aff. ¶ (G)(4), at 7.)

Dr. Kilpatrick's proposal contains numerous "conceptual and practical obstacles almost certain to negate straightforward use of an across-the-board formula" here.  *LaBauve*, 231 F.R.D. at 676 (rejecting a similar "mass appraisal" model that "optimistically concludes in the most conclusory of terms that plaintiffs' property values" can be modeled on a class-wide basis); *see also Pickett v. IBP, Inc.*, 182 F.R.D. 647, 659 (M.D. Ala. 1998) ("where there is substantial evidence of serious problems in calculating damages, the [C]ourt should not certify the class merely on the assurance that a solution will be found").

Denial of class certification due, in part, to the complexity of calculating individual damages is supported by numerous recent decisions in which courts have rejected similar attempts to certify classes based on claims of property damages.  For example, in *Bradford*, the district court refused to certify a claim based on alleged diminution in value of various properties caused by a train derailment because "[f]actors such as a property's damage, location, age, condition, structural makeup and history are determinative on the issue of a property's devaluation" and such factors "vary from property to property."  *Bradford v. Union Pac. R.R. Co.*, No. 05-CV-4075, 2007 WL 2893650, at *11 (W.D. Ark. Sept. 28, 2007).  Thus, "the issue of diminished value w[ould] have to be analyzed for each individual property on a case by case basis."  *Id*.  *See also Comer v. Nationwide*, No. 1:05 CV 436, 2006 WL 1066645, at *2 (S.D. Miss. Feb. 23, 2006) (refusing to certify a class seeking property damages arising from Hurricane Katrina, because "[t]he nature and extent of the property damage the owners sustained from the common cause, Hurricane Katrina, will vary greatly in its particulars" and "with respect

to the issue of damages, each individual claim will require particular evidence to establish the cause of and the extent of the loss").

    **D.**    **IP Has Compelling Statute of Limitations Arguments That Necessitate Individual Examination Of Each Plaintiff's Claims And Underlying Circumstances.**

        **1.**    **Determining When The Statute Of Limitations Began To Run Will Require Plaintiff-by-Plaintiff Scrutiny.**

The causes of action for which Plaintiffs seek certification are governed by either a two or six year statute of limitations.[33]  Nonetheless, Plaintiffs seek to certify claims concerning damage allegedly incurred as a result of releases from the Prattville Mill over "many years." (Third Am. Compl. ¶ 19; *see also* Doc. 41, Opp'n to Mot. to Dismiss at 10 ("this action does not concern a single, discrete action taken on a single, discrete date[] the Defendant discharged tons of hazardous substances into the environment in the Prattville Community over many, many years" (emphasis omitted).)

Putative class members, thus, either did (or should have) become aware of the existence of their claims or their injury over the course of the more than 40-year period that the Prattville Mill's emissions have allegedly affected the proposed class area.  In similar circumstances, courts have concluded that the individualized nature of statute of limitations inquiries renders class certification inappropriate.  For example, in *Fisher*, the court held that a "plaintiff-specific timeliness defense could reasonably be expected to become a focal point of this litigation,

---

[33]    *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) (two years for negligence); *McKenzie v. Killian*, 887 So.2d 861, 866 (Ala. 2004) (six years for trespass; two years for trespass on the case); *Carr v. Int'l Ref. & Mfg. Co.*, 13 So.3d 947, 952-53 (Ala. 2009) (either two or six years for wantonness); *Stocks v. CFW Constr. Co.*, 472 So.2d 1044, 1046 (Ala. 1985)  (the statutory period for strict liability is the same as negligence generally, i.e., two years).

overshadowing common issues and negating the benefits of the class certification mechanism." 238 F.R.D. at 310; *see also LaBauve*, 231 F.R.D. at 675 ("individualized assessments of the statute of limitations issues" were reason enough to "cause individual considerations to predominate for purposes of a Rule 23(b)(3) inquiry"); *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404, 414 (C.D. Cal. 2000); *Corley v. Entergy Corp.*, 220 F.R.D. 478, 488 (E.D. Tex. 2004).[34]

The applicable statute of limitation began to run either at the moment of legal injury, *see, e.g., Evans v. Walter Indus., Inc.*, 579 F. Supp. 2d 1349, 1355 (N.D. Ala. 2008), or, to the extent that a "discovery" rule, such as that contained in the federal Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") applies, at the time of actual or constructive discovery of the claims. *See* 42 U.S.C. § 9658(a)(1), (b)(4)(A).[35]

Individual inquiries would be necessary under either standard. The date of an actual injury is, of course, a plaintiff-specific inquiry. In the event CERCLA applies, the federally

---

[34] Numerous circuits have similarly denied class certification—including putative classes under Rule 23(b)(2)—where individual statute of limitations issues would have required resolution of many individualized, fact-intensive inquiries. *See, e.g.*, *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 149 (3d Cir. 1998) (denying class certification under Rule 23(b)(2) because "whether each class member's claim is barred by the statute of limitations raise[d] individual issues"); *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 342 (4th Cir. 1998) (class certification is improper when "'affirmative defenses (such as . . . the statute of limitations) may depend on facts peculiar to each plaintiff's case'" (quoting *In re N.D. Cal. Dalkon Shield IUD Prods. Liab. Littig.*, 693 F.2d 847, 853 (9th Cir. 1982))); *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 597 (4th Cir. 1976) (noting that "considerable difference[s] in rights, so far as tolling the statute [of limitations] is concerned," can preclude class certification).

[35] IP does not concede that CERCLA governs the running of the statute of limitations in this case, and the Court need not decide the issue at this juncture. In any event, regardless of the law that applies, numerous individualized inquiries will be required to assess whether each Plaintiff's claims are timely.

established date for triggering the statute of limitations (the "Federally Required Commencement Date" or "FRCD") is defined as "the date the plaintiff knew (or reasonably should have known) that the … property damages … were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." *Id*. § (b)(4)(A).  As defined under CERCLA, inquiries into both the actual and constructive knowledge of the cause of each plaintiff's injuries are required to determine the FRCD.  Investigating a plaintiff's actual knowledge requires extensive individual inquiry, such as what the plaintiff knew when and by what means.  *See Fisher*, 238 F.R.D. at 310 n.80 (noting that "[r]esidents who read . . . news accounts and noticed symptoms of contamination on their own land" would "have had objectively reasonable ground for believing their properties were contaminated").  Constructive knowledge similarly requires individual inquiry.  First, courts "assess whether a reasonable person in [the plaintiff's] situation would have been expected to inquire about the cause of his . . . injury." *Fisher v. Ciba Specialty Chems. Corp.*, No. 03-0566, 2007 WL 2995525, at *16 (S.D. Ala. Oct. 11, 2007) (quotation omitted).  Second, courts consider "whether such inquiry 'would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim,' and charge [the] plaintiff with knowledge of facts that would have been discovered through that process." *Id.*

The Prattville Mill's alleged emissions, to the extent they affected any class member's property, will have affected such properties in different ways at different times.  In addition, different class members have resided on their current property and/or within the Prattville area for different lengths of time.  As a result, different class members are likely to have been injured or have gained actual or constructive knowledge of their injuries at different times.  Mr. Benefield's and Mr. Johnson's testimony illustrate this point.  Both testified that the Prattville Mill has released allegedly offensive and harmful odors for decades.  (Benefield Dep. 148:6-

153:2 (describing sulfuric acid odors and ash dating back at least 10 years and failing to identify

any possible source other than IP); Johnson Dep. 76:10-78:17 (attributing noxious odors to the

Prattville Mill dating back to the 1970s).)  In addition, Mr. Benefield testified that he has

associated long-standing, obvious corrosion on his personal property with sulfuric acid he

believes came from the Prattville Mill.  (Benefield Dep. at 148:6-21 (testifying that decades ago

he was told by chemical supplier that the substances were coming from the IP Prattville Mill).)

The deposition transcripts also indicate that there was at least one community organizing event

regarding the Prattville Mill's operations and that residents met with lawyers about the Mill's

operations in the years preceding this lawsuit.  (*Id*. at 125:2-130:23 (describing an organizational

meeting with lawyers present at an unidentified church and how he came to find out about the

meeting); Johnson Dep. 21:12-23:1, 25:13-25:23 (same).)  The testimony of each named Plaintiff

shows that IP will have a strong statute of limitation defense to their individual claims.

For the proposed class, the result is that "painstaking factfinding on a plaintiff-by-

plaintiff basis" will be necessary to decide the timeliness of each individual's claims.  The

foreseeability of those inquiries is sufficient to conclude that "individual considerations . . .

predominate" and to deny Plaintiffs' motion for class certification.  *LaBauve*, 231 F.R.D. at 675.

Further, even if the class representatives' claims are deemed timely, the facts and circumstances

surrounding each putative class member must be analyzed to determine if that is true for each

member.  These individualized determinations preclude a predominance finding, either by their

own force or in conjunction with IP's other Rule 23(b)(3) arguments.  *See Klay*, 382 F.3d at

1255.

>    2.    **Plaintiffs' Allegations Of Continuous Torts Do Not Overcome The Problems For Class Certification Created By The Statute of Limitations.**

Plaintiffs' allegation that IP's conduct here constitutes a "continuing tort" does not obviate the need for individualized statute of limitations determinations for two reasons.  First, although Plaintiffs reference a "continuing tort," they have not limited their claims to those that fall within two or six years of filing the Complaint.  Plaintiffs have repeatedly eschewed limiting their claims to any time period.  (*See, e.g.*, Third Am. Comp. ¶ 19; *see also* Doc. 41, Opp'n to Mot. to Dismiss at 10.)  As long as Plaintiffs wish to pursue claims and damages relating to events before the two- or six-year continuous tort period in the class action, individual statute of limitations inquiries will be necessary to determine which putative class members' claims are time-barred (and would therefore be limited to at most damages incurred within six years of filing suit) and those that may not be time-barred (and could therefore potentially seek damages for a longer time period).

Second, Plaintiffs cannot avoid these implications by seeking to limit the class to claims for continuous torts.  Such an effort would create a conflict of interest between the class representatives and unnamed putative class members.  Class adjudication of claims limited to the two- or six-year continuous tort period would likely have claim preclusive effect on the ability of any unnamed class members without statute of limitations problems to assert claims for damages extending beyond the continuous tort period.  Such claims would likely be barred by claim preclusion because they would necessarily rest on the same grounds that formed the basis of the class claims.  *See Ragsdale v. Rubbermaid, Inc.*, 193 F.3d 1235, 1238 (11th Cir. 1999).  Accordingly, class representatives pursuing claims for only those damages accruing within the continuous tort period would not be adequate representatives for the class.  *O'Connor*, 197 F.R.D. at 416-17.

IV.    **The Class Definition And The Nearly Simultaneous Filing of the *Brantley, et al. v. IP* Litigation Raise Significant Manageability Issues And Demonstrate That A Class Action Is Not Superior.**

Rule 23(b)(3) instructs that in order to certify a class, a court must determine "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" and that a matter pertinent to this finding includes "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3), (b)(3)(D).  The superiority requirement involves consideration of the "relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *Klay*, 382 F.3d at 1269.  The manageability consideration of Rule 23(b)(3) "encompasses the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  There are several features of this class action suit that raise significant manageability concerns and compel a conclusion that a class action is not superior to other forms of litigation.

A.    **The Existence Of The *Brantley* Litigation And The Exclusion Contained In The Class Definition Pertaining To It Render The Putative Class Action Unmanageable And Not Superior To Other Methods Of Litigation.**

First, the *Brantley* litigation demonstrates that it is neither "impracticable" for individuals with the property damage claims at issue here to bring suit individually against IP nor would it be inefficient to do so.  *See McGuire*, 1994 WL 261360, at *8 (holding that a class action is not the superior method because similar cases were filed against IP by the same plaintiffs and their attorneys).  The *Brantley* litigation was filed just before this putative class action.  That complaint contains the same broad and undefined allegations that numerous compounds emitted from the Prattville Mill since its inception have caused a wide variety of harm to members of the Prattville community.  (*Brantley*, Doc. 42.)  There are presently 170 *Brantley* Plaintiffs who claim property damages under the same causes of action alleged in the Complaint here and 332

55

Plaintiffs who claim personal injuries.[36]  In the *Brooks, et al. v. IP*, 09-cv-946 litigation, there

are four Plaintiffs bringing claims of wrongful death on behalf of their decedents.  Plaintiffs'

counsel's active engagement in the *Brantley* and *Brooks* cases is fundamentally inconsistent with

the assertion in Plaintiffs' brief that "as a practical matter, class action treatment is the only

viable option for litigating this controversy for most proposed class members because, in light of

the complexity of the environmental issues and the significant costs associated with presenting

them, the cost of bringing individual cases to trial would not be economically feasible."  (Pls.'

Br. 46.)

The parties have worked together in *Brantley* and *Brooks* to present the Court with

proposals to manage those cases efficiently.  Despite the number of plaintiffs, under the Court's

supervision the parties crafted a litigation plan that maximizes efficiencies across plaintiffs while

recognizing the need for plaintiff-specific work on causation and damage issues.  (*Brantley*, Doc.

92.)  That schedule manages in an orderly way the significant factual development of

individualized issues that predominate both for the property damage and personal injury

claimants and, accordingly, provides for adjudication of these individualized injury and

causation issues in plaintiff cohorts, beginning with the first cohort of 40.

Second, the exclusion in the class definition here for *Brantley* plaintiffs would cause the

Court and the parties to engage in a series of mini-hearings and negotiations concerning in which

of the two cases certain property damage claims would be adjudicated.  The Court need not look

further than named representative Mr. Johnson to envision the issues that would arise upon

---

[36]   Notably, the wives of both named representatives in this suit brought property damage
claims in *Brantley* concerning the same piece of property purportedly representative of
this putative class action.  *See* Doc. 42 (*Brantley* complaint); *see also* Exs. 14 & 21
(attaching Questionnaire responses of Madge Benefield and Shadel Johnson).

certification of a class.  Like many homeowners, Mr. Johnson is a joint owner of his residential property located at 1359 Highway 14 West in Prattville with his wife, Shadel Johnson.  (Johnson Dep. 47:5-11, 108:4-10; *see also* Ex. 20 (deed to the Johnson property).)

Shadel Johnson filed claims on nearly identical grounds for damage to the same real property in the *Brantley* case.  (*See Brantley*, Doc. 42 (identifying Shadel Johnson as a plaintiff); *see also* Ex. 19 (Questionnaire Response of Shadel Johnson bringing property damage claims concerning 1359 Highway 14 West, Prattville, Alabama).)  Alabama law is clear that an injured party cannot receive duplicate damages for a single wrong.  *See Birmingham News Co. v. Horn*, 901 So.2d 27, 62 (Ala. 2004) ("The prohibition against double recovery underlies the equitable principle…to which a party 'should not recover twice for a single injury.'" (internal citations omitted), *overruled on other grounds by Horton Holmes, Inc. v. Sharer*, 999 So.2d 462 (Ala. 2008).)  The Alabama Supreme Court quoted a leading Alabama treatise on damages to state the "general rule that there can be only one satisfaction of the same damage or injury. The different means of ascertaining damages in a given situation should not be applied so as to give double damages or double compensation for the same thing." *Id.* (citing Jeanelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 1–8 (4th ed. 1999)).

"In a joint tenancy each tenant is seized of some equal share while at the same time each owns the whole." *Porter v. Porter*, 472 So.2d 630, 634 (Ala. 1985).  To avoid the inequities inherent in joint owners **each** seeking compensation for the **same** injury to their real property, Donald and Shadel Johnson should be joined in either the *Brantley* or the *Benefield* litigation. They simply cannot maintain independent suits seeking the same damages in both cases. Because the *Brantley* litigation was filed first in time by Shadel Johnson, it would be practical for Mr. Johnson's claims in this litigation to be dropped.  But practicality will likely be only one

of many issues that Donald and Shadel Johnson consider in deciding the appropriate case to pursue their claims of property damage.  There will likely be many, perhaps hundreds, of similarly difficult decisions that other joint owners of property in the proposed class area will be required to make should this case be certified.  The Court and counsel to the parties will, undoubtedly, get involved at various points in this decision-making process and significant resources will be expended to document the decisions reached by these individuals. Furthermore, the Court could be asked to resolve disputes between joint owners.  Before the class proceedings even get off the ground, the Court may "have to basically pick apart the class member by member, taking into consideration circumstances applicable only to that plaintiff.  This in essence would partition the entire class into individualized actions, and would create mismanagement of the class."  *Reilly*, 965 F. Supp. at 606.

**B.**    **Plaintiffs Provide No Explanation For How Three Causes Of Action Identified In The Complaint Will Be Dealt With During Class Proceedings.**

On June 1, Plaintiffs filed their motion for class certification and supporting brief seeking certification of four claims—trespass, negligence, strict liability and wantonness.  (Pls.' Br. 14.) Thereafter, Plaintiffs filed the Third Amended Complaint purporting to assert ***seven*** claims on behalf of the putative class.  (*See* Third Am. Compl.)  Three claims contained in the Complaint—public nuisance, private nuisance, and fraud—are nowhere mentioned in Plaintiffs' motion or brief.

Regardless of whether Plaintiffs purport to include or exclude these three claims, they render class proceedings unmanageable.  If the claims are included, then an even greater number of individual issues will predominate and thus preclude certification under Rule 23(b)(3). Claims for both public and private nuisance require individualized evidence of activities that

interfered with each Plaintiffs' use of his or her specific real property, causation, and damages.[37]
*LaBauve,* 231 F.R.D. at 673 (holding that "considerable individualized showings would be necessary as to … three nuisance elements"); *see also Funliner of Ala., L.L.C. v. Pickard*, 873 So.2d 198, 209 (Ala. 2003) (denying certification of a class bringing claims for public nuisance because "special injury" would require individualized proof).

Similarly, claims for fraud have repeatedly been identified as requiring individualized proof and not being susceptible to class adjudication.  Among other elements, a claim of fraud under Alabama law (either by way of misrepresentation or suppression of material facts) requires a false representation or nondisclosure of a material fact and inducement or reliance by the plaintiff on that representation or nondisclosure.  *See* Ala. Code § 6-5-102; *see also id.* § 6-5-104.  The reliance issues will require a "plaintiff-by-plaintiff assessment" as "[d]ifferent plaintiffs will almost certainly have become aware of different representation at different times (if ever), and will have reacted differently to such awareness."  *Fisher*, 238 F.R.D. at 312 (denying certification of fraud claims on the grounds that individual issues predominate (footnote omitted)); *see also Reynolds Metals Co. v. Hill*, 825 So.2d 100, 105 (Ala. 2002) (vacating class certification because the fraud claims presented individualized issues of reliance that predominated).

Alternatively, if Plaintiffs do not seek certification of these three causes of action, their assertion in the Complaint raises two additional problems that weigh against certification of any

---

[37]  To succeed on a claim for nuisance, a plaintiff must demonstrate (1) activities that worked hurt, inconvenience, or damage to it, (2) breach of a legal duty owed, (3) causal relation between the activity complained of and the hurt, inconvenience, or damage sued for, and (4) damages.  *See Tipler v. McKenzie Tank Lines*, 547 So.2d 438, 440 (Ala. 1989).  Plaintiffs must additionally demonstrate a "special damage" if a claim for public nuisance is brought. Ala. Code § 6-5-123 (1975).

class.  First, the caption of the Complaint identifies that Mr. Benefield and Mr. Johnson bring this action "individually **and** on behalf of others similarly situated."  (Third Am. Compl. 1 (emphasis added).)  The "individual[]" nature of the pleading in conjunction with the maintenance of the nuisance and fraud causes of action in the Complaint purports to allow the named Plaintiffs to pursue claims **in addition** to those brought on behalf of the class.  This could raise conflict of interest issues in subsequent proceedings if it turns out that pursuit of the individual claims is superior for them.  *See Valley Drug*, 350 F.3d at 1189 ("If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate.")

Second, whether ultimately pursued by the named Plaintiffs individually or not, the nuisance and fraud claims asserted on behalf of the absent putative class members raise significant claim splitting concerns.  The Seventh Amendment provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States."  U.S. Const. amend. VII. The facts underlying the class claims of negligence, trespass, and wantonness—facts concerning IP's conduct, putative members' alleged exposure to substances, damages to plaintiffs' properties, and a causal relationship between the damages and alleged exposure—also underlie the nuisance and fraud claims asserted in the Complaint on behalf of putative class members. Thus, to the extent any putative class member may seek redress for nuisance or fraud claims arising out of the same occurrences, a second jury would improperly be tasked with analyzing many of the same facts as were addressed by the first jury evaluating class claims for trespass, negligence, and wantonness.  *See In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1302-03 (7th Cir. 1995) (ordering decertification of a putative class where the issues sought to be certified would not have resolved the entirety of the defendant's alleged liability as between the parties and, thus, different juries would have examined overlapping issues); *see also Castono v. Am.*

*Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996) (reversing the district court's certification of a class whereby "common issues" would be tried by one jury and a second jury, or series of juries, would pass on individual issues because the "Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues"). Even if constitutionally permissible, separate trials would require duplicative proceedings, which further illustrates that class treatment is not a superior mechanism to resolve Plaintiffs' claims.

**V.     Plaintiffs Also Do Not Qualify for Class Certification Under Rule 23(b)(2), Because Injunctive Relief Does Not Predominate Over Damages In This Case.**

In addition to seeking certification under Rule 23(b)(3), Plaintiffs make a lone reference to Rule 23(b)(2) in their brief. Plaintiffs provide no argument or otherwise explain why the relief they seek qualifies this case for certification under Rule 23(b)(2), which "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." Fed. R. Civ. P. 23(b)(2) 1966 Amend. Advisory Committee's Note. The Eleventh Circuit has held that class certification under Rule 23(b)(2) should be denied where, as here, the "plaintiff class's damages claim predominates over its claims for equitable relief. " *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001).

Under *Murray*, a damages claim "predominates" over a claim for equitable relief "unless [the monetary relief] is ***incidental*** to requested injunctive or declaratory relief." 244 F.3d at 812 (citing *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 415 (5th Cir. 1998)). And "incidental" damages are those to which Plaintiffs would be "automatically entitled [] if Defendants' liability to the class is established." *Id.* "'Liability for incidental damages should not . . . entail complex individualized determinations.'" *Id.* (quoting *Allison*, 151 F.3d 402 at 415) (modification in original).

This plainly is not the case here.  Plaintiffs do not even attempt to argue that their claims for injunctive relief "predominate" over their claims for damages, and the damages they seek *would* require "complex individualized determinations." *Murray*, 244 F.3d at 812.  Like the plaintiffs in *Murray* who were denied certification under Rule 23(b)(2), assessing Plaintiffs' claims for monetary relief here "compels an inquiry into each class member's individual circumstances."  *Id.*

## **CONCLUSION**

For all of the foregoing reasons, Plaintiffs' motion for class certification should be denied.

Date:  August 12, 2010

/s/ Jessica D. Greenston
Daniel W. Nelson*
Email: dnelson@gibsondunn.com
Jessica D. Greenston*
Email: jgreenston@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9571
*Admitted Pro Hac Vice*

Tabor R. Novak, Jr. (NOV001)
Email: tnovak@ball-ball.com
Allison A. Ingram (ALF005)
Email: ala@ball-ball.com
Ball, Ball, Matthew & Novak, P.A.
2000 Interstate Park, Suite 204
P.O. Box 2148
Montgomery, AL 36102-2148
334-387-7680
334-387-3222 (fax)

Patrick W. Dennis*
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
46th Floor
Los Angeles, CA 90071
Telephone: (213) 229-7567
Facsimile: (213) 229-6567
Email: pdennis@gibsondunn.com
*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of August, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following:

Gregory A. Cade
gregc@elglaw.com
Mark Rowe
mrowe@elglaw.com
Hoyt Gregory Harp
gharp@elglaw.com
Kevin B. McKie
kmckie@elglaw.com
Christina E. Wall
cwall@elglaw.com

J. Edward Bell, III
ebell@edbelllaw.com
J. Ryan Heiskell
rheiskell@edbelllaw.com

/s/ Jessica D. Greenston
Of Counsel