**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | |
|---|---|
| JAMES K. BENEFIELD AND DONALD RAY JOHNSON, individually and on behalf of others similarly situated, | ) |
| Plaintiffs, | ) Civil Action No.: |
| vs. | ) 2:09 cv 232-WHA-TFM |
| INTERNATIONAL PAPER COMPANY, a New York corporation (Alabama No. F/C 853-624). | ) |
| Defendant. | ) |

**PLAINTIFFS' REPLY TO INTERNATIONAL PAPER COMPANY'S MEMORANDUM IN OPPOSITION TO MOTION FOR CLASS CERTIFICATION**

COME NOW, the above named Plaintiffs, and herein reply to International Paper Company's (IP) Memorandum in Opposition to the Motion for Class Certification filed by the Plaintiffs.

# TABLE OF AUTHORITIES

## Cases

*AC, Inc. v. Baker*, 622 So.2d 331 (Ala. 1993) .......... 44

*Allee v. Medrano*, 416 U.S. 802, 94 S. Ct. 2191, 40 L. Ed. 2d 566 (1974) .......... 32

*Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183 (11th Cir. 2009) .......... 12

*Bonner v. Prichard*, 661 F.2d 1206 (11th Cir. Ala. 1981) .......... 33

*Brantley et al., v. International Paper*, 2:09-cv-230-WHA-TFM (U.S.D.C. Ala) . 8, 10, 49

*Brasel v. Weyerhaeuser Company*, cv 07-4037, USDC, W. Dis. Ark. (Texarkana Division) .......... 19

*Brown v. Sibley*, 650 F.2d 760 (5th Cir. Miss. 1981) .......... 32

*Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283 (2d Cir.1999) .......... 17, 18

*Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004) .......... 39, 42

*Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993) .......... 6

*Donovan v. Philip Morris Usa, Inc*., Civil Action No. 06cv12234-NG. .......... 15

*Dunn v. Midwest Buslines, Inc.,* 94 F.R.D. 170 (E.D. Ark. 1982) .......... 13

*Evans v. Walter Industries, Inc*. 579 F. Supp.2d 1349 (N.D.Ala. 9-23-2008) .......... 44

*Fisher v. Ciba Specialty Chemical Co.*, 238 F.R.D. 273 (S.D. Ala. 2006) .......... 7, 39

*Forman v. Data Transfer, Inc.*, 164 F.R.D. 400 (E.D. Pa. 1995) .......... 13

*Hagen v. Winnemucca*, 108 F.R.D. 61 (D. Nev. 1985) .......... 13

*Helms v. Consumerinfo.Com, Inc.*, 236 F.R.D. 561 (N.D.Ala. 2005) .......... 36

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig*., 241 F.R.D. 435 (S.D.N.Y. 2007) .......... 10

*In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) .......... 8

*In re Polypropylene Carpet Antitrust Litig*., 996 F.Supp. 18 (N.D. Ga.1997) .......... 18

*In re Terazosin Hydrochloride Antitrust Litig*., 220 F.R.D. 672 (S.D.Fla. 2004) 36, 37, 38

*In Re Tft-Lcd (Flat Panel) Antitrust Litigation* No. M 07-1827 SI (N.D.Cal. 3-28-2010). 8

*Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271 (D. Mass. 2000) .......... 7

*Klay v. Humana, Inc*., 382 F.3d 1241 (11th Cir. 2004) ............................ 35, 36, 46, 47, 48

*Krueger v. New York Tel. Co.*, 163 F.R.D. 433 (S.D.N.Y. 1995).................................... 19

*LaBauve v. Olin Corp*., 231 F.R.D. 632 (S.D. Ala. 2005)......................................... 39, 44

*Maughan v. Sw Servicing*, 758 F.2d 1381 (10th Cir. Utah 1985).................................... 43

*O'Connor v. Boeing N. Am.*, 197 F.R.D. 404 (C.D Cal. 2000) ................................. 40, 41

*O'Connor v. Boeing N. Am.*, 311 F.3d 1139 (9th Cir. Cal. 2002)..................................... 43

*O'Connor v. Boeing N. Am., Inc.*, 92 F. Supp. 2d 1026 (C.D. Cal. 2000) ........................ 41

*Perez v. Metabolife Intern., Inc*., 218 F.R.D. 262 (S.D. Fla. 2003)................................... 7

*Sher v. Raytheon Co*., 261 F.R.D. 651 (M.D. Fla. 2009)................................................. 17

*Shin v. Cobb County Bd. of Educ*., 248 F.3d 1061 (11th Cir. 2001)................................ 16

*Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (U.S. 1966)............................................ 30

*Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006) ................................. 16

*White v. Mercury Marine, Division of Brunswick, Inc*., 129 F.3d 1428 (11th Cir.1997) . 45

*Windham v. Am. Brands, Inc*., 565 F.2d 59 (4th Cir. 1977) ............................................ 48

**Statutes**

42 *U.S.C.* § 9658 ........................................................................................ 37, 38

**Rules**

Rule 702, *Federal Rules of Evidence*.................................................................. 27, 37, 46

Rule 23, *Federal Rules of Civil Procedure*............................ 6, 7, 8, 12, 15, 16, 33, 34, 50

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ 2

TABLE OF CONTENTS........................................................................................... 4

INTRODUCTION ................................................................................................... 6

ARGUMENT AND CITATION OF AUTHORITY ....................................................... 7

BECAUSE THE CLASS DEFINITION MEETS ALL STANDARDS FOR ASCERTAINABILITY IMPOSED BY RULE 23(a), CERTIFICATION MAY NOT BE DENIED ON THIS GROUND............................................................................... 7

PLAINTIFFS' EXPERTS ARE QUALIFIED, THEIR METHODOLOGY IS SOUND AND ACCEPTED IN THE SCIENTIFIC COMMUNITY AND ALL OF DEFENDANT'S OBJECTIONS ARE *DAUBERT* RELATED, AN INQUIRY INAPPROPRIATE AT THE CLASS CERTIFICATION STAGE................................ 16

THE METHODOLOGY USED BY DR. ROSENFELD IN A SIMILAR CASE HAS RECENTLY SURVIVED A DAUBERT CHALLENGE......................................... 19

EVEN IF THE COURT WERE TO EXAMINE DEFENDANT'S EXPERTS ANALYSIS OF PLAINTIFFS' EXPERTS, THE DEFENDANTS' EXPERTS ANALYSIS IS FLAWED TO THE POINT THAT PLAINTIFFS' EXPERTS WOULD NOT BE EXCLUDED. ................................................................. 20

Defendant's expert Dr. Shields ............................................................ 20

Defendant's expert Dr. Daugherty ......................................................... 25

THE MOTION FOR CLASS CERTIFICATION MEETS ALL REQUIREMENTS OF RULE 23(a)........................................................................................................ 27

PLAINTIFFS' CLAIMS ARE TYPICAL OF THE CLASS AND THEY HAVE STANDING TO ASSERT CLAIMS ON THEIR BEHALF AND MS. JOHNSON'S INTERVENTION CURES ANY POSSIBLE DEFECT. .......................................... 27

IF THE COURT WERE TO FIND THAT THE PROPOSED CLASS REPRESNETATIVES ARE INADEQUATE, THEN THE COURT'S INQUIRY MUST STOP AND THE COURT CAN NOT CONSIDER THE MERITS OF CLASS CERTIFICATION. ..................................................................................... 30

The approximately 1500 class members easily meets Rule 23's numerosity requirement ........................................................................................ 32

THE MOTION FOR CLASS CERTIFICATION MEETS ALL REQUIREMENTS OF RULE 23(B)(3) ................................................................................................ 33

Questions of law or fact common to class members predominate over any questions affecting only individual members ........ 33

1. Causation........ 35

2. Statute of limitations ........ 37

CERCLA FRCD Requires Class Wide Proof ........ 37

Continuing Tort Theory Also Provides For Class Wide Proof ........ 43

3. Damages........ 45

A CLASS ACTION IS CLEARLY THE SUPERIOR MECHANISM FOR DECIDING THE ALLEGED CLAIMS AND FOR ALL PRACTICAL PURPOSES IS THE ONLY AVAILABLE MECHANISM FOR DOING SO ........ 48

# INTRODUCTION

Plaintiffs filed their initial *Motion for Class Certification* accompanied with expert reports from Dr. Rosenfeld, Dr. Cheremisinoff, and Dr. Kilpatrick. These reports and expert testimony established all the requirements for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure. In establishing that Plaintiffs' claims met the numerosity, commonality, typicality, and superiority requirements, Plaintiffs prove that the properties as set forth by the class definition were uniformly contaminated above a specific level by a single industrial source, i.e., IP's Prattville facility. Furthermore, Plaintiffs' expert Dr. Kilpatrick provided a mass appraisal method that has been approved in other cases that will show class wide damages. Plaintiffs have also shown that Defendants do not have a viable individual issue argument as to statute of limitations because all statutes are subject to CERCLA's Federally Required Commencement Date.

Defendant has contended that Plaintiffs' motion should be denied, countering Plaintiff's arguments with their own. However, as set forth herein, Defendant's objections and criticisms of Plaintiffs' experts are not appropriate at this time because Daubert[1] inquiries should not be made at the class certification stage. Furthermore, as set forth herein, Plaintiff's experts have either overcome a *Daubert* challenge as to the same issues raised by this Defendant or their methodology has been approved by another Court

[1] *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)

in the class context in a similar case. Wherefore, Plaintiffs request that the class as set forth in the *Plaintiffs' Motion for Class Certification*, as amended, be certified.

## ARGUMENT AND CITATION OF AUTHORITY

### BECAUSE THE CLASS DEFINITION MEETS ALL STANDARDS FOR ASCERTAINABILITY IMPOSED BY RULE 23(a), CERTIFICATION MAY NOT BE DENIED ON THIS GROUND

IP initially contends that the *Motion for Class Certification* should be denied because the class definition purportedly is "not sufficiently definite" and would require a series of mini-trials to determine who is a member of the class. This objection is meritless.

A proposed class definition passes muster under Rule 23 where "the proposed class definition …[specifies] a particular group harmed during a particular time period via a particular manner, such that the district court can utilize objective indicia to determine who is and is not part of the class." *Fisher v. Ciba Specialty Chemical Co.*, 238 F.R.D. 273, 301 (S.D. Ala. 2006). Conversely, "[a] court should deny class certification where the class definitions are overly broad, amorphous, and vague, or where the number of individualized determinations required to determine class membership becomes too administratively difficult." *Perez v. Metabolife Intern., Inc.*, 218 F.R.D. 262, 269 (S.D. Fla. 2003). To be ascertainable, all class members need not be identified at the outset; the class need only be determinable by "stable and objective factors." *Kent v. SunAmerica Life Ins. Co.*, 190 F.R.D. 271, 278 (D. Mass. 2000) (citing 7A Wright, Miller, & Kane, supra § 1760). And a class definition is not rendered unascertainable because class

members will be required to submit some information in order to determine whether they are members of the class. E.g., *In Re Tft-Lcd (Flat Panel) Antitrust Litigation* No. M 07-1827 SI (N.D.Cal. 3-28-2010); *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493, 506 (S.D.N.Y. 1996).

Tested against these standards, the Plaintiffs' proposed class definition fully complies with Rule 23. The Plaintiffs seek certification of the following class:

> All persons who on the date of the filing of the Complaint or Third Amended Complaint:
>
> (a) owned real property located in whole, or in part, within two miles of the outer boundary of the Facility;
>
> (b) which was contaminated by the Hazardous Substances, Particulate Matter, and/or Noxious Odors[2] released into the environment from the Facility; and
>
> (c) who suffered damages as a result in the form of a diminution in value of the real property in excess of $100;
>
> Excluded from this class are:
>
> (a) all persons owning contaminated real property[3] within the Class Area who have suffered any personal injury as a proximate result of the Hazardous Substances, Particulate Matter, and/or Noxious Odors;
>
> (b) all employees, officers, directors, legal representative, heirs, successors, and assigns of International Paper.
>
> (c) All Plaintiffs in *Brantley et al., v. International Paper*, 2:09-cv-230-WHA-TFM (U.S.D.C. Ala).[4] [5]

---

[2] Plaintiffs herein withdraw any claims caused purely by Noxious Odors.

[3] Plaintiffs herein limit their claims to only claims for residential property owners.

[4] The Third Amended Complaint also lists a fourth exclusion – "(d) all persons who acquired their interest in the real property by inheritance within 10 years of the date of the filing of the Third Amended Complaint." Subsection (d)

Membership in this class is easily determinable by purely objective criteria.

As explained in the *Motion for Class Certification* at 36, "Plaintiffs' Class is defined based upon an approximate two mile radius of Defendant's Facility as Plaintiffs' experts have indicated as the contaminated area and further defined by geographic boundaries of streets so that any potential class member will definitely know if they are included within the class." Public records of real property ownership and tax rolls provide the broad objective criteria for indentifying members of the proposed class. All property owners with property in the designated area potentially are members of the class. The Plaintiffs' experts provide the next two objective criteria for identifying the class – the experts have opined in their reports and deposition testimony that all the land in this area has been contaminated above EPA Regional Screening Levels by the Hazardous Substances, Particulate Matter, and Noxious Odors[6] emitted from the Facility. Dr. Kilpatrick has

---

was included in the Third Amended Complaint as a result of a typographical error, however, and should be disregarded.

[5] Because more than one complaint is filed, Defendant expresses confusion as to what date should be used to commence the class. The statute of limitations is tolled upon the filing of the original Complaint and that should be the date used.

[6] Defendant, and its expert, objects to the Screening Level being used to determine uniformity of contamination because they contend that standard addresses contamination in soil and not attic dust. Defendant's wrongful contention will be addressed more fully *infra,* however, Plaintiff's expert Dr. Rosenfeld's methodology has recently passed muster pursuant to *Daubert* in a similar case. Also, regardless of the number, the point to be understood for class certification purposes is that all property is contaminated above this number. The fact that some houses are more contaminated and some less contaminated is irrelevant. It will be Dr. Kilpatrick's job to incorporate into his property / damages model the dimmunitation in value for this uniform level of contamination. If

offered a mass appraisal theory that will allow for class-wide proof to be used to appraise the real property in the Class Area.

The three exclusions narrow the class using purely objective criteria. Property owners who also have suffered personal injury as a result of the contamination are excluded from the class. These persons will be informed of this limitation in the class action notice and will self-select to avoid class membership (opt out). Employees, officers, directors, legal representative, heirs, successors, and assigns of International Paper are also excluded. These persons are easily ascertainable from the Defendant's employment records. All Plaintiffs in *Brantley et al., v. International Paper*, 2:09-cv-230-WHA-TFM (U.S.D.C. Ala.), of course, are easily identified by reference to the pleading.

In *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 241 F.R.D. 435 (S.D.N.Y. 2007), the court certified a class based on a class definition functionally identical to the one proposed by the Plaintiffs. In that case, a pipeline break in November of 1988 released thousands of gallons of gasoline onto an Illinois farm. Thirteen years later, landowners within a one mile radius from the spill filed, a class action against, the parties responsible for the spill, alleging that their land had been contaminated by the gasoline. The class action plaintiffs sought to certify three subclasses of persons harmed after January 1, 1988 defined as follows:

> (1) their real property was contaminated by gasoline from the pipeline release resulting in the loss of market value or quiet enjoyment of the property (subclass one);

---

the court has any concerns about the property owners whose property may be contaminated significantly above the Screening Level, any of those concerns can be handled in a properly worded class notice.

> (2) their wells and other sources of water were contaminated by gasoline from the pipeline release resulting in expenses associated with procuring uncontaminated water including the cost of connecting to a public or commercial source of uncontaminated water (subclass two);
>
> (3) they were exposed to gasoline contamination from the pipeline resulting in personal injury, or an increased risk of personal injury, including cancer (subclass three).

*Id*. at 246.

The court certified subclasses one and two but declined to certify the personal injury class because common issues did not predominate as to that class[7]:

> A careful review of Plaintiffs' proposed classes and the evidence submitted shows that the two subclasses involving damages to class members' property satisfy the requirements of Rule 23(a) and (b)(3) with respect to the alleged torts committed by the Companies….However, the subclass involving personal injuries arising from exposure to MTBE cannot be certified because common issues do not predominate over individual issues related to proximate causation.

*Id*. at 256. The instant plaintiffs have avoided the problems typically raised by personal injury classes by excluding them from the class. The Plaintiffs' proposed class definition thus falls squarely within the class definition approved by the MTBE court.[8]

IP has failed to offer any explanation as to why the MTBE court was wrong and the various objections raised by IP to the Plaintiffs' proposed class definition are all

---

7 This case is also illustrative of the proposition that a court should certify a certifiable class if it is before the court and not deny certification to the case as a whole just because one part of the case is not proper for class certification.

8 Citations to many other cases wherein courts certified classes based on similar class definitions can be found in footnote 36 of the Plaintiffs' Motion for Class Certification.

meritless. First, IP complains that the proposed definition purportedly requires a "merits adjudication" and "individualized fact finding" insofar as it depends on the experts' determination that the land is "contaminated" and that the contamination caused a diminution in property value. With respect to the "merits determination," however, IP profoundly confuses the nature of the inquiry made at the class certification stage with the ultimate adjudication made by the finder of fact. The Court may properly inquire into the merits at this stage *to the extent required to determine whether to certify the class.* Indeed, the Eleventh Circuit has recently emphasized that, in many cases, some overlap between the merits and the inquiry required by Rule 23 is inescapable:

> "Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." …"It is inescapable that in some cases there will be overlap between the demands of [Rule] 23(a) and (b) and the question of whether [a] plaintiff can succeed on the merits." …Thus, the principle that district courts should not evaluate the merits of plaintiffs' claims "should not be talismanically invoked to artific[i]ally limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." … While we avoid merits determinations to the extent practicable, this case does require the Court to look beyond the pleadings and examine the parties' claims, defenses, and evidence to ensure that class certification would comport with Rule 23's standards.

*Babineau v. Fed. Exp. Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009)(citations omitted). Thus, the Court properly may consider the experts' testimony that the land within the Class Area has been uniformly contaminated by the Hazardous Substances, Particulate Matter, and Noxious Odors above the EPA Regional Screening level, and that the contamination has caused injury to the property in the form of diminishing its value. The

*precise amount* of diminution in value will be established by Dr. Kilpatrick when he engages in his mass appraisal of the properties.

Nor does the class definition "mimic the liability standard" as did the class definitions in the three cases cited by IP in its brief. [9] To recover on the negligence claim, the Plaintiffs must still prove, that IP was negligent; to recover on the wantonness claim, the Plaintiffs must still prove, wanton conduct by IP; to recover on the strict liability claim, class members must still prove that the Facility is an abnormally dangerous activity; to recover on the trespass claim, the Plaintiffs must still show, the elements of the tort other than an invasion of their property by the contaminants.

Finally, the proposed definition is not faulty because in the view of IP's expert, individual fact finding must be made to determine whether the contamination exceeds regulatory limits and because this determination in turn purportedly requires individual testing of each property. The Plaintiffs' experts have provided the Court with well-accepted methodologies that permit class-wide determination of contamination levels without the need for individual testing. If these methodologies are unreliable so as to require the exclusion of the Plaintiffs' experts' testimony, IP's remedy is to file a motion

[9] *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995) (holding that the class definition is "untenable" because it required that a putative class member had received "unsolicited facsimile advertisements" from the defendant, mimicking the liability standard at issue); *Hagen v. Winnemucca*, 108 F.R.D. 61, 63 (D. Nev. 1985)( the court rejected a class definition that hinged membership on "whether a person's constitutional rights had actually been violated"); *Dunn v. Midwest Buslines, Inc.*, 94 F.R.D. 170, 171-72 (E.D. Ark. 1982)(in a Title VII case, the court rejected a class definition that would first require "a finding of discrimination in order to define the class").

under *Fed. R. Evid*. 702 at the appropriate time; such a challenge being not appropriate at the class certification stage.[10] Thus, IP's first objection to the proposed class definition should be rejected as absolutely meritless.

Second, IP objects to the personal injury exclusion on grounds that this will somehow require a review of each individual's medical records to determine if they indeed have suffered personal injury. This assertion is preposterous. The personal injury exclusion *limits* the class. Property owners with personal injuries that they believe were caused by Facility emissions will self-exclude themselves from the class. As previously noted, a class definition is not rendered unascertainable because class members must subsequently provide information to include or exclude themselves from the class. The only possible scenario in which a review of individual records would be required would occur if a land owner with cancer or some environmentally-caused disease attempted to join the class. This is extremely unlikely because class members would have no reason to lie about whether they have contacted some environmentally-caused disease or not. If so, the landowner would be expected to sue individually rather than join a class action where his personal injuries could not be compensated.

In any event, neither the Eleventh Circuit nor the pre-split Fifth Circuit has ever ruled that self-selection is *per se* impermissible in defining a Rule 23 class, or defining those excluded from the class. The United States District Court for the District of Massachusetts recently squarely rejected an ascertainability challenge to a medical

---

[10] The appropriateness of the Court considering *Daubert* issues at the class certification state is discussed more fully *infra.*

monitoring class action that required self-selection for an exclusion. This particular class excluded persons diagnosed with lung cancer who had a smoking history. As the court noted, smoking history and whether a person is under care for cancer are purely objective criteria. The court saw no problem with having class members address these issues in affidavits:

> Here, there are only two factors to examine — smoking history and a diagnosis of lung cancer. Surely, any potential class member would know whether or not a doctor suspects he or she has lung cancer. Indeed, courts have not found ascertain ability to be a problem when membership hinged on far more difficult determinations than those at issue here. …
> Smoking history and whether one is under care for cancer are objective criteria. Either someone has smoked for at least twenty pack-years or he has not; either someone is under a physician's care for suspected cancer or he is not. Class members can sign affidavits under penalty of perjury or submit doctors' letters to detail their smoking histories and medical status.
> . …In any event, what Philip Morris complains of is a potential administrative burden in determining who is a class member, but this issue is "primarily one of manageability, and not ascertain ability."
>
> Finally, potential class members who are already suspected of having lung cancer would have little incentive to lie about their situation. Medical monitoring would not benefit them. Presumably, they are already about to undergo or are in the midst of far more intensive screening and treatment. In fact, once someone presents with any indication of lung cancer, by definition, they would be excluded from the class. ..
>
> I find the proposed class to be ascertainable.

*Donovan v. Philip Morris Usa, Inc*., Civil Action No. 06cv12234-NG.

(Mass. 6-24-2010). The same reasoning applies to this case.

Finally, assuming *arguendo* that the proposed class definition needs improvement to satisfy Rule 23, the proper remedy is to make modifications to the definition rather than to deny certification. It is well established that federal district courts have discretion to limit or modify proposed class definitions. *Shin v. Cobb County Bd. of Educ*., 248 F.3d

1061, 1065 (11th Cir. 2001) ("[t]he district judge may review his certification order at any time and may consider redefined or more narrowly tailored classes or subclasses"); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597, 611 (E.D. La. 2006)("district courts enjoy discretion to limit or modify class definitions to provide the necessary precision").

Since the class is defined as an ascertainable class, the *Motion for Class Certification* should be granted.

## PLAINTIFFS' EXPERTS ARE QUALIFIED, THEIR METHODOLOGY IS SOUND AND ACCEPTED IN THE SCIENTIFIC COMMUNITY AND ALL OF DEFENDANT'S OBJECTIONS ARE *DAUBERT* RELATED, AN INQUIRY INAPPROPRIATE AT THE CLASS CERTIFICATION STAGE.

First, Plaintiffs' note that none of the Defense experts offered opinions of their own, instead being only hired to critique Plaintiffs' experts' methodology. That is what they were hired to do. [Daugherty Deposition, p. 19, Exhibit A[11]] Secondly, Defendant's experts asked for material concerning contamination including verification of IP's TRI information and any testing for Dioxin offsite and were not provided any of the requested materials. Therefore, according to Dr. Shields, there was no way for him to judge if IP's TRI numbers were correct or if Dr. Cheremisinoff's calculations were incorrect. [Shields Deposition, p. 58-9, Exhibit B[12]] Lastly, Defendants devote a substantial portion of their Brief in attacking Plaintiffs' experts' methodology and scientific accuracy. (pp. 24-50 are

[11] The Daugherty Deposition pages cited herein are attached hereto as Exhibit A as a composite exhibit.

[12] The Shields Deposition pages cited herein are attached hereto as Exhibit B as a composite exhibit.

devoted to attacking Plaintiffs' experts, i.e. 26 pages of a 62 page brief) Although Defendants never cite *Daubert*, it is clear that they are attempting a *Daubert* Challenge to Plaintiffs' experts, a challenge that is inappropriate at the class certification stage.

In *Sher v. Raytheon Co*., 261 F.R.D. 651, 670 (M.D. Fla. 2009) [13] the Court was faced with the same issues as this court as to Plaintiffs' experts, specifically Dr. Kilpatrick. The court found:

> Defendant spent a significant amount of time during the Hearing attempting to prove that Plaintiffs' expert analyses and opinions are too factually and scientifically deficient to support class certification. As a threshold matter, the Court finds that it is not necessary at this stage of the litigation to declare a proverbial winner in the parties' war of the battling experts or dueling statistics and chemical concentrations. See *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292-93 (2d Cir.1999) (holding that "statistical dueling[14]" between parties' experts on fact issues was "not relevant to the certification determination")[15]. This type of determination would require the Court to weigh the evidence presented and engage in a *Daubert* style critique of the proffered experts'

[13] The court also addressed the *Fisher* and *LaBauve* cases. The Plaintiffs in *Sher*, just as the Plaintiffs here have taken the warnings set forth in these cases and have addressed each of issues that each case found to preclude class certification.

[14] This type of "statistical dueling" is evidenced by the differences between Dr. Jackson and Dr. Kilpatrick's opinions. While Plaintiffs have extensively documented Dr. Kilpatrick's modeling opinion in their initial Brief, showing that Dr. Kilpatrick has a viable model for assessing issues class wide, Dr. Jackson [has] not tried to develop such a model, *nor has anyone asked [him] to develop such a model* [and that] it would not be possible to develop any such a model…using regression analysis on a common class wide basis. [Jackson Deposition, p. 42, Exhibit C] *emphasis added.* The Jackson Deposition pages cited herein are attached hereto as exhibit C as a composite exhibit.

[15] "Though Metro-North's critique of the Class Plaintiffs' evidence may prove fatal at the merits stage, the Class Plaintiffs need not demonstrate at this stage that they will prevail on the merits. Accordingly, this sort of "statistical dueling" is not relevant to the certification determination." *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir. N.Y. 1999)

> qualifications, which would be inappropriate.
>
> At this stage of the litigation, therefore, an inquiry into the admissibility of Plaintiffs' proposed expert testimony as set forth in *Daubert* would be inappropriate, because such an analysis delves too far into the merits of Plaintiffs' case. See, e.g., *In re Polypropylene Carpet Antitrust Litig.*, 996 F.Supp. 18, 25-26 (N.D. Ga.1997) (agreeing that expert's analysis was subject to Daubert test to determine admissibility in court proceedings, but finding Daubert inquiry unnecessary at class certification stage).
>
> The Court has considered the opinions of Plaintiffs' experts, Dr. Bedient and Dr. Kilpatrick. The Court is cognizant of Defendant's well-documented objections to these opinions. However, Dr. Bedient's scholarly credentials are impeccable. Through the Property Map, Dr. Bedient established the geographic contours of the groundwater plume[16] and using peer-reviewed science and relevant data he defined a zone of impact and identified the scope of the class. **Dr. Kilpatrick's scholarly credentials are also sound. Dr. Kilpatrick provided Plaintiffs with a viable model for calculating property damages on a class-wide basis.** The Court finds therefore, that individual issues do not predominate. And, even if the Court found Defendant's arguments about the necessity for significant individualized inquiry regarding the proposed plaintiffs' damages, the rule of law in the Eleventh Circuit is that "the presence of individualized damages issues does not prevent a finding that the common issues in [a] case predominate." *Allapattah*, 333 F.3d at 1261.
>
> *Sher* at 670 emphasis added, footnote added. [17]

[16] Defendant attempts to distinguish *Sher* from this case because *Sher* involved a groundwater plume and this case involves air dispersion. First, Defendant's argument that the houses above the contaminated groundwater plume are more identifiable. This argument misses the point. The purpose of the definition is to identify the class in such a way so that the putative class members will know if they are included or excluded from the class. See Brief in Support of Plaintiffs' Motion for Class Certification, p. 34-37. Secondly, as discussed, *supra*, Dr. Paul's methodology has recently survived a *Daubert* challenge and Dr. Kilpatrick's methodology has been accepted as the basis for showing class wide issues and damages in Sher.

[17] See also: *Krueger v. New York Tel. Co.*, 163 F.R.D. 433, 440 (S.D.N.Y. 1995) It is inappropriate for the Court to determine the ultimate correctness of either parties' contentions [**17] in the context of class certification

Therefore, the *Sher* Court first noted that a *Daubert* inquiry and secondly found that Dr. Kilpatrick's damage model, the same model before the court in this case, was sufficient to certify the class.

## *THE METHODOLOGY USED BY DR. ROSENFELD IN A SIMILAR CASE HAS RECENTLY SURVIVED A* DAUBERT *CHALLENGE*

Recently Plaintiffs' expert, Dr. Rosenfeld, in a similar case[18], was faced with a Daubert Challenge. There, Weyerhaeuser contended that Dr. Rosenfeld's analysis was not admissible for the exact same reasons as Defendants in this case[19]. Weyerhaeuser's Brief in *Brazel* raised the same issues as did Defendants in this case: Dr. Rosenfeld's qualifications, WB p. 1, Dr. Rosenfeld did not use statistical methods in selecting the test houses, WB p. 2, that only 11 houses were tested, WB p. 4, that the sampling was inadequate and unreliable, WB p. 4, the sampling of attic dust was improper, WB p. 5, evaluating "indoor dust concentrations in relation to background concentrations for soils" was improper, WB, p. at 7 and 10. The court Denied Defendant's *Daubert* motion to exclude Dr. Rosenfeld's testimony.[20]

Therefore, of the Plaintiffs' two primary experts; Dr. Kilpatrick has had his model for determining damages on a class wide basis accepted and the other, Dr. Rosenfeld has had his methodology approved a being appropriate pursuant to *Daubert.*

---

[18] *Brasel v. Weyerhaeuser Company*, cv 07-4037, USDC, W. Dis. Ark. (Texarkana Division)

[19] Defendant's Reply to Plaintiffs' Response to Motion to Exclude Certain Opinions and Testimony of Plaintiff's Expert, Paul Rosenfeld, Ph.D, *Brazel*, September 8, 2010. (attached hereto as Exhibit E) (hereafter referred to as "WB")

[20] Minute Entry, September 9, 2010, *Brazel.* (attached hereto as Exhibit F)

## *EVEN IF THE COURT WERE TO EXAMINE DEFENDANT'S EXPERTS ANALYSIS OF PLAINTIFFS' EXPERTS, THE DEFENDANTS' EXPERTS ANALYSIS IS FLAWED TO THE POINT THAT PLAINTIFFS' EXPERTS WOULD NOT BE EXCLUDED.*

### Defendant's expert Dr. Shields

In an effort to undermine the significance of the dioxin levels found in the attics throughout Prattville, Dr. Shields suggested that a screening attic dust level of 750 ppt be implemented for comparison to the samples collected throughout Prattville (Shields Affidavit pg. 9). As a reference, Dr. Shields utilized the EPA 2005 study *Interior dust samples, Nitro, WV community center and schools.* However, Dr. Shields made several decisions in his selection of this study that compromise the scientific integrity of attempting to claim that 750 ppt is a suitable screening level for dioxins in indoor dust.

First, Dr. Shields failed to acknowledge the nature of the common knowledge of the industrial activity that had taken place in Nitro over the past several decades. Before selecting a single study to reference as an appropriate screening level justification, Dr. Shields should have conducted thorough research to determine the relevance of his proposed screening level to the houses in Prattville. Nitro, WV was the site of one of Monsanto's largest chemical plants from 1929-1995. Following World War II, the facility was utilized for pesticide production, which contained vast amounts of dioxins. In 1949, a failed pressure valve caused the emission of innumerable quantities of dioxin-containing chemicals to be spread across the community, causing considerable health dangers to the residents. Following the incident, Monsanto continued to produce Agent Orange through the 1960s, the process of which produced considerably more dioxins to

be emitted to the nearby region. Had Dr. Shields sufficiently studied the complex history of the city of Nitro, it would have been prudent to consider the extreme levels of contamination found throughout and to be skeptical of the more lax screening levels that may have been implemented to simplify the remediation process. A thorough evaluation of the development of screening levels in the state of West Virginia would have been more applicable, as the dioxin levels in Nitro are so obviously atypical of those expected throughout the nation. Dr. Shields' failure to responsibly investigate the formulation of screening levels demonstrates the flaws of his analysis with regards to dioxin remediation.

Dr. Shields did not discriminate between residential and commercial use in his considerations for establishing a dioxin dust cleanup level. In 2001 the state of West Virginia assigned residential and industrial soil screening levels of 4.1 and 370 ppt, respectively (*WV Voluntary Remediation and Redevelopment Act Guidance Manual)*. The WVDEP determined that the screening level for industrial soil should be 90 times that of residential soil. Considering that no-one lives in the Community Center of Nitro, the structure sampled from which Dr. Shields derives his proposed screening level, a more appropriate indoor dust screening level for **residences** in the community would have been 8.4 ppt, which is 1/90th the level deemed acceptable for the Community Center. The development of these screening levels was independent of any confounding or alternative motives, where desires to limit remediation efforts and costs at the Nitro site may have compromised the screening levels determined for indoor dust. However, because the Nitro risk assessment did not involve any residences, the method of scaling residential-to-industrial dioxin levels is necessary to accurately propose an indoor

residential dust screening level based on that study. As a self-proclaimed expert on dioxins and furans and their chemical fate and transport, Dr. Shields' ignoring the EPA's consideration of residential versus commercial building uses in screening level determination is a fatal flaw in his analysis. For his failure to take into account the residential nature of the structures sampled throughout Prattville, the opinions of Dr. Shields are not scientifically valid, and should be hereby excluded from further consideration.

In an attempt to further undermine the significance of the extremely elevated dioxin levels found in the attic dust samples from the Prattville residences, Dr. Shields defines an arbitrary and invalid background soil dioxin concentration of 47 ppt, based on the US EPA *Denver Front Range Study Part 1* (2001). However, an attempt to formulate an argument against Dr. Rosenfeld's comparison of dust dioxin levels to established EPA Residential Soil Regional Screening Levels, Dr. Shields compromises his scientific integrity by ignoring statistical components of the study he references. Observing Panel 6A on page 17 of the 2001 EPA report, he references the highest dioxin concentration found in residential buildings was 154.7 ppt TEQ. However, in the footnote below Panel 6B, the study notes: "Statistics exclude one data point from the commercial data set and one data point from the residential data set that are judged to be outliers." Presented in the second table are the data for all land uses excluding the outliers mentioned in the footnote. The new maximum concentration for the residential soil samples is 42.9 ppt TEQ. This value is less than one third of the previous maximum, and the exclusion of the outlier significantly decreases the standard deviation and mean of the residential samples. Dr. Shields claims that the background dioxin concentration for soil to be used for

comparison should be 47 ppt, which is beyond the range of all statistically relevant samples from the study he references.  His lack of attention to statistical procedures in assessing background dioxin levels renders his opinions baseless and they should be excluded.

On the following page of the Denver study, the EPA acknowledges that "it is important to remember that none of the 'residential' sampling locations are actually on private residential properties, but rather all are on governmental properties located in or near residential neighborhoods."  The paragraph goes on to explain that "because a full land use history is not available for most of these ['residential'] properties, it is possible that some of these governmental properties might have been used in the past for activities that tended to increase dioxin levels slightly." (*Id*., p. 18)  Not only did Dr. Shields ignore that these levels were not detected on actual private residential properties, he failed to acknowledge the potentially elevated levels due to government activity.  On top of choosing a background concentration that was higher than all sampled 'residential properties' excluding the one previously determined outlier, Dr. Shields performed insufficient research to produce a scientifically reliable proposal for a background soil dioxin level.  For these reasons, the definition of 47 ppt as dioxin background soil concentrations in residential settings is baseless and unfounded.  Dr. Shields should have taken these confounding factors into account when attempting to establish a background soil concentration for dioxins and his distorted use of this EPA study is unreliable.

Dr. Shields asserts in his Affidavit that "Dr. Rosenfeld assumes that the Prattville Mill is the predominant source of dioxins and furans in the proposed class are without

properly evaluating the contribution of the many other potential sources." (Shields Affidavit, p. 14) Dr. Rosenfeld successfully quantifies and models reported emissions coming from the IP Prattville facility that have been provided via the EPA TRI database, while Dr. Shields performs no assessment of either the mill or any other alternative sources that would be contributing to dioxin levels found throughout Prattville. In fact, Dr. Shields acknowledges that he has not evaluated the basis for the calculations that went into TRI self-reporting, nor has he made any effort in his Affidavit to quantify alternative dioxin sources. Ultimately, this makes his claim that other sources significantly contributed to the dioxin levels observed across the entire community unfounded.

As part of his argument, on pages 14-17 of his Affidavit, Dr. Shields lists his suggestions of potential dioxin sources throughout the community. However, at no point does Dr. Shields offer emissions factors or anything quantifiably valid that links any of the sources he proposes to the dioxin levels found in the attics of Prattville. The only statistical analysis that Dr. Shields provides regarding the source attribution of dioxins in the attic dust samples is his discussion of the dioxin-to-furan ratios, which he claims are a "useful indication of the similarities or dissimilarities between samples." (Shields Affidavit, p. 20) Considering the eleven attic dust samples throughout Prattville he opines that the variability observed, a range of 5.5-29.2, is sufficient to demonstrate the complex contribution from many sources, which he fails to positively identify. However, he provides no analysis of the mill's dioxin emissions with regards to dioxin and furan ratios, and further admits that "there often are subtle differences among the lower chlorinated congeners" from plant to plant. This variability from plant to plant within the

paper industry could also explain differences in dioxin-to-furan ratios due to slightly changing operations at a single facility, such as the IP Prattville mill. Additionally, Dr. Shields concedes that he has not evaluated whether or not variability in congener distribution or TEQ concentrations bears any significance toward comparing levels to "background" concentrations. Without a thorough evaluation of the typical congener distribution expected from emissions from a paper mill supplemented by supporting documents that would explain the additional sources Dr. Shields suggests but does not quantify his assertion of multiple source contribution is baseless. Furthermore, Dr. Shields could not perform a proper analysis. Because, as stated, *supra*, he asked for the materials but was not provided them.

**Defendant's expert Dr. Daugherty**

Dr. Daugherty does not apply reliable methodology to sufficient facts and data to conduct an analysis or model concentrations within the two-mile radius. Rather, Dr. Daugherty theorizes that "accounting for emissions and meteorological variations over specific years of interest *can* [Emphasis Added] also result in significant differences in estimated concentrations."[21] Dr. Daugherty also theorizes that "concentrations estimated by air dispersion modeling at any single location *can* [Emphasis Added] vary both hour to hour and year..."[22] Though Dr. Daugherty has not reliably applied scientific methodology to the facts of the case nor presented sufficient facts and data, Dr.

[21] Daughtery Affidavit, 8.

[22] *Id.*

Daugherty concludes on the basis of his theorizing, "therefore, individual Plaintiff locations and residency periods would have dissimilar airborne concentrations."[23]

Plaintiffs note that Dr. Daugherty's opinions and testimony regarding Dr. Rosenfeld's use of dispersion modeling software in the selection of the two-mile radius are irrelevant.  Dr. Daugherty claims that Dr. Rosenfeld's use of dispersion modeling software in the selection of the two-mile radius is not a "generally used scientific practice."[24]  First, this type of inquiry is inappropriate for the Class certification phase and even if it was, the Supreme Court has stated that "nothing in the text of this Rule [Federal Rule of Evidence 702] establishes 'general acceptance' as an absolute prerequisite to admissibility."  Additionally, the Supreme Court noted "that austere standard [i.e. general acceptance], absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials."

Dr. Daugherty does not assess whether additional sources have contributed to air quality impacts, but rather states in a general manner that "there are a variety of other sources that *can* [Emphasis Added] emit the same or similar compounds as those modeled by Dr. Rosenfeld and considered by Dr. Cheremisinoff in his corrosion opinion.[25]  Dr. Daugherty further theorizes in regard to these "alternative sources of emissions that *may have* [Emphasis Added] impacted properties within the 2-mile

---

[23] *Id.*

[24] *Id.* at 14.

[25] *Id.*

radius."[26] Dr. Daugherty has not presented sufficient facts and data to formulate opinions regarding contributing sources of air quality impacts. Dr. Daugherty has not applied reliable scientific methodology to formulate opinions regarding emissions from alternative sources; he has not reliably applied scientific methodology to the facts of the case; and he has not determined whether or not the alternative sources contribute to air quality impacts.

Furthermore, according to Dr. Daugherty, "appropriate scientific inquiry would require the assessment of whether sources other than the Prattville Mill have contributed to air quality impacts in the Prattville area." Dr. Daugherty conducts no such assessment, and thus by his own standard, it would seem that Dr. Daugherty's opinions and testimony in this matter should not be admitted under the guise of appropriate scientific inquiry.

Therefore Dr. Dougherty's assessment is not valid.

## THE MOTION FOR CLASS CERTIFICATION MEETS ALL REQUIREMENTS OF RULE 23(a)

### ***Plaintiffs' Claims Are Typical Of The Class And They Have Standing To Assert Claims On Their Behalf and Ms. Johnson's Intervention Cures Any Possible Defect.***

Defendants contend that Mr. Benefield is not a proper class representative because he does not own the property in question[27]. (Defendant's Brief p. 12-14).

---

[26] *Id.*

[27] Defendant contends that Mr. Benefield is not a proper class representative because he does not own the property in question. (Defendant's Brief p. 12-14). However,

However, Defendant has, at most, shown that the property was originally owned by Mr. Benefield's late wife and has not shown that Mr. Benefield is devoid of ownership interest in the property.  Since Mrs. Benefield's death, Defendant has presented no evidence if Mr. Benefield does not have any ownership interest in the property.  At best, Defendant has shown that Mr. Benefield is not entirely sure what his ownership interest may be.  As such, Defendant has not met its burden of showing that Mr. Benefield is not a proper class representative and the class should be certified with him as a class representative.  Then, if further evidence shows that Mr. Benefield is not a proper class representative, the proper procedure would be for the Court to petition the class for an appropriate class representative.

The claims of the Johnsons[28] are typical of those of the class and they have standing to assert claims as the class representative.  Defendants contend that Mr.

---

Defendant has, at most, shown that the property was originally owned by Mr. Benefield's late wife and has not shown that Mr. Benefield is devoid of ownership interest in the property.  Since Mrs. Benefield's death, Defendant has presented no evidence that Mr. Benefield does not have any ownership interest in the property.  At best, Defendant has shown that Mr. Benefield is not entirely sure what his ownership interest may be.  Furthermore, the proper procedure should be for International Paper to file a motion to dismiss Benefield's claim to conclusively establish whether he has standing.  As such, Defendant has not met its burden of showing that Mr. Benefield is not a proper class representative and the class should be certified with him as a class representative.  Then, if further evidence shows that Mr. Benefield is not a proper class representative, the proper procedure would be for the Court to petition the class for an appropriate class representative.

[28]     Defendant contends that Mr. Johnson is not adequate because he owes the property in question with his wife and that she is an indispensible party to his claim in this case.  Mrs. Johnson is currently a Plaintiff in Brantley-cv-230 asserting a property claim and a personal injury claim.  Attached hereto is Mrs. Johnson's Motion to dismiss her claim from the Brantley case, her Motion to Intervene in this case, and her Brief in

Johnson is not a proper class representative because he does not have sufficient knowledge of the lawsuit and that he owns the property with his wife. Mrs. Johnson is contemporaneously filing a Motion to Intervene to cure the property ownership issue. As to Mr. Johnson's knowledge of the lawsuit, more than a mere lack of details and legal theory is needed. *See* Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 3.34 (5th ed. 2010) and cases cited therein. As pointed out in *Newburg*, these type of challenges were generally settled by the Supreme Court derivative case of *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363 (U.S. 1966)

> The Court of Appeals in affirming the District Court's dismissal, however, indicated that whether Mrs. Surowitz and her counselors acted in good faith and whether the charges they made were truthful were irrelevant once Mrs. Surowitz demonstrated in her oral testimony that she knew nothing about the content of the suit. . . . We cannot construe Rule 23 or any other one of the Federal Rules as compelling courts to summarily dismiss, without any answer or argument at all, cases like this where grave charges of fraud are shown by the record to be based on reasonable beliefs growing out of careful investigation. The basic purpose of the Federal Rules is to administer justice through fair trials, not through summary dismissals as necessary as they may be on occasion. These rules were designed in large part to get away from some of the old procedural booby traps which common-law pleaders could set to prevent unsophisticated litigants from ever having their day in court. If rules of procedure work as they should in an honest and fair judicial system, they not only permit, but should as nearly as possible guarantee that bona fide complaints be carried to an adjudication on the merits. Rule 23 (b), like the other civil rules, was written to further, not defeat the ends of justice. The serious fraud charged here, [*374] which of course has not been proven, is clearly in that class of deceitful conduct which the federal securities laws were largely passed to prohibit and protect against. *Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 374 (U.S. 1966)

---

Support of Motion to Intervene. [Exhibits H, I, and J respectively] Mrs. Johnson is willing to do so to assure that the class has proper class representation and is properly certified. The issues as to the appropriateness of intervention at this time and its ability to cure defects are addressed in Mrs. Johnson's Motion to Intervene.

*Newburg* continued by saying:

> Finally, the amendments to the Federal Rules of Civil Procedure calling for increased mandatory involvement of the court in pretrial matters, increased obligations of counsel who sign documents filed in court, and sharp curtailment of control of discovery pertaining directly to the merits of the issues in litigating, should reinforce this judicial direction to curb any potential dilatory or abusive tactics that are possible with such challenges.
> Some courts have upheld such challenges, usually when they are supported by a combination of other negative factors or circumstance. *Newburg*, 3.34, p. 469 [and examples of such conduct with citations, pp. 469 – 495: plaintiff who spoke only Yiddish, Plaintiff as father of class counsel, Plaintiff refusal to attend a hearing, criminal convictions for theft, prior fraudulent conduct, likelihood of present false testimony, giving false testimony.]

Therefore, the Johnsons, especially coupled with the intervention of Mrs. Johnson, should not be disqualified as class representatives.

However, if the Court were to determine that the Johnsons were not proper class representatives, then the proper remedy is for the court to dismiss the case, without addressing the merits of the class.

## *IF THE COURT WERE TO FIND THAT THE PROPOSED CLASS REPRESNETATIVES ARE INADEQUATE, THEN THE COURT'S INQUIRY MUST STOP AND THE COURT CAN NOT CONSIDER THE MERITS OF CLASS CERTIFICATION.*

As stated herein, Mrs. Johnson wishes to dismiss her claim in Benefield and wishes to intervene in this case to cure any possible or alledged defects in the Johnson's claim. However if the court finds that the Johnsons are not appropriate class representatives, then the court's inquiry must stop and the Johnson's claims must be dismissed and the court is without jurisdiction to decide if class certification is proper.

Inclusion of class action allegations in a complaint does not relieve a plaintiff of himself meeting the requirements for constitutional standing, even if the persons described in the class definition would have standing themselves to sue. If the plaintiff has no standing individually, no case or controversy arises. This constitutional threshold must be met before any consideration of the typicality of claims or commonality of issues required for procedural reasons by Fed. R. Civ. P. 23.

As we have seen, named plaintiffs were not involved with or excluded from any program or activity for which MIB received federal financial assistance for purposes of section 504. They are not members of some potential class of people who were excluded from participation in, denied the benefits of, or otherwise subjected to discrimination under programs or activities covered by section 504. Thus, in alleging discrimination under section 504, named plaintiffs are attempting to represent a class of which they are not members. A person simply cannot represent a class of which he is not a member. Chief Justice Burger has analyzed the situation in the following terms: (A) named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs; it bears repeating that a person cannot predicate standing on injury which he does not share. Standing cannot be acquired through the back door of a class action. *Allee v. Medrano*, 416 U.S. 802, 828-29, 94 S. Ct. 2191, 2206-07, 40 L. Ed. 2d 566 (1974) (Burger, C. J., concurring).  In a single-claim action, because individual standing requirements constitute a threshold inquiry, the proper procedure when the class plaintiff lacks individual standing is to dismiss the complaint, not to deny the class for inadequate representation or to allow other class representatives to step forward. This dismissal should take place before class certification issues are ever reached. See 1 Newberg on Class Actions § 1080, at 138 (1977). At that stage of the proceedings, no preclusive effects attach so as to bar a subsequent action by other class members who themselves have standing to represent the putative class of discriminatees. Here, however, where three distinct claims were asserted in the same cause of action, whether the district court should have dismissed any claims that named plaintiffs had no standing to bring or for which there existed no private cause of action, or whether instead the court should have entertained an amended complaint setting up separate subsets of the proposed class, is a closer question and one we need not decide here.

In the present posture of this case, we elect to vacate so much of the judgment below as rules adversely to named plaintiffs and the certified class on the merits of the section 504 claims and remand that portion of the case to the district court with instructions to dismiss. If visually impaired persons other than these named plaintiffs have suffered

> impermissible discrimination in some program or activity with respect to which MIB was the recipient of federal financial assistance within the meaning of section 504, they are not precluded from asserting any claims they may have under that section.
>
> *Brown v. Sibley*, 650 F.2d 760, 771-772 (5th Cir. Miss. 1981) citations, footnotes and quotation marks omitted (decided July 16, 1981) (Fifth Circuit cases decided before October 1, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. Ala. 1981)

See also, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2.9 (5th ed. 2010).

Therefore, if the Johnsons are found to be inadequate class representatives, then the Court's inquiry must stop and the case must be dismissed.

**The approximately 1500 class members easily meets Rule 23's numerosity requirement**

IP makes a cursory argument that the Plaintiffs have failed to meet the numerosity requirement of Rule 23. Given that the putative class is estimated to include over 1500 members, however, this objection is meritless on its face. The *Brantley* personal injury action, which includes approximately 330 plaintiffs seeking property damage and/or personal injury, does not change these results. The reasons for filing the *Brantley* case are irrelevant. Whether Brantley proceeds as individual cases is irrelevant upon the determination of if the 1500 Plaintiffs in this case meet the numerosity requirement.

In any event, the 1500 member instant putative class action has nearly five times as many plaintiffs as the approximately 330 member mass action. Arguing that a class action is not a superior vehicle for a 1500 plaintiff lawsuit solely because a 330 member

action is being litigated is nonsensical on its face. The numbers are simply not comparable.

Nor may certification be denied on numerosity grounds because the class is not defined in part by its exclusions. While it is true that the Plaintiffs are not able at this time to count the precise number of property owners in the class area that suffer from Facility-caused personal injuries, or are employees of IP, the class action notice will notify these landowners that they are not eligible for the class and will advise all landowners who fall into either exclusion to opt out of the class. In the very unlikely event that the class is reduced below Rule 23's minimum numerosity requirement by landowners who have suffered personal injury and/or are IP employees, the Court can revisit the class certification at that time.

## ***THE MOTION FOR CLASS CERTIFICATION MEETS ALL REQUIREMENTS OF RULE 23(b)(3)***

### **Questions of law or fact common to class members predominate over any questions affecting only individual members**

As foregoing discussion demonstrates, all of the requirements of Rule 23(a) have been met and the Court in order to certify the class need only find that "the questions of law or fact common to class members predominate over any questions affecting only individual members…." *Fed. R. Civ. Pro.* 23(b)(1)(3). As the Eleventh Circuit has explained:

> Under Rule 23(b)(3), "[i]t is not necessary that all questions of fact or law be common, but only that some questions are common and that they predominate over individual questions." …In determining whether class or

> individual issues predominate in a putative class action suit, we must take into account "the claims, defenses, relevant facts, and applicable substantive law,"…, to assess the degree to which resolution of the classwide issues will further each individual class member's claim against the defendant….
>
> "Whether an issue predominates can only be determined after considering what value the resolution of the class-wide issue will have in each class member's underlying cause of action." …Common issues of fact and law predominate if they "ha[ve] a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief." …Where, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3).

*Klay v. Humana, Inc*., 382 F.3d 1241, 1254-55 (11th Cir. 2004). Accordingly, the first key inquiry here is whether common issues have a direct impact on each class member's effort to establish liability and entitlement to damages. Once this inquiry has been made, the focus turns to whether the Plaintiffs must still present a great deal of individual proof, or argue individual legal points, to establish *most or all of the elements of their legal claims.*

As pointed out in the Motion for Class Certification, Rule 23 (b)(3)'s predominance standard is easily met because the Plaintiffs have alleged four torts and all of the elements of these torts may be proven by class wide proof.[29] IP apparently

[29] In addition to the foregoing common issues of fact, class wide issues will solely determine the Plaintiffs' ability to recover punitive damages. Under *Ala. Code* § 6-11-20, a substantial part of the case will involve proof applicable to the entire class as to whether the Defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice in causing the pollution to be deposited in the Class Area. Obviously, it is preferable to resolve the punitive damages issue in one class action rather than 1500 individual actions.

concedes this point with two exceptions – IP insists that causation and damages must be proven by individual proof. In addition, IP contends that individual proof is necessary to establish its statute of limitations defense to all claims. As will be seen, however, IP is simply wrong that individual proof will be required for these issues.

### 1. Causation

IP disputes the opinions of the Plaintiffs' experts that the property in the class area has been uniformly contaminated by IP. According to IP, the experts used an improper methodology. IP also challenges some of the assumptions the experts made in reaching their conclusions. Most notably, IP disputes the experts' assumption that this is a single source contamination case.[30] IP claims there are multiple sources of contamination other than IP, and that the amount of contamination varies so greatly that an individual assessment of the contamination level of each property must be made.

As discussed *infra*, however, IP's complaints about the experts primarily arise from a misunderstanding of the experts' testimony or IP's focus on parts of their testimony out of context. But the Court need not - *and in fact may not* - resolve these issues at the class certification stage. The Eleventh Circuit has emphasized that “"[i]n assessing whether to certify a class, **the Court's inquiry is limited to whether or not the proposed methods… [for class wide proof] are so insubstantial as to amount to**

[30] The absurdity of IP's argument that it is not a single source emitter involves one closed facility that “may” have emitted dioxins and fireplaces and the yard burning of trash. IP contends that these sources, compared to IP's releasing of 1,869 tons of critical pollutants a year, makes it a non-industrial single source emitter. See Cheremisinoff Depo. pp. 224-225.

**no method at all. . . . [Plaintiffs] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis."** *Klay v. Humana, Inc.*, 382 F.3d 1241, 56-60 (11th Cir. 2004) *quoting in part In re Terazosin Hydrochloride Antitrust Litig*., 220 F.R.D. 672, 698 (S.D.Fla. 2004). See also *Helms v. Consumerinfo.Com, Inc.*, 236 F.R.D. 561 (N.D.Ala. 2005)(recognizing this standard).

The Plaintiffs' contamination experts used an established scientific methodology of sample attic testing and air emission modeling in the Class Area to conclude that the property in the Class Area has been uniformly contaminated by the emissions from the Facility. No credible argument can be made that this approach was "so insubstantial as to amount to no method at all." As a matter of law, **that ends the inquiry** as to the opinions of the Plaintiffs' experts on causation. If the methodology they used is so unreliable as to render their opinions inadmissible, IP's remedy *after certification* is to file a *Daubert* motion under Rule 702, and then file a motion to decertify the class if the expert's testimony is needed for certification. If the methodology passes muster under Rule 702 but the experts made incorrect assumptions that would change their conclusions, IP's remedy is to point out these mistakes to the jury on cross-examination and present its own experts to prove otherwise. But IP cannot challenge their methodology and assumptions in opposing the Motion for Class Certification.

The defendant in *In re Terazosin* similarly attempted to defeat class certification by challenging the methodology employed by the plaintiffs' expert and the assumptions on which his calculations were based. The United States District Court for the Southern

District of Florida properly rejected these objections as being insufficient to defeat class certification:

> While Defendants complain that Dr. Hartman's methodologies are too imprecise for class certification, and further object to many of the underlying assumptions upon which his calculations are based, such contentions cannot defeat class certification. As noted above, for class certification purposes, plaintiffs need not supply a precise damage formula and the Court need not decide which approach is best-suited to the particularities of this case. "It is sufficient to note at this stage that there are methodologies available, and that Rule 23(c)(1) and (d) allow ample flexibility" to deal with the individual damages issues that may develop.

*In re Terazosin Hydrochloride Antitrust Litig.,* 220 F.R.D. 672, 698 (S.D.Fla. 2004).

The same result should follow in this case. Nonetheless, the Plaintiffs have shown supra that IP's various objections to the experts' opinions are meritless.

### 2. Statute of limitations

### CERCLA FRCD REQUIRES CLASS WIDE PROOF

IP's argument that its statute of limitations defense will require individualized assessments for each class member is meritless. As pointed out in the Plaintiffs' Motion for Class Certification, the discovery rule set forth in CERCLA, 42 *U.S.C.* § 9658 – viz., the "federally required commencement date," or FRCD as it is commonly called governs the accrual date of each cause of action asserted. The FRCD effectively provides that, if state law provides a shorter time, a plaintiff's cause of action accrues on "the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by

the hazardous substance or pollutant or contaminant concerned." 42 *U.S.C.* § 9658(b)(4)(A).

Assuming arguendo that the state statutes of limitations have not been tolled by the continuous tort rule, class wide proof can be used to set the FRCD applicable to the class. IP has presented no evidence that any class member actually knew of a claim against IP so as to be barred by the applicable limitations period and continues to deny that emissions from the Facility have contaminated the surrounding land. Thus, any statute of limitations defense will turn solely on constructive notice.

IP has not presented any evidence that the class members should have been on inquiry notice of their claims. There has been virtually no publicity of the contamination outside of the limitations periods. Moreover, Dr. Cheremisinoff has explained in his affidavit that IP grossly underreported its emissions in violation of the Community Right to Know Act. Hence, if any class member had even suspected that Facility emissions were contaminating his property and had checked the public register, the class member would have been under the impression that the Facility was in compliance with all applicable standards. Indeed, the EPA website to this very day states that the Prattville Facility is in compliance with federal standards. Class wide proof thus can be used to show that class members also did not have constructive notice of any claim outside of the limitations periods.

In contending that the CERCLA FRCD requires individual inquiry that would defeat class certification, IP relies on *Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273 (S.D. Ala. 2006) , *O'Connor v. Boeing N. Am., Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000)

*rev'd in part and aff'd in part*, 311 F.3d 1139 (9th Cir. 2002), *Corley v. Entergy Corp.*, 220 F.R.D. 478 (E.D. Tex. 2004) and *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D. Ala. 2005)31 . However, each case is distinguishable since each case shows the amount of publicity and community activity needed to place a plaintiff on inquiry notice.

*Fisher* involved Ciba's McIntosh Facility disposal of DDT and BHC which had not been produced since 1965 and 1954 respectively. The Court denied a motion for class certification for a number of reasons including the court's determination that it would have to "set a separate FRCD for each plaintiff." 238 F.R.D. at 311. This ruling was predicated on unchallenged evidence that the court deemed could have given each class member notice of his claim. Specifically, the court noted that "Defendants' unchallenged evidence is that extensive publicity attended the Ciba facility's designation as a Superfund site in 1983, and that certain community organizations in McIntosh launched concerted efforts, amidst media fanfare, to obtain redress from Ciba for alleged contamination to their properties in the mid-1990s." *Id*. at 310-11. The court further explained that "Ciba contamination received considerable media attention from the 1960s forward, and particularly after the site was declared a Superfund site in 1983. Residents who read those news accounts and noticed symptoms of contamination on their own land may have had objectively reasonably grounds for believing that their properties were contaminated." *Id.* at 311.

---

[31] These are the primary cases relied on by IP and the cases string cited in footnotes 33 and 34.

In this case, of course, the Facility has not been designated a Superfund site, there has been no "extensive publicity that it has contaminated surrounding land, and community organizations did not attempt to obtain redress from IP in highly publicized efforts." Hence, there is no factual basis to conclude that individual FRCDs must be set for each class member.

Defendant's reliance on *O'Connor*, 197 F.R.D. 404 (C.D Cal. 2000)  is equally misplaced.  Because in a prior "summary judgment order, the Court found that the Class II and III representatives had not properly pled the 'discovery' rule.  *Id*. at 411 (citing *O'Connor SJM*, 92 F. Supp. 2d at 1053).  The court had previously found "that CERCLA discovery rule does not preempt the California discovery rule." *O'Connor v. Boeing North Am., Inc.*, 92 F. Supp. 2d 1026, 1036 (C.D. Cal. 2000)  Lastly, the court noted that Summary Judgment had been granted as to several Plaintiffs on the statute of limitations issue, and, therefore, the Plaintiff's assertion, an assertion the court previously relied on in certifying the class, that the class as a whole could not have know of Defendants actions prior to a 1997 UCLA about Defendant's conduct.

What is more important than the *O'Connor*, 197 F.R.D. 404 (C.D. Cal. 2000) case cited by Defendants is *O'Connor v. Boeing North Am., Inc.*, 92 F. Supp. 2d 1026 (C.D. Cal. 2000), wherein the Court examined the knowledge before the public that put Plaintiffs on inquiry notice.  The discussion of the publicity of the defendant's conduct encompasses 4 pages, pages 1031 – 35 and includes publicity, DOE reports, and "[a] petition signed by 650 persons… filed with the United States Nuclear Regulatory Commission  in opposition to the renewal of Rocketdyne's license." *Id.* at 1032. In

addition, the court found that a task force included representatives from federal, state, and local agencies whose findings were reported in the media and that over 1,000 news articles on the matter had been published.  Finally, the court noted that "[s]ince 1989, Rocketdyne has sponsored dozens of public meetings with interested citizens, community groups, legislative representatives, regulators, and news reporters in an effort to respond to the concerns about the health and safety impacts of the Rocketdyne facilities…. Rocketdyne and the EPA also maintain a mailing list of persons interested in issues of potential contamination from Rocketdyne facilities. These persons are provided with periodic reports concerning environmental issues at the facilities." *Id.* at 1038, nt. 18. Thus, the publicity in this case was so extensive that it is not surprising that the court concluded individual proof would be required to test the statute of limitations defense.

*Corley* was a easement case involving cables that had been run over Plaintiff's land and involved claims for "conversion, breach of contract, civil conspiracy, and unjust enrichment under Louisiana, Mississippi, and Texas law"  *Corley v. Entergy Corp.*, 220 F.R.D. 478, 481 (E.D. Tex. 2004)  This case clearly has no bearing on Plantiff's CERCLA FRCD argument.

*LaBauve* involved mercury contamination that happened from 1952 through 1982. In addressing the CERCLA FRCD, the court noted that "the critical legal inquiry for purposes of establishing when the limitations period began to run for plaintiff Pressley is when she "reasonably should have known" that her property had been damaged by industrial contamination from the Olin site. Defendants have developed considerable evidence on this point."   231 F.R.D. at 654.  The crux of the plaintiff's argument in

*LaBauve* was that the FRCD did not begin to run because the defendant had denied that it had contaminated the plaintiff's property. In doing so, the court noted that "plaintiffs maintain that defendants should be barred from invoking the statute of limitations because they have denied and continue to deny liability. If this were the test for equitable estoppel, then few plaintiffs would ever be subject to meaningful limitations constraints, as it is the rare defendant who does not deny wrongdoing prior to and during class action litigation, especially where millions of dollars may be at stake." *Id*.

In this case, IP did not merely deny liability but actively concealed the amount of exposure by lying to the Prattville community through misrepresentations made through the Community Right to Know Act. A defendant cannot lie about its amount of pollutions and then say, "but wait, you cannot bring your lawsuit because you should have learned about our conduct despite our lying to you." What makes IP's argument even more curious is its references on pages 52 – 3 of its brief wherein IP discusses two of the named Plaintiff's deposition testimony that amounts to Plaintiffs admitting that the mill emitted noxious odors, acid smelling rain and that Mr. Benefield had been told that "substances were coming from the IP Prattville Mill." Defendant Brief, p. 53. This is hardly the level of personal knowledge needed to invoke a statute of limitation defense much less "a strong statute of limitations defense." *Id.*

Any such inquiry, by any Plaintiff or any class member, would have involved going beyond what IP told the community and would have involved a detailed scientific study to see that IP was putting out tons of Dixons that it was lying about. Mere suspicion is not enough. *O'Connor v. Boeing N. Am.*, 311 F.3d 1139 (9th Cir. Cal. 2002).

"[A] plaintiff will be charged with knowledge of facts that he would have discovered through inquiry." *Id.* at 1150. In this case, an inquiry would only have lead class members to Defendant's lies pursuant to the Community Right to Know Act. Defendant does not deny that they lied to the Prattville Community when they repeated contamination pursuant to the Community Right to Know Act, contending that this basis for Plaintiffs' CERCLA FRCD in "Merits Related" and even though Dr. Shields specifically asked for this information and it was not provided. This is particularly true when the inquiry is a detailed scientific inquiry. See *Maughan v. Sw Servicing*, 758 F.2d 1381, 1385 (10th Cir. Utah 1985) (justifying application of the discovery rule "because of the complexity of the scientific data concerning causation of cancer, the disparity of knowledge between plaintiffs and potential defendants, and the often long latency period of the disease"). Thus class wide proof will decide the statute of limitations defense raised by IP.

**Continuing Tort Theory Also Provides For Class Wide Proof**

If the Court does not find that CERCLA FRCD is a class wide issue, then in the alternative, continuing tort also provides class wide proof as to the statute of limitations issue.

In addition, IP completely ignores five other class wide issues the Court must decide before it can be determined if any class member's claims are time-barred. First, the Plaintiffs contend that IP is engaged in a "continuing tort" and that, as a result, the statute of limitations is tolled until the date of the last injury. *AC, Inc. v. Baker*, 622 So.2d 331 (Ala. 1993)("this Court has… recognized, in certain situations, a 'continuing tort'

doctrine that operates to toll the running of the limitations period in tort cases until the date that the last injury occurred”). See *Evans v. Walter Industries, Inc*. 579 F. Supp.2d 1349 (N.D.Ala. 9-23-2008)(finding no continuing trespass where unremediated emissions settled and remained on plaintiff’s property); *LaBauve v. Olin Corp*., 231 F.R.D. 632, 656 (S.D.Ala. 2005)(continued presence and passive migration of contaminants did not constitute a continuing trespass). In the instant case, of course, the Plaintiffs’ experts will testify that IP is *knowingly, intentionally*, and *actively* emitting tons of contaminants from the Facility *on a daily basis* that settle and remain on the class members’ property. The Plaintiffs will argue that the Alabama Supreme Court would treat these *knowing, intentional,* and *active* emissions as a continuing tort that tolls the statute of limitations until the emissions cease. Whatever the Court’s resolution of this issue, it is undisputed that class wide proof will be needed to prove the character of the emissions and IP’s intentional and knowing conduct, and the Court will have to decide a class wide legal issue.

Second, there is a class wide legal issue as to the scope of the damages the Plaintiffs may recover even under a continuing tort theory. The Plaintiffs contend that the Alabama Supreme Court would apply a pure version of the continuing tort theory for these *knowing, intentional,* and *active* emissions and that this would entitle them to recover all damages and not merely those sustained during the applicable limitations period. See *White v. Mercury Marine, Division of Brunswick, Inc*., 129 F.3d 1428, 1430 (11th Cir.1997)(applying Georgia law)(“ [u]nder the pure version of the continuing tort theory, a cause of action for any of the damages a plaintiff has suffered does not `accrue' until the defendant's tortious conduct ceases. …Under the pure continuing tort theory, a

plaintiff may recover for all the harm he has suffered, not just that suffered during the limitations period").

### 3. Damages

IP insists that an individualized assessment of each class member's damages must be made by traditional real estate and personal property appraisal methods. IP contends that the Court should reject the mass appraisal methodology offered by Dr. Kilpatrick.

As previously explained, however, the Court cannot make such a drastic ruling as the class certification stage. Again, ""[i]n assessing whether to certify a class, the Court's inquiry is limited to whether or not the proposed methods… [for class wide proof] are so insubstantial as to amount to no method at all. . . . [Plaintiffs] need only come forward with plausible statistical or economic methodologies to demonstrate impact on a class-wide basis." *Klay v. Humana, Inc.*, 382 F.3d 1241, 56-60 (11th Cir. 2004). Dr. Kilpatrick's methodology is the state of the art in mass tort damages appraisal, and not only is a reliable method, it is the most reliable method. The method not only has been peer reviewed but has already been accepted by several courts.

Given this showing, the Court at this stage must accept that the methodology is at least a plausible one and may not deny the Motion for Class Certification on this basis. Again, IP's remedy is to attempt to exclude Dr. Kilpatrick's opinion under Rule 702 and if successful to ask the Court at that time to revisit the certification of the class.

Nonetheless, the Plaintiffs respectfully submit that IP's various objections to Dr. Kilpatrick's mass appraisal methodology are meritless. First, as stated *supra*,

Defendant's arguments are all *Daubert* type arguments and not appropriate for class certification. Secondly, Dr. Kilpatrick's model, methodology and damage calculation has already been accepted by one court as proper for class certification. Third, Defendant's argument that other cases involving class certification have focused on water and not airborne contamination is without merit. The issue is that the Plaintiffs have shown uniform contamination by a single industrial source that has shown a diminution in property values. Plaintiff has done so in this case. Furthermore, as Plaintiffs pointed out in their initial brief, page 16, damages in Alabama do not need to be shown through mathematical certainty rather, the jury is allowed to consider evidence of damages as a matter of a reasonable inference and/or estimations just so long as it does not amount to speculation. Dr. Kilpatrick's model more than adequately meets the requirement for damage calculations that can be submitted to a jury in Alabama. The issue is not if Dr. Kilpatrick has performed a full damages calculation at this time, but has he put forth a viable model to do so on a class wide basis? According to the court in *Sher* the answer is yes.

But even assuming, *arguendo*, that an individualized assessment of each class member's damages must be made, the Eleventh Circuit has recognized that the presence of individualized damages issues does not foreclose a finding that common issues predominate:

> The defendants point out that individualized determinations are necessary to determine the extent of damages allegedly suffered by each plaintiff. While this is undoubtedly true, it is insufficient to defeat class certification under Rule 23(b)(3). "[N]umerous courts have recognized that the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate."Allapattah Servs. v. Exxon

> Corp., 333 F.3d 1248, 1261 (11th Cir. 2003), reh'g en banc denied, 362 F.3d 739 (11th Cir. 2004); see, e.g., In re Tri-State Crematory Litig., 215 F.R.D. 660, 692 n. 20 (N.D.Ga. 2003) ("The requirement of determination of damages on an individual basis does not foreclose a finding of predominance or defeat certification of the class.").

*Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004). Indeed, the Eleventh Circuit has emphasized that it is primarily where there are significant individualized questions going *to liability* that individualized assessments of damages may preclude certification. Only in rare cases where the calculation of individualized damages is so complex as to be "intolerable" should certification be denied in a common liability issues case:

> Particularly where damages can be computed according to some formula, statistical analysis, …or other easy or essentially mechanical methods,… the fact that damages must be calculated on an individual basis is no impediment to class certification.
>
> It is primarily when there are significant individualized questions going to liability that the need for individualized assessments of damages is enough to preclude 23(b)(3) certification. ….
>
> ….Of course, there are also extreme cases in which computation of each individual's damages will be so complex, fact-specific, and difficult that the burden on the court system would be simply intolerable, see, e.g., *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) ("The district court estimated — conservatively, we think — that in the absence of a practical damage formula, determination of individual damages in this case could consume ten years of its time. The propriety of placing such a burden on already strained judicial resources seems unjustified."), but we emphasize that such cases rarely, if ever, come along.

*Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004)(footnotes deleted).

In this case, the liability issues are exclusively subject to class wide proof and class wide legal issues. Moreover, Dr. Kilpatrick has put forth a damage model that will allow the diminution in value of each class member's property to be proven on a class wide basis. Thereby, negating the need for individual damage determinations. Class members claiming damage to personal property would be required to list that property

and make it available for appraisal by the appraisers. The entire process could be completed in a matter of weeks –not the ten year scenario in *Windham v. Am. Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1977) which the Eleventh Circuit used as an example of the type of rare case where certification should be denied.

As the foregoing discussion demonstrates, no credible argument can be made that individual issues predominate over class issues. The proof need to establish the elements of all four torts and the proof needed to recover punitive damages will not vary among class members with the sole possible exception of damages for personal property. The Court accordingly should find that “the questions of law or fact common to class members predominate over any questions affecting only individual members” and reject IP’s challenge to the *Motion for Class Certification* on this basis.

***A CLASS ACTION IS CLEARLY THE SUPERIOR MECHANISM FOR DECIDING THE ALLEGED CLAIMS AND FOR ALL PRACTICAL PURPOSES IS THE ONLY AVAILABLE MECHANISM FOR DOING SO***

IP concludes its opposition with a half-hearted argument that a class action is not the superior mechanism for deciding the Plaintiffs’ claims. IP primarily complains because approximately 332 persons living near the Facility who have suffered personal injury as a result of the emissions have filed a separate civil action - viz., *Brantley et al., v. International Paper,* 2:09-cv-230-WHA-TFM (U.S.D.C. Ala). IP reasons that the mere existence of this lawsuit somehow establishes that individual lawsuits, or perhaps mass actions, are the superior mechanism for litigating the instant claims.

In making this argument, of course, IP simply ignores that there are 1500 members of the class alleged in the Third Amended Complaint. Thus, the instant case involves nearly five times as many plaintiffs as *Brantley*. Further, the mere decision by the *Brantley* attorneys to file that lawsuit as a mass action does not mean that the mass action is superior mechanism for litigating property damage claims. The reasons for filing the *Brantley* case are irrelevant. To the extent that the *Brantley* plaintiffs own real property in the class action, they also seek to recover for damage to their real property because of the rules against splitting claims as well the res judicata consequences of filing separate actions for personal injury and property damage.

IP thus has utterly failed to show the *Motion for Class Certification* should be denied because of the *Brantley* lawsuit or for any other reason.[32]

[32] IP also claims that the purported indefinite class definition also is evidence that a class action is not a superior mechanism for this case. But since this objection is meritless for the reason explained in Part I of this Reply, this objection should be disregarded for purposes of the superiority inquiry.

**CONCLUSION**

Plaintiffs herein have proven numerosity, commonality, typicality, and superiority to the extent required by Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs have done so by expert testimony showing that all properties in the class area are uniformly contaminated by a single industrial source, especially considering that any Daubert inquiry at this stage is inappropriate. Furthermore, as to any deficiencies as to the named class representatives that the defendants contend render them improper; (1) Defendants have not carried their burden to prove that Mr. Benefield is not a proper class representative, and (2) to the extent Defendant has challenged Mr. Johnson, those challenges have been cured by Mrs. Johnson's intervention.

Wherefore, Plaintiffs request that the class be certified as set forth in Plaintiffs' initial *Motion for Class Certification*, as amended.

For the reasons stated, the Plaintiffs renew their request that the *Motion for Class Certification* be granted.

Date: September 20th, 2010

*/s/ Gregory A. Cade*________
Gregory A. Cade (CADE 010)
Kevin B. McKie (MCK061)
H. Gregory Harp (HAR 299)
Mark L. Rowe (ROW 003)
Christina E. Wall (WAL 203)
ENVIRONMENTAL LITIGATION GROUP, P.C.
3529 Seventh Avenue South
Birmingham, Alabama 35222
Telephone: (205) 328-9200
Facsimile: (205) 328-9456
Email: kmckie@elglaw.com
gharp@elglaw.com
gregc@elglaw.com
mrowe@elglaw.com
cwall@elglaw.com

J. Edward Bell, III
J. Ryan Heiskell
Bell Legal Group
232 King Street
PO Box 2590
Georgetown, SC 29442
ebell@edbelllaw.com
rheiskell@edbelllaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of September, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Daniel W. Nelson
Email: dnelson@gibsondunn.com
Jessica Greenston
Email: jgreenston@gibsondunn.com
Patrick W. Dennis
Email: pdennis@gibsondunn.com
Charles H. Haake
Email: chaake@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 887-3687

Tabor R. Novak, Jr. (NOV001)
Email: tnovak@ball-ball.com
Allison A. Ingram (ALF005)
Email: ala@ball-ball.com
Ball, Ball, Matthew & Novak, P.A.
2000 Interstate Park
Suite 204
P.O. Box 2148
Montgomery, AL 36102-2148
Telephone: (334) 387-7680

Casey Lampkin Butts
Email: ButtsCV@fpwk.com
Walter G. Watkins, III
Email: trey@fpwk.com
Walter Garner Watkins, Jr.
Email: wwatkins@fpwk.com
Forman Perry Watkins Krutz & Tardy, LLP.
200 South Lamar Street
City Centre Building, Suite 100
Jackson, MS 39201-4009
Telephone: (601) 960-8600

*/s/ Gregory A. Cade*
Gregory A. Cade